# EXHIBIT A

1  BRAD A. MOKRI, SBN: 208213
   LAW OFFICES OF MOKRI & ASSOCIATES
2  1851 E. First Street, Suite 900
   Santa Ana, California 92705
3  Telephone No.: (714) 619-9395
   Facsimile No.: (888) 342-1406
4
   Attorney for Plaintiff,
5  BUY INSTA SLIM, INC.

6

7

8              **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

10

11  BUY INSTA SLIM, INC., a California       ) Case No.: 8:18-cv-00011 AG (KESx)
12  Corporation,                             )
                                             ) **SECOND AMENDED COMPLAINT**
13                                           )   **FOR DAMAGES FOR:**
                                             )
14            Plaintiff,                     ) **1.BREACH OF WRITTEN**
                                             )   **CONTRACT**[Stayed as to FAITH]
15                                           ) **2.BREACH OF THE IMPLIED**
        vs.                                  )   **COVENANT OF GOOD FAITH**
16                                           )   **AND FAIR DEALING** [Stayed as
                                             )   to FAITH]
17                                           ) **3.BREACH OF FIDUCIARY DUTY**
                                             )   [Stayed as to FAITH]
18  FAITH BUSINESS MANAGEMENT               ) **4.BREACH OF WRITTEN**
    COMPANY, INC., a Corporation doing       )   **CONTRACT;**
19  business as NATIONAL DIRECT              ) **5.NEGLIGENT**
                                             )   **MISREPRESENTATION**
20  SALES & MARKETING; WAL-                 )   **OF MATERIAL FACTS** [Stayed as
    MART STORES, INC.,                       )   to FAITH]
21  a Corporation doing business as WAL-     ) **6. CONSTRUCTIVE FRAUD**[Stayed
    MART; and DOES 1 through 30,             )   As TO FAITH]
22                                           ) **7. INTENTIONAL**
    inclusive,                               )   **INTERFERENCE WITH**
23                                           )   **CONTRACT** [Stayed as to FAITH]
              Defendants.                    ) **8. INTENTIONAL**
24                                           )   **INTERFERENCE WITH**
                                             )   **ECONOMIC ADVANTAGE**
25                                           )   [Stayed as to FAITH]
                                             ) **9. MONEY HAD AND RECEIVED**
26                                           )   [Stayed as to FAITH]
                                             ) **10. OPEN BOOK ACCOUNT**
27                                           ) **11. ACCOUNT STATED**
                                             ) **12. COMMON COUNT-GOODS**
28                                           )   **SOLD AND DELIVERED**
                                             )

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
1

**EXHIBIT A**                    **PAGE 001**

) *[DEMAND FOR JURY TRIAL]*
) **Action Filed: December 5, 2017**
) **Trial Date:   April 9, 2019**
)

COMES NOW PLAINTIFF, BUY INSTA SLIM, INC., and alleges the following:

## PARTIES

1.      At all times mentioned herein, Plaintiff BUY INSTA SLIM, INC. ("BIS" or "Plaintiff") was and is a corporation duly formed under the laws of the State of California, with its principal place of business located at 17662 Armstrong Avenue, Irvine, County of Orange, State of California.

2.      At all times mentioned herein, Defendant FAITH BUSINESS MANAGEMENT COMPANY doing business as NATIONAL DIRECT SALES & MARKETING (hereinafter "FAITH") was and is a corporation formed under the laws of the State of Texas and authorized and qualified to do business in the State of California. Per order of the Court on or about March 26, 2018, the claims brought against FAITH have been stayed for parties to submit their claims to arbitration. The Causes of Actions and allegations pertaining to FAITH in this Second mended Complaint are for reference and will become active only if the controversies between Plaintiff and FAITH have not been successfully arbitrated.

3.      At all times mentioned herein, Defendant WAL-MART STORES, INC., doing business as WAL-MART (hereinafter "WAL-MART") was and is a corporation formed under the laws of the State of Arkansas and authorized and qualified to do business in the State of California.

4.      Plaintiff is ignorant of the true names and capacities of defendants designated as Does 1 through 100, inclusive. Plaintiff reserves the right to amend the complaint when the true identity of such defendants becomes known to Plaintiff. Plaintiff, however, alleges on information and belief that each doe defendant was and is in some manner liable for Plaintiff's damages, and was and is

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

2

**EXHIBIT A**                                      **PAGE 002**

1  the authorized employee, representative, and agent of other named defendants and

2  undertook and completed the actions alleged herein with the authorization and

3  ratification of such other defendants. As such, Plaintiff alleges on information and

4  belief that each such defendant is severally and jointly liable for Plaintiff's

5  damages.

6  **VENUE AND JURISDICTION; PREAMBLE**

7  5.    Plaintiff alleges that the venue and jurisdiction are proper in this Court

8  because the causes of action arose in the County of Orange, State of California.

9  6.    This Second Amended Complaint is brought pursuant to the Court's

10  Order of June 4, 2018, granting Plaintiff leave to amend its First Amended

11  Complaint after granting WAL-MART's motion to dismiss.

12  **BACKGROUND FACTS**

13  7.    Plaintiff alleges that Plaintiff is the manufacturer and supplier of an

14  innovative and revolutionary line of underclothing for men with the advantage of

15  providing a more pleasing physical look for men who may require a bit of

16  assistance in appearing more fit and more slim. Plaintiff's products are very

17  popular and have been for the past seven years. To that end, Plaintiff supplies its

18  products, of which there are many, to several national retailers, inclusive of

19  defendant WAL-MART.

20  8.    Plaintiff alleges that on or about October 3, 2013, Plaintiff and WAL-

21  MART entered into the written WAL-MART GENERAL MERCHANDISE

22  PURCHASE AGREEMENT (hereinafter "AGREEMENT") a true and correct

23  copy of which is appended hereto as **Exhibit "A"**. By the terms of the

24  AGREEMENT, WAL-MART agreed to place orders for merchandise from

25  Plaintiff and Plaintiff agreed to provide the ordered merchandise within the

26  timeframe provided by WAL-MART.

27  9.    After the AGREEMENT with WAL-MART, on or about June 22,

28  2014, Plaintiff entered into a written agreement entitled "EXCLUSIVE BROKER

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

3

1 AGREEMENT" (hereinafter "Agreement") with FAITH. A true and correct copy

2 of the Agreement is appended hereto as **Exhibit "B"**.

3      10.    Plaintiff alleges that per the terms and conditions of the Agreement,

4 FAITH became Plaintiff's exclusive selling agent for the sale of Plaintiff's

5 products to WAL-MART, Walgreen's, K-Mart, CVS, Sam's Club, and Meijer.

6 Implied in the Agreement is that FAITH would work on behalf and in the best

7 interests of Plaintiff by addressing issues regarding the sale of Plaintiff's products.

8 In effect, under the terms of the Agreement, FAITH was responsible for the sale

9 and resolution of any issues connected with its duties as Plaintiff's broker.

10      11.    Plaintiff alleges that with respect to WAL-MART, the Agreement

11 with FAITH did not become operative until August 22, 2014, in light of the fact

12 that Plaintiff was still under contract to another broker, which contract terminated

13 on or about August 20, 2014.

14      12.    After the AGREEMENT was signed between WAL-MART and

15 Plaintiff, WAL-MART started placing orders and Plaintiff fulfilled all orders

16 received from WALMART per the terms of the AGREEMENT. However, WAL-

17 MART did not fully pay for all the merchandise ordered and received.

18      13.    After signing the AGREEMENT Plaintiff received orders from WAL-

19 MART and full field all orders received by shipping merchandise as provided in

20 clause 2 of the AGREEMENT. In compliance with the terms of the AGREEMENT

21 as stated in clause 4, Plaintiff transmitted invoices to WAL-MART for

22 merchandise shipped and accepted by WAL-MART.

23      14.    WAL-MART did not fully pay for merchandise received and shorted

24 payments to Plaintiff. Plaintiff repeatedly inquired and asked defendants about the

25 short payments to no avail.

26      15.    Plaintiff alleges that on or about November 16, 2016, Plaintiff sent an

27 electronic mail communication to FAITH's authorized representatives Joe Namee

28 regarding WAL-MART's unauthorized returns and requested that FAITH as

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

4

1  Plaintiff's exclusive broker resolve the issue with WAL-MART.

2      16.    Plaintiff alleges that not only FAITH did not resolve the unauthorized
3  product return issue with WAL-MART, it failed to do so with subsequent returns
4  from WAL-MART and the chargeback Plaintiff had to bear when Plaintiff did
5  nothing wrong to cause the unauthorized returns and WAL-MART did not have
6  the contractual right to return the items that did not in fact belong to Plaintiff.

7      17.    Plaintiff alleges that from and after November 16, 2016, Plaintiff
8  presented FAITH with several issues and claims regarding its business relationship
9  with WAL-MART starting from the unauthorized returns and improper charge
10 backs by WAL-MART. Plaintiff also requested FAITH to look into and find out
11 the reasons behind WAL-MART's sudden drop in placing orders with Plaintiff.

12     18.    Plaintiff alleges that rather than responding to Plaintiff's concerns and
13 issues regarding its business with WAL-MART, FAITH stonewalled Plaintiff by
14 representing that it was doing all it could do, while not fully representing
15 Plaintiff's interests and even going so far as threatening to sue Plaintiff for non-
16 payment of commissions to FAITH when Plaintiff had paid FAITH commission up
17 to and including April of 2017, despite FAITH's failure to meet its contractual
18 obligations to its client, Plaintiff.

19     19.    As a result of FAITH and WAL-MART's respective conduct, Plaintiff
20 has sustained hundreds of thousands of dollars in revenue and inventory damages
21 and loss. WAL-MART at no time during these interactions between the parties
22 provided a written notice of termination of the AGREEMENT.

23 **FIRST CAUSE OF ACTION**
24 **FOR BREACH OF WRITTEN CONTRACT**
25 **AGAINST DEFENDANTS FAITH AND DOES 1 TO 30, INCLUSIVE**
26 ***(STAYED PER COURT ORDER ON MARCH 26, 2018)***

27     20.    Plaintiff realleges and incorporates by reference the allegations
28 contained in paragraphs 1 through 19 as though herein fully set forth.

**SECOND AMENDED COMPLAINT FOR DAMAGES**
5

21.     Plaintiff alleges that by virtue of the written exclusive broker Agreement entered into by and between Plaintiff and FAITH (Exhibit A), FAITH was obligated to act as Plaintiff's exclusive broker and to that end to protect and advocate for Plaintiff's position as the manufacturer and supplier of goods to WAL-MART.

22.     Plaintiff alleges that from and after November 16, 2016, FAITH breached the terms of the Agreement when it failed to address and resolve the issues Plaintiff had with WAL-MART regarding the unauthorized returns and charge backs, the participation and contribution to the mark down program, and WAL-MART's declining orders.

23.     Plaintiff alleges that rather than resolving the foregoing issues, FAITH did absolutely nothing and instead demanded its commission when despite its breaching conduct, Plaintiff continued to make commission payments to FAITH until April of 2017, and suspended the same when FAITH demonstrated by its conduct that its allegiance was to WAL-MART rather than its client and principal, Plaintiff.

24.     Plaintiff alleges that it has complied with all the terms, conditions, covenants, and promises of the Agreement with the exception of such terms, conditions, covenants, and promises which by virtue of FAITH's breaching conduct have excused Plaintiff from further compliance and performance.

25.     Plaintiff alleges that as a consequence of FAITH's breaching conduct, FAITH has sustained compensatory damages in a sum not less than $500,000 according to proof at trial.

## SECOND CAUSE OF ACTION
## FOR BREACH OF THE IMPLIED CONVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS FAITH AND DOES 1 TO 30
### *(STAYED PER COURT ORDER ON MARCH 26, 2018)*

26.     Plaintiff realleges and incorporates by reference the allegations

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

6

1    contained in paragraphs 1 through 25 as though herein fully set forth.

2         27.    Plaintiff alleges that implied in every contract there is a covenant that

3    every party to an agreement with deal in good faith and fairly with one another in

4    order to accomplish the beneficial objectives of the agreement.

5         28.    Plaintiff alleges that from and after November 16, 2016, and

6    continuing thereafter, FAITH breached the implied covenant of good faith and fair

7    dealing when it knew that Plaintiff relied on it to protect Plaintiff's business

8    interests and instead acted against Plaintiff's interests and failed to resolve any of

9    the merchandising and sales issues Plaintiff had brought to FAITH's attention

10    concerning Plaintiff's business with WAL-MART. In fact, FAITH only worsened

11    Plaintiff's position with WAL-MART when it effectively abandoned Plaintiff's

12    representation under the guise that it has not been paid commissions when in fact

13    Plaintiff had paid FAITH's commissions for several months even after FAITH had

14    failed to represent Plaintiff's interests.

15         29.    Plaintiff alleges that FAITH used Plaintiff's reliance on its status as a

16    broker and an entity knowledgeable in the retail business and purchasing industry

17    to undermine Plaintiff's relationship with WAL-MART.

18         30.    Plaintiff alleges that as a consequence of FAITH's breach of the

19    implied covenant of good faith and fair dealing, Plaintiff has sustained

20    compensatory damages in a sum not less than $500,000 according to proof at trial.

21         31.    Plaintiff alleges that the conduct of FAITH was and is fraudulent,

22    oppressive, malicious and despicable and undertaken with a complete and

23    conscious disregard for Plaintiff's property and legal rights such as to warrant the

24    imposition of exemplary and punitive damages against FAITH in a sum according

25    to proof at trial.

26    / / /

27    / / /

28    / / /

**SECOND AMENDED COMPLAINT FOR DAMAGES**

7

## THIRD CAUSE OF ACTION FOR
## BREACH OF FIDUCIARY DUTY
## AGAINST DEFENDANTS FAITH AND DOES 1 TO 30
### *(STAYED PER COURT ORDER ON MARCH 26, 2018)*

32.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 31 as though herein fully set forth.

33.     Plaintiff alleges that as Plaintiff's broker and agent, FAITH had and has a duty of confidentiality and of a fiduciary to represent the interests of Plaintiff in all business dealings to which Plaintiff assigns FAITH.

34.     Plaintiff alleges that from and after November 16, 2016, FAITH breached its fiduciary duty to Plaintiff when it failed to support, address, and represent Plaintiff's concerns, issues, and claims with WAL-MART regarding the charge backs, unauthorized returns, demands for participation in the mark down program, and the reduction in purchase orders brought about by WAL-MART. Plaintiff further alleges that for over 9 months despite Plaintiff's repeated demands for information and resolution from FAITH regarding the foregoing issues, FAITH ignored Plaintiff's requests, and when it finally responded, it supported WAL-MART's version of the issues rather than pressing for results from WAL-MART.

35.     Plaintiff alleges that as a consequence of FAITH's breach of its fiduciary duty, Plaintiff has sustained compensatory damages in a sum not less than $500,000 according to proof at trial.

36.     Plaintiff alleges that the conduct of FAITH was and is fraudulent, oppressive, malicious and despicable and undertaken with a complete and conscious disregard for Plaintiff's property and legal rights such as to warrant the imposition of exemplary and punitive damages against FAITH in a sum according to proof at trial.

/ / /

/ / /

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

8

## FOURTH CAUSE OF ACTION
## FOR BREACH OF WRITTEN AGREEMENT
## AGAINST DEFENDANTS WAL-MART AND DOES 1 TO 30

37.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 36 as though herein fully set forth.

38.   Plaintiff and defendant WALMART entered into the AGREEMENT attached as **Exhibit "A"** on October 3, 2013 whereby Plaintiff agreed to fulfill orders received from WAL-MART and WAL-MART agreed to pay for the invoices transmitted by Plaintiff for merchandise shipped and received by WAL-MART. After the AGREEMENT was signed WAL-MART started placing orders.

39.   Per clause 2 of the terms of the AGREEMENT, Plaintiff shipped the merchandise to WAL-MART after receiving orders from WAL-MART. Plaintiff fully complied with terms of clause 2 as set forth in the AGREEMENT. Per clause 4 of the agreement Plaintiff transmitted invoices to WAL-MART for the merchandise shipped to WAL-MART.

40.   Although WAL-MART accepted the merchandise and received proper invoices from Plaintiff, WAL-MART failed to fully pay for the merchandise received and invoices transmitted to WAL-MART.

41.   WAL-MART breached the AGREEMENT by failing to fully pay for merchandise ordered and received by WAL-MART and shorted payments to Plaintiff. Plaintiff repeatedly inquired and asked defendants about the short payments to no avail. After signing the AGREEMENT, WAL-MART placed order for total of $4,150,994.07. Plaintiff fulfilled all orders and transmitted invoices to WAL-MART for total of $4,150,994.07. WAL-MART only paid $3,613,688.49 leaving a balance of $537,255.58.

42.   Per clause 29 of the AGREEMENT either party could terminated the AGREEMENT for any or no reason and without penalty upon at least 30 days notice. However, the agreement continue to apply to any order dated before the

---

**EXHIBIT A**                                                    **PAGE 009**

1  termination of the AGREEMENT even if the merchandise is delivered and
2  accepted after termination of this AGREEMENT.

3      43.    WAL-MART breached the AGREEMENT by failure to give 30 days'
4  notice as required per clause 29 of the AGREEMENT and failure to pay for
5  merchandise after WAL-MART stopped doing business with Plaintiff.

6      44.    Per clause 6 of the Appendix to the AGREEMENT WAL-MART had
7  the right to return to Plaintiff the merchandise that were (1) defective or none
8  conforming, (2) returned to WAL-MART by customer, (3) subject to conditions of
9  a guaranteed sale or over stock balancing, or (4) subject to a recall or product
10 withdrawal.

11     45.    WAL-MART breached clause 6 of the Appendix to the
12 AGREEMENT by charging Plaintiff for merchandise returned to Plaintiff that
13 were not defective or non conforming, merchandise that were not returned by
14 customer, merchandise that were not subject to guarantee sale or overstock
15 balancing, or subject to recall or product withdrawal.

16     46.    WAL-MART breached the agreement by failing to return Plaintiff's
17 own merchandise and charging Plaintiff for the return merchandise which did not
18 manufactured by Plaintiff. In fact the merchandise that WAL-MART returned to
19 Plaintiff was not even the merchandise which were manufactured by Plaintiff
20 and/or shipped by Plaintiff to WAL-MART.

21     47.    Attached as **Exhibit "C"** are pictures of few of the returns by WAL-
22 MART showing WAL-MART returned merchandise that was not manufactured or
23 shipped by Plaintiff for which WAL-MART charged back Plaintiff. WAL-MART
24 breached the AGREEMENT by returning the wrong merchandise and charging
25 Plaintiff for the wrong merchandise.

26     48.    Plaintiff alleges that from and after signing the AGREEMENT
27 Plaintiff complied with all the unilateral terms and conditions of the
28 AGREEMENT, which favored WAL-MART in every aspect of the business

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
10

between the parties.

49.    As a consequence of WAL-MART's breach of the AGREEMENT, Plaintiff has sustained damages in excess of $537,255.58 according to proof at trial.

## FIFTH CAUSE OF ACTION
## FOR NEGLIGENT MISREPRESENTATION OF MATERIAL FACTS
## AGAINST DEFENDANTS FAITH AND DOES 1 TO 30
### *(STAYED PER COURT ORDER ON MARCH 26, 2018)*

50.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 49 as through herein fully set forth.

51.    Plaintiff alleges that from and after November 16, 2016, Plaintiff conveyed its concerns about WAL-MART's unauthorized returns and charge backs, the participation and contribution to the mark down program, and WAL-MART's declining orders to FAITH. Plaintiff alleges that these issues and concerns were brought to the attention of FAITH's authorized agent Joe Namee.

52.    Plaintiff alleges that from and after November 16, 2016, FAITH's authorized agents and representatives Joe Namee and John Edgmon represented and reassured Plaintiff that the issues and claims raised by Plaintiff were being pursued and addressed with WAL-MART.

53.    Plaintiff alleges that at various times between November 16, 2016, and August 28, 2017, FAITH by way of Joe Namee and John Edgmon represented to Plaintiff's authorized agent Houshang Jalili and Plaintiff's president Eamann Jalili that they were doing their best to address Plaintiff's claims and issues with WAL-MART but were not having any success. Plaintiff alleges that FAITH knew or had reason to know that the foregoing representations were in fact false. The true representations were that FAITH was not working in and for Plaintiff's best interest and was undermining Plaintiff's business by failing to take WAL-MART to task for its failure to abide by the terms of the February 2017 oral agreement in

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

11

addition to matters of concern that predated the oral agreement such as unauthorized merchandise returns, charge backs, and demands that Plaintiff participate in WAL-MART's mark down program.

54.    Plaintiff alleges that based on the three year relationship with FAITH as a Principal and broker respectively, Plaintiff justifiably relied on FAITH's representations and trusted that FAITH would act in Plaintiff's best interests. Plaintiff alleges that had Plaintiff known of the true facts, Plaintiff would have terminated the Agreement and terminated the commission payments to FAITH well before April of 2017.

55.    Plaintiff alleges that as Plaintiff's broker, FAITH had and has a duty to provide the true facts to Plaintiff. Plaintiff alleges that from and after August of 2017, Plaintiff discovered the true facts which were that FAITH had not done anything to resolve the foregoing claims and issues.

56.    Plaintiff alleges that as a result of FAITH's wrongful actions, Plaintiff has sustained compensatory damages in a sum not less than $500,000 according to proof at trial.

## SIXTH CAUSE OF ACTION
## FOR CONSTRUCTIVE FRAUD
## AGAINST DEFENDANTS FAITH AND DOES 86 TO 88
### *(STAYED PER COURT ORDER ON MARCH 26, 2018)*

57.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 as through herein fully set forth.

58.    Plaintiff alleges that from and after November 16, 2016, Plaintiff conveyed its concerns about WAL-MART's unauthorized returns and charge backs, the participation and contribution to the mark down program, and WAL-MART's declining orders to FAITH. Plaintiff alleges that these issues and concerns were brought to the attention of FAITH's authorized agent Joe Namee.

59.    Plaintiff alleges that from and after November 16, 2016, FAITH's

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
12

1  authorized agents and representatives Joe Namee and John Edgmon represented

2  and reassured Plaintiff that the issues and claims raised by Plaintiff were being

3  pursued and addressed with WAL-MART.

4      60.    Plaintiff alleges that at various times between November 16, 2016,

5  and August 28, 2017, FAITH by way of Joe Namee and John Edgmon represented

6  to Plaintiff's authorized agent Houshang Jalili and Plaintiff's president Eamann

7  Jalili that they were doing their best to address Plaintiff's claims and issues with

8  WAL-MART but were not having any success. Plaintiff alleges that FAITH knew

9  or had reason to know that the foregoing representations were in fact false. The

10  true representations were that FAITH was not working in and for Plaintiff's best

11  interest and was undermining Plaintiff's business by failing to take WAL-MART

12  to task for its failure to abide by the terms of the February 2017 oral agreement in

13  addition to matters of concern that predated the oral agreement such as

14  unauthorized merchandise returns, charge backs, and demands that Plaintiff

15  participate in WAL-MART's mark down program.

16      61.    Plaintiff alleges that based on the three year relationship with FAITH

17  as a Principal and broker respectively, Plaintiff justifiably relied on FAITH's

18  representations and trusted that FAITH would act in Plaintiff's best interests.

19  Plaintiff alleges that had Plaintiff known of the true facts, Plaintiff would have

20  terminated the Agreement and terminated the commission payments to FAITH

21  well before April of 2017.

22      62.    Plaintiff alleges that as Plaintiff's broker, FAITH had and has a

23  fiduciary duty to provide the true facts to Plaintiff. Plaintiff alleges that from and

24  after August of 2017, Plaintiff discovered the true facts which were that FAITH

25  had not done anything to resolve the foregoing claims and issues.

26      63.    Plaintiff alleges that as a result of FAITH's wrongful actions, Plaintiff

27  has sustained compensatory damages in a sum not less than $500,000 according to

28  proof at trial.

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
13

64.     Plaintiff alleges that the conduct of FAITH was and is fraudulent, oppressive, malicious and despicable and undertaken with a complete and conscious disregard for Plaintiff's property and legal rights such as to warrant the imposition of exemplary and punitive damages against FAITH in a sum according to proof at trial.

## SEVENTH CAUSE OF ACTION FOR
## INTENTONAL INTERFERENCE WITH CONTRACT
## AGAINST DEFENDANTS FAITH AND DOES 89 TO 91
### *(STAYED PER COURT ORDER ON MARCH 26, 2018)*

65.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 64 as though herein fully set forth.

66.     Plaintiff alleges that at all times mentioned herein, FAITH knew based on Plaintiff's representations to FAITH that Plaintiff had a contract with WAL-MART for supplying WAL-MART with Plaintiff's merchandise to be displayed and sold at WAL-MART's stores.

67.     Plaintiff alleges that armed with this knowledge, FAITH set out to undermine Plaintiff's contract with WAL-MART by making representations to Plaintiff that it would exclusively represent Plaintiff's interests but would in fact support WAL-MART's version of events, especially pertaining to the unauthorized item returns, charge backs, drop in orders, and participation in the mark down program.

68.     Plaintiff alleges that from and after November 16, 2016, FAITH did nothing to address Plaintiff's concerns regarding WAL-MART's actions which affected Plaintiff's sales and a resulting drop in revenue.

69.     Plaintiff alleges that from and after August of 2017, FAITH's fraudulent and breaching conducted culminated in WAL-MART's termination of its agreement with Plaintiff.

/ / /

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
14

70.     Plaintiff alleges that as a consequence of FAITH's intentional interference with Plaintiff and WAL-MART's agreement, Plaintiff has sustained compensatory damages in a sum not less than $500,000 according to proof at trial.

71.     Plaintiff alleges that the conduct of FAITH was and is fraudulent, oppressive, malicious and despicable and undertaken with a complete and conscious disregard for Plaintiff's property and legal rights such as to warrant the imposition of exemplary and punitive damages against FAITH in a sum according to proof at trial.

## EIGHT CAUSE OF ACTION
## FOR INTENTIONAL INTERFERENCE WITH
## PROSPECIVE ECONOMIC ADVANTAGE
## AGAINST DEFENDANTS FAITH AND DOES 92 TO 94
### (STAYED PER COURT ORDER ON MARCH 26, 2018)

72.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71 as though herein fully set forth.

73.     Plaintiff alleges that at all times mentioned herein, FAITH knew based on Plaintiff's representations to FAITH that Plaintiff was engaged in a business enterprise with WAL-MART for supplying WAL-MART with Plaintiff's merchandise to be displayed and sold at WAL-MART's stores.

74.     Plaintiff alleges that armed with this knowledge, FAITH set out to undermine Plaintiff's business with WAL-MART by making representations to Plaintiff that it would exclusively represent Plaintiff's interests but would in fact support WAL-MART's version of events, especially pertaining to the unauthorized item returns, charge backs, drop in orders, and participation in the mark down program.

75.     Plaintiff alleges that from and after November 16, 2016, FAITH did nothing to address Plaintiff's concerns regarding WAL-MART's actions which affected Plaintiff's sales and a resulting drop in revenue.

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

76.     Plaintiff alleges that from and after August of 2017, FAITH's fraudulent and breaching conducted culminated in WAL-MART's termination of its business with Plaintiff.

77.     Plaintiff alleges that as a consequence of FAITH's intentional interference with Plaintiff and WAL-MART's business, Plaintiff has sustained compensatory damages in a sum not less than $500,000 according to proof at trial.

78.     Plaintiff alleges that the conduct of FAITH was and is fraudulent, oppressive, malicious and despicable and undertaken with a complete and conscious disregard for Plaintiff's property and legal rights such as to warrant the imposition of exemplary and punitive damages against FAITH in a sum according to proof at trial.

## NINTH CAUSE OF ACTION FOR
## COMMON COUNT-MONEY HAD AND RECEIVED
## AGAINST DEFENDANT FAITH AND DOES 1 TO 30
### *(STAYED PER COURT ORDER ON MARCH 26, 2018)*

79.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 78 as though fully herein set forth.

80.     Within the past four years, defendant FAITH became indebted to Plaintiff in the sum of $150,000 for money had and received for the use and benefit of Plaintiff. Plaintiff has demanded payment from defendant FAITH but defendants have ignored Plaintiffs efforts. As a result, Plaintiff has been damaged.

81.     The contract on which this action provides that in the event legal action is taken to enforce collection, the prevailing party on the contract is entitled to recover reasonable attorney's fees.

/ / /
/ / /
/ / /
/ / /

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**

16

## TENTH CAUSE OF ACTION FOR
## OPEN BOOK ACCOUNT
## AGAINST DEFENDANT WAL-MART AND DOES 1 TO 30

82.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 81 as though fully herein set forth.

83.     An account was stated by and between Plaintiff and defendant WAL-MART, as alleged herein, and on such statement a balance of $537,255.58 was found due to plaintiff from defendant WAL-MART.

84.     Although demanded by Plaintiff from WAL-MART, neither all nor any part of the agreed balance has been paid. As a result Plaintiff has been damaged in an amount to be determined at the time of trial in no less than $537,255.58

85.     There is now due, owing, and unpaid from defendants to Plaintiff the sum of no less $537,255.58 together with interest according to proof at the time of trial.

86.     The contract on which this action is based is a contract on a book account. Section 337a of the Code of Civil Procedure provides that in the event legal action is taken to enforce collection, the prevailing party on the contract is entitled to recover reasonable attorney's fees.

## ELEVENTH CAUSE OF ACTION FOR
## ACCOUNT STATED
## AGAINST DEFENDANT WAL-MART AND DOES 1 TO 30

87.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 86 as though fully herein set forth.

88.     Defendant WAL-MART became indebted to Plaintiff on an open book or mutual, open, and current account for money due in the sum of  no less than $537,255.58 at defendant's special instance and request and for which defendants agreed to pay the above sum.

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
17

**EXHIBIT A**                                                    **PAGE 017**

89. Several demands has been made to no avail, and there is now due, owing, and unpaid the sum of no less than $537,255.58 with interest thereon at the rate of 10% per annum according to proof at the time of trial.

90. The contract on which this action is based is a contract on a book account. Section 337a of the Code of Civil Procedure provides that in the event legal action is taken to enforce collection, the prevailing party on the contract is entitled to recover reasonable attorney's fees.

**TWLFTH CAUSE OF ACTION FOR**

**COMMON COUNT-GOODS SOLD AND DELIVERED**

**AGAINST DEFENDANT WAL-MART AND DOES 1 TO 30**

91. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 90 as though fully herein set forth.

92. Within the past four years, defendant WALL MART became indebted to Plaintiff in the sum of no less than $537,255.58 for goods sold and delivered for the use and benefit of Plaintiff.  Plaintiff has demanded payment from defendant WAL-MART but defendants have ignored Plaintiff's efforts. As a result Plaintiff has been damaged.

WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT AGAINST DEFENDANTS AND EACH OF THEM, AS FOLLOWS:

**AS TO THE CAUSES OF ACTION PERTAINING TO FAITH:**

**THE FIRST, SECOND, THIRD, FIFTH, SIXTH, SEVENTH, EIGHT, AND NINTH CAUSES OF ACTION**

1. For compensatory damages in a sum not less than $537,255.58 according to proof at trial;

2. For prejudgment interest at the legal rate from and after November 16, 2016;

3. For Attorney's fees in accordance with the Agreement between Plaintiff and FAITH, according to proof at trial;

4.    For punitive and exemplary damages in a sum according to proof at trial pertaining only to the second, third, ninth, tenth, and eleventh causes of action;

5.    For restitution;

6.    For injunctive relief;

7.    For reasonable costs of suit; and

8.    For any other relief the Court deems just and proper.

**AS TO THE CAUSES OF ACTION PERTAINING TO WAL-MART:**

**THE FOURTH , TENTH, ELEVENTH, AND TWELFTH CAUSES OF**

**ACTION**

1.    For compensatory damages in a sum not less than $500,000 according to proof at trial;

2.    For prejudgment interest at the legal rate from and after November 16, 2016;

3.    For Attorney's fees in accordance with the AGREEMENT between Plaintiff and WAL-MART, according to proof at trial;

4.    For restitution in a sum according to proof at trial;

5.    For reasonable costs of suit; and

6.    For any other relief the Court deems just and proper.

Respectfully Submitted,

Dated: June 22, 2018    **LAW OFFICES OF MOKRI & ASSOCIATES**

By:   /s/ Brad A. Mokri   .
        Brad A. Mokri,
        Attorney for Plaintiff,
        BUY INSTA SLIM, INC.

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
19

### PROOF OF SERVICE

I am a citizen of the United States and employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 1851 E. First Street, Suite 900, Santa Ana, California 92705.

On June 22, 2018, I served the foregoing document(s) described as **SECOND AMENDED COMPLAINT FOR DAMAGES** on the interested parties in this action by placing a true ( **X** ) **copy** () **original** thereof enclosed in a sealed envelope addressed as follows:

*PLEASE SEE ATTACHED SERVICE LIST*

( **X** ) **BY ELECTRONIC SERVICE:** I am familiar with the United States District Court */Central* District of California's practice for collecting and processing electronic filings. Under that practice, documents are electronically filed with the court. The Court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned Judge, and any registered users in the case. The NEF will constitute service of the document. Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities. Under said practice , the following CM/ECF users were served.

( ) **BY OVERNITE EXPRESS DELIVERY:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the OVERNITE EXPRESS DELIVERY DROP BOX on the same day with postage thereon fully prepaid at Santa Ana, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit for mailing in affidavit.

( ) **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Santa Ana, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit for mailing in affidavit.

( ) **BY PERSONAL SERVICE:** I delivered such envelope by hand to the offices of the addressee(s).

( ) **BY FAX:** (Code Civ. Prod.§ 1013(a),(e); Cal. Rules of Court, rule 2.306)-By transmitting said document(s) by electronic facsimile to the respective facsimile numbers(s) of the party(ies). The facsimile machine I used complied with California Rules of Court, rule 2.3014, and no error was reported  by the machine.

( **X** ) **FEDERAL:** I declare that I am employed in the office of a member of the bar of this court at whose direction the services is made.

Executed on June 22, 2018, at Santa Ana, California.

/s/ Gissou Mokri       .
Gissou Mokri

---

**SECOND AMENDED COMPLAINT FOR DAMAGES**
20

1

## PROOF OF SERVICE

2

3  *Attorneys For* **Faith Business Management Company, Inc., D/B/A National**
4  **Direct Sales And Marketing**

5
6  MULCAHY, LLP
   Kevin Adams (SBN 239171)
7  Email: kadams@mulcahyllp.com
   4 Park Plaza, Suite 1230
8  Irvine, California 92614
9  Phone: (949) 252-9377
   Fax: (949) 252-0090
10

11
   O'TOOLE ATWELL, PC
12  Brian O'Toole (SBN 15340510)
13  Email: botoole@otoole-atwell.com
    504 Lavaca, Suite 1010
14  Austin, Texas 78701
15  Telephone: (512) 476-4740
    Facsimile: (512) 476-1228
16

17
    *Attorneys For* **Defendant Wal-Mart Stores, Inc.**
18  Robert J. Herrington
19  Robert S. Freund
    Greenberg Traurig, LLP
20  1840 Century Park East, Suite 1900
21  Los Angeles, CA 90067
    Email: herringtonr@gtlaw.com
22  Email: freundr@gtlaw.com
23

24

25

26

27

28

---

## SECOND AMENDED COMPLAINT FOR DAMAGES

21

# EXHIBIT "A"

 **Walmart** Save money. Live better.

 **Sam's Club.** Savings Made Simple

## WALMART GENERAL MERCHANDISE SUPPLIER AGREEMENT

Supplier Number: 444349–82–0                                         Effective Date: 10/03/2013

This Supplier Agreement ("Agreement") between the party listed below ("Supplier") and Wal-Mart Stores, Inc., and its direct and indirect US and Puerto Rico operating subsidiaries (hereinafter referred to collectively as "Company") sets forth the terms of the business relationship between Company and Supplier. All sales and deliveries of Merchandise (as defined below) by Supplier to Company will be covered by and subject to the terms of this Agreement, the Standards for Suppliers and the terms of the Order (as defined below). This Agreement becomes effective on the date shown above and remains effective for the term set forth herein. The execution and submission of this Agreement does not impose upon Company any obligation to purchase Merchandise.

### GENERAL SUPPLIER INFORMATION

For privately-owned entities, Company considers the following classifications as categories in its Supplier Diversity Program: (Check any that apply)

_BLACK OR AFRICAN–AMERICAN                              _ASIAN
_HISPANIC AMERICAN OR LATINO                            _NATIVE AMERICAN OR ALASKA NATIVE
_NATIVE HAWAIIAN OR OTHER PACIFIC ISLANDER

_ WOMAN OWNED BUSINESS        _ VETERAN          _ DISABLED VETERAN   _ PERSON WITH DISABILITIES

If Supplier falls within any of the above classifications and has been certified as such by a government agency or Company-recognized purchasing council, Supplier may be eligible for the Supplier Diversity Program. Supplier will provide to Company a copy of its certification upon request. In addition, the certification must be emailed to supplierdiversity@wal-mart.com when the Agreement is submitted to Company.

Enter the Federal Taxpayer Identification Number (TIN) of the Supplier Named Below. The entry must match Supplier's federal tax identification number and will be verified with the Internal Revenue Service. If a TIN has not been issued, enter the Employer's Social Security Number or Export License Number.
TIN:*****3158

Type of Payee (Check Only One):  _Individual/Sole Proprietorship  X Corporation/LLC  _Partnership

| | |
|---|---|
| **Supplier Name:** BUY INSTA SLIM INC | **President:** EEMAAN JALILI        Phone: 9492632301 |
| **Address:**        17662 ARMSTRONG AVE | **Acct. Executive or V.P. Sales:** MONIR   Phone: 9492632301 |
| **Address 2:** | JALILI |
| **City/State/Zip:** IRVINE, CA 92614 | **Acct. Contact:** JOE NAMEE        Phone: 5122506911 |

**ADDRESS TO MAIL PAYMENT:**

Supplier Name:  BUY INSTA SLIM INC
Address:        17662 ARMSTRONG AVE
Address 2:
City/State/Zip:  IRVINE, CA 92614
Factor Name:
Supplier Also Doing Business As, If different from Supplier name: (Attach a list to Agreement if space below is insufficient):
Supplier Number:

**ADDRESS TO MAIL CLAIM DOCUMENTATION:**

Supplier Name:  BUY INSTA SLIM INC
Attention:
Address:        17662 ARMSTRONG AVE
City/State/Zip:  IRVINE, CA 92614
Accounting Phone Number:        Extension #: 0
9492632301
Toll Free Number:        Fax Number: 9492632323

**ADDRESS TO SEND ORDERS:**

Supplier Name:        BUY INSTA SLIM INC
Attention:
Address:        17662 ARMSTRONG AVE
City/State/Zip:  IRVINE, CA 92614
Street Address for use by delivery services other than the U.S. Mail, If not already shown in the Purchase Order address above:
Room:
Expedite Orders Phone: 9492632301  Extension #:

**ADDRESS TO SEND PRICING TICKETS:**

Supplier Name:        BUY INSTA SLIM INC
Attention:
Address:        17662 ARMSTRONG AVE
City/State/Zip:  IRVINE, CA 92614

Has Supplier or any related entity (including any entity with substantial common ownership or senior management as Supplier), whether or not the entity still exists, previously conducted business with Company?  Yes _ No X_  If so, under what name(s)?

**EXHIBIT A**                                    **PAGE 023**

### STANDARD TERMS AND CONDITIONS

**1. DEFINITIONS.**  As used in this Agreement or any Company–issued Order, the following capitalized words shall have the meanings set forth below:

(a) "Account" means any right to receive payments arising under this Agreement.

(b) "Authorized Buyer" means any General Merchandise Manager, Divisional Merchandise Manager, Buyer, Sr. Buyer and Replenishment Manager (or successor or equivalent titles) of Company assigned to the category/department corresponding to the purchased Merchandise.

(c) "Electronic Data Interchange" ("EDI") means the electronic transmission of information regarding specific business processes (invoicing, ordering, reporting, etc.) between two or more businesses according to standards mandated by Company.

(d) "Law" means any applicable international, foreign, or domestic law, regulation, order or other requirement imposed or compelled by a governing or regulatory authority having legal force (whether federal, state or local), including any treaty, statute, common law, judicial decision, rule, regulation, code or ordinance.

(e) "Merchandise" means all products, goods, materials, equipment, articles, and tangible items supplied by Supplier to Company within the Territory, and all packaging, instructions, warnings, warranties, advertising and other services included therewith.

(f) "Must Arrive By Date" or "MABD" means the delivery date or period identified in an Order.

(g) "Order" means any written or electronic purchase order for Merchandise issued by Company through an Authorized Buyer.

(h) "Recall" means any removal of Merchandise from the stream of commerce or the issuance of a corrective action plan or other remedial action initiated by Supplier, a government entity, or Company.

(i) "Shared Services" means Company's business division known as Global Shared Services, North America, or its functional successor, which is the accounting department of Company responsible for control and processing of new supplier agreements and updates to existing agreements.

(j) "Standards" means the Wal-Mart Stores, Inc. Standards for Suppliers Manual, as posted at http://corporate.walmart.com/suppliers.

(k) "Territory" means the United States, its territories and possessions.

**2. ORDERS; CANCELLATION.**  Supplier may ship only after receipt of an Order.  Supplier may accept an Order only as follows: (i) a written confirmation notice to Company, if such notice is requested by Company, or (ii) shipping conforming Merchandise in accordance with this Agreement and the Order.  Shipments made contrary to Company's routing instructions will be deemed F.O.B. Destination (store, club or warehouse).  Supplier's invoice, confirmation memorandum or other writing may not vary the terms of any Order.  Supplier's failure to comply with one or more terms of an Order shall constitute breach of this Agreement and shall be grounds for the exercise by Company of any of the remedies provided for in this Agreement or by applicable Law.  Projections, past purchasing history and representations about quantities to be purchased are not binding, and Company shall not be liable for any act or expenditure (including but not limited to expenditures for equipment, labor, materials, packaging or capital expenditures) by Supplier in reliance on them.  Company may cancel all or any part of an Order at any time prior to shipment.

**3. SUPPLIER FINANCIAL INFORMATION; CHANGES IN CONTROL.**  Within thirty (30) days prior to the Effective Date, upon each anniversary thereof, and at such other times as Company may request, Supplier hereby authorizes Company to obtain at Supplier's expense, a current Dun & Bradstreet report (or such other risk evaluation report as may be designated by Company) for Supplier.  Supplier shall immediately notify Company upon any occurrence of a change of Control (as described in Section 20 below) of Supplier after the Effective Date.

**4. PAYMENT TERMS; CASH DISCOUNT; AUDITS.**  Supplier shall transmit invoices on the same day Merchandise is shipped, but Company's payment terms under an Order will be calculated from the latest of: (i) the date that Company accepts delivery of the Merchandise at the facility designated by Company and records receipt of the Merchandise on its Warehouse Management System (i.e., in exceptional situations, delivery or drop off on Company property may not be the same day that the Merchandise is recorded on its Warehouse Management System); (ii) the date that Company receives the invoice, or if disputed, the date the invoice is reconciled; (iii) the MABD; or (iv) if terms are "pay from scan," the date of sale of the Merchandise by Company.  Any cash discount selected by Supplier on the Appendix will be calculated on the gross amount of Supplier's invoice.  Company will make payment via electronic funds transfer ("EFT"), unless otherwise agreed to by Company in writing.  Supplier will provide any information and documents required by Company to establish EFT payment.  To equalize for the difference in payment processing time between EFT and physical checks, Company's payments by EFT will be deemed timely if paid within five (5) banking days after the due date of the invoice and Company will send remittance advices to Supplier via EDI.  Irrespective of any prior payments, Company or its auditors may inspect and audit Supplier's financial and other account records relating to the sale and return of Merchandise.  Supplier will provide reasonable assistance in such audits by providing supplemental records as reasonably requested by Company or its auditors.

**5. SET-OFF; RESERVATION OF ACCOUNT; CREDIT BALANCE.**  Company may recoup, set off, or credit against amounts payable to Supplier all present and future indebtedness of Supplier to Company arising from this or any other transaction with Supplier or any of its affiliates whether or not related hereto.  If Company determines that Supplier's performance under an Order and/or this Agreement is likely to be impaired, Company may establish a reserve or place a hold on Supplier's Account to satisfy Supplier's actual or anticipated obligations to Company arising from any such Order or this Agreement, by withholding payment of Supplier's invoices.  Company will disburse to Supplier any remaining amounts due on Supplier's Account so held in reserve or release the hold if and when Company determines that the reserve is no longer necessary to secure Supplier's obligations.  Supplier will pay to Company in cash any credit balance upon written request.  IMPORTANT NOTICE: ALL PAYMENTS OF MONIES OWED PURSUANT TO THIS SUPPLIER AGREEMENT AND PURCHASE ORDERS MUST BE MAILED TO THE FOLLOWING ADDRESS: WAL-MART STORES, INC./SAM'S CLUB, C/O CORPORATE ACCOUNTING, P.O. BOX 500787, ST. LOUIS, MISSOURI 63150-0787.

**6. ASSIGNMENT OF ACCOUNTS.**  Supplier shall provide Company written notice of an assignment, factoring, or other transfer of its Account at least thirty (30) days prior to such assignment, factoring, or other transfer taking legal effect.  Such written notice shall include the name and address of the assignee/transferee, the date the assignment is to begin, and terms of the assignment, and shall be considered delivered upon receipt of such written notice by Shared Services.  Supplier may have only one assignment, factoring or transfer of its Account effective at any time.  The assignment of any Account hereunder shall not affect Company's rights set forth in Section 5 of this Agreement.  Supplier shall defend, indemnify and hold Company harmless from any and all lawsuits, claims, demands, actions, damages (including reasonable attorney fees, court costs, obligations, liabilities or liens) arising from or related to

2

**EXHIBIT A**                                                     **PAGE 024**

the assignment, transfer or factoring of its Account. Supplier releases and waives any right, claim or action against Company for amounts due and owing under this Agreement where Supplier has not complied with the notice requirements of this provision. Notices required pursuant to this Section shall be mailed to: Wal-Mart Stores, Inc. Attn: Global Shared Services, North America, Master Data Management, 1301 S.E. 10th St. Bentonville, AR 72716-0560. Notwithstanding the foregoing or any other circumstance, Company reserves the right to remit payment to Supplier.

**7. TAXES.** The Order price includes all taxes, millages and charges, except sales, excise or use tax for which Company is obligated upon the sale or use of the Merchandise. If Supplier receives a refund of any taxes included in the Order price or otherwise collected from Company by Supplier, Supplier shall promptly pay or credit Company the amount of the refund, including any interest.

**8. PRICE PROTECTION; PRICE GUARANTEE AND NOTICE OF PRICE INCREASES.** Supplier guarantees its prices against manufacturer's or Supplier's own price decline. If Supplier reduces its price on any Merchandise sold to Company, which Merchandise has not yet been delivered to Company by Supplier or, if consistent with Supplier's practice, which Merchandise is currently in Company's inventory (including Merchandise on hand, in warehouses and in transit), Supplier shall at Company's discretion either issue a check or give Company a credit equal to the price difference for such Merchandise, multiplied by the units of such Merchandise to be delivered by Supplier and/or currently in Company's inventory. If a court, regulatory agency or other government entity with jurisdiction finds that the prices on an Order are in excess of that allowed by any Law, the prices shall be automatically revised to equal a price which is not in violation of said Law. If Company overpays for Merchandise at a price in violation of this section, Supplier shall promptly refund the difference between the price paid for the Merchandise and the price which is not in violation of this section. If at a reasonably close in point in time with Supplier's sale of Merchandise to the Company, Supplier sells or offers to any competitor of Company any merchandise of like grade and quality at lower prices and/or on terms more favorable than those stated on the Order, then, except as prohibited by Law, the prices and/or terms of the Order shall be deemed automatically revised to equal the lowest prices and most favorable terms at which Supplier shall have sold or shall have offered such merchandise and payment shall be made accordingly. If Company becomes entitled to such lower prices, but has already made payment at a higher price, Supplier shall promptly refund the difference in price to Company. Supplier shall give Company written notice of any proposed Merchandise price increase at least sixty (60) days prior to the effective date of the increase.

**9. SUPPLIER EDI RESPONSIBILITIES.**
(a) Supplier shall electronically receive Orders and send Company invoices via EDI unless otherwise agreed to by Company in writing.
(b) Supplier shall ensure that access by its employees to the EDI interchange is restricted by password to those persons authorized to contractually bind Supplier.
(c) Supplier's use of the EDI interchange acknowledges Supplier's review and acceptance of the terms and requirements for using the EDI system to contract electronically.
(d) Supplier will establish a unique user identification to identify itself, and the presence of the user identification in the EDI interchange will be sufficient to verify the source of the data and the authenticity of the document.
(e) EDI documents containing Supplier's user identification will constitute a signed writing, and neither party shall contest the validity or enforceability of the document on the basis of lack of a signature or sufficient identification of the parties.
(f) EDI documents or printouts thereof shall constitute originals.
(g) EDI documents will be retained by both Company and Supplier in a form that is accessible and reproducible.
(h) If Company agrees to waive the EDI requirements of this section of this Agreement, Orders may be sent via overnight mail at Supplier's expense.

**10. PURCHASE COSTS AND CONDITIONS.** Supplier is responsible for verifying the accuracy of costs, discounts, allowances and all other terms of sale on all Orders. If incorrect information exists, Supplier shall notify Company of any inaccuracies not less than twenty-four (24) hours prior to shipment. If a change is necessary, no shipment is to commence without written confirmation of the change from an Authorized Buyer. If Merchandise ships prior to discovery of an error on the Order, the parties shall confer within forty-eight (48) hours of such discovery to determine the actions to be taken regarding the erroneous Order.

**11. SHIPPER LOAD AND COUNT RESPONSIBILITIES.** If Supplier is shipping to Company a full truckload collect, or full truckload under Company control, Supplier is responsible for monitoring its shipping process. Supplier is required to close the trailer, seal it with a Supplier-provided seal, and document the seal number on all copies of the Bill of Lading. All such shipments will be considered Shipper Load and Shipper Count, whether or not so notated. If Supplier fails to seal the trailer, or fails to reference and identify the seal on all copies of the Bill of Lading, and shortages occur, Supplier shall be liable for such shortages. The provisions of this Agreement supersede any contrary Bill of Lading term, clause, notation, other provision, or any other writing.

**12. DELIVERY TIME.** THE TIME SPECIFIED IN AN ORDER FOR SHIPMENT AND/OR DELIVERY OF MERCHANDISE IS OF THE ESSENCE OF THIS AGREEMENT AND IF SUCH MERCHANDISE IS NOT SHIPPED AND/OR DELIVERED WITHIN THE TIME SPECIFIED, COMPANY RESERVES THE RIGHT, AT ITS OPTION AND WITHOUT LIMITATION, TO CANCEL THE ORDER AND/OR REJECT ANY MERCHANDISE DELIVERED AFTER THE TIME SPECIFIED. In addition to the aforementioned remedy, Company may exercise any other remedies provided for in this Agreement or provided by applicable Law, including but not limited to those remedies provided by the Uniform Commercial Code. Company may assess and collect reasonable damages for any deliveries of Merchandise not received within the MABD. Notwithstanding Company's right to cancel shipment, or to reject or revoke acceptance of Merchandise, Supplier shall inform Company immediately of any actual or anticipated failure to ship all or any part of an Order or the exact Merchandise called for in an Order on the shipment date specified. Acceptance of any Merchandise shipped after or before the MABD shall not be construed as a waiver of any of Company's rights or remedies resulting from the untimely shipment.

**13. REPRESENTATIONS AND WARRANTIES.** By acceptance of an Order, Supplier represents and warrants that:
(a) Supplier is in compliance with and will continue to comply with Company's Standards;
(b) Supplier and the Merchandise are in compliance with and will continue to comply with all Laws applicable to the manufacture, sourcing, distribution and sale of the Merchandise;
(c) The Merchandise will be new and not used, remanufactured, reconditioned or refurbished, and will comply with all specifications contained in such Order and will be of equal or better quality as all samples delivered to Company;
(d) The Merchandise is genuine and is not counterfeit, adulterated, misbranded, falsely labeled or advertised or falsely invoiced within the meaning of any Laws;
(e) The Merchandise has been labeled, advertised and invoiced in accordance with the requirements of all Laws, and the Merchandise, and its sale by Company anywhere within the Territory does not violate any Law;

3

**EXHIBIT A**                    **PAGE 025**

(f) The Merchandise shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit and safe for the purposes for which the Merchandise is intended to be used, including but not limited to consumer use;

(g) The Merchandise does not infringe upon or violate any patent, copyright, trademark, trade name, trade dress, trade secret, or any other rights belonging to others, and all royalties owed by Supplier, if any, have been paid to the appropriate licensor;

(h) All information regarding the Merchandise, provided by or on behalf of Supplier to Company, including all weights, measures, sizes, legends or descriptions printed, stamped, attached or otherwise indicated with regard to the Merchandise, is true and correct, and conforms and complies with all Laws relating to the Merchandise;

(i) Where required by Law, or by Company's policies, the Merchandise has been tested by third-party testing bodies approved by Company, found compliant with all applicable standards and Laws, and the results of such tests will be provided to Company at Company's request;

(j) All Merchandise shall have an accurate UPC barcode (also known as an EAN/UPC symbol) that includes a valid Global Trade Item Number® (GTIN®) and will comply with GS1 US standards (found at http://www.gs1us.org) or such other of Company's UPC requirements, as amended from time to time;

(k) There is no other impediment or restriction, legal or otherwise, that limits, prohibits or prevents Supplier from selling and delivering the Merchandise to Company or limits, prohibits or prevents Company from reselling the Merchandise to its customers within the Territory;

(l) The Merchandise is mined, produced, manufactured, assembled, packaged and transported in compliance with the Standards and all Laws; and

(m) The Merchandise is not transshipped for the purpose of mislabeling, evading quota or country of origin restrictions or avoiding compliance with the Standards and all Laws.

Where applicable, Supplier will provide Company with a current, complete and accurate Material Safety Data Sheet ("MSDS") for the Merchandise. Nothing contained in this Agreement or an Order shall be deemed a waiver of any representations, warranties or guarantees implied by Law.

**14. INDEMNIFICATION.** Supplier shall protect, defend, hold harmless and indemnify Company, including its affiliates, officers, directors, employees and agents, from and against any and all lawsuits, claims, demands, actions, liabilities, losses, damages, costs and expenses (including attorneys' fees and court costs), regardless of the cause or alleged cause thereof, and regardless of whether such matters are groundless, fraudulent or false, arising out of any actual or alleged:

(a) Misappropriation or infringement of any patent, trademark, trade dress, trade secret, copyright or other right relating to any Merchandise;

(b) Death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged use of or latent or patent defect in, the Merchandise, including but not limited to: (i) any actual or alleged failure to provide adequate warnings, labeling or instructions; (ii) any actual or alleged improper construction or design of the Merchandise; or (iii) any actual or alleged failure of the Merchandise to comply with specifications or with any express or implied warranties of Supplier;

(c) Violation of any Law relating to the Merchandise, or to any of its components or ingredients, or to its manufacture, shipment, labeling, use or sale, or to any failure to provide a Material Safety Data Sheet or certification;

(d) Act, activity or omission of Supplier or any of its employees, representatives or agents, including but not limited to activities on Company's premises and the use of any vehicle, equipment, fixture or material of Supplier in connection with any sale to or service for the Company; and

(e) Any installation or display by Supplier of Merchandise covered by this Agreement.

Supplier shall promptly notify Company of the assertion, filing or service of any lawsuit, claim, demand, action, liability or other matter that is or may be covered by this indemnity, and shall immediately take such action as may be necessary or appropriate to protect the interests of Company, its officers, directors, employees and agents. Supplier shall promptly notify Company of the legal counsel Supplier proposes to engage to defend Company's interest in such matter. Upon Company's request, Supplier will promptly provide reasonable cooperation and assistance to Company with respect to any claim, lawsuit, demand, or investigation involving Company that relates to the Merchandise or any obligations under this Agreement. Any and all counsel selected or provided by Supplier to represent or defend Company or any of its officers, directors, employees or agents shall accept and acknowledge receipt of Company's Outside Counsel Guidelines, and shall conduct such representation or defense strictly in accordance with such Guidelines. If Company determines that such counsel has not done so, or appears unwilling or unable to do so, Company may replace such counsel with other counsel of Company's own choosing. In such event, any and all fees and expenses of Company's new counsel, together with any and all expenses or costs incurred on account of the change of counsel, shall be paid or reimbursed by Supplier as part of its indemnity obligation hereunder. Company shall at all times have the right to direct the defense of, and to accept or reject any offer to compromise or settle, any lawsuit, claim, demand or liability asserted against Company or any of its officers, directors, employees or agents, and Supplier will not settle or resolve any portion of any such claim or lawsuit without Company's written approval, which Company will not unreasonably withhold. The duties and obligations of Supplier created hereby shall not be affected or limited in any way by Company's extension of express or implied warranties to its customers.

**15. RECALLS; REPORTING OF DEFECTS; TESTING.** If Merchandise is the subject of a Recall, Supplier shall be responsible for all matters and costs associated with the Recall, including but not limited to:

(a) Consumer notification and contact;

(b) All expenses and losses incurred by Company in connection with such Recall (and where applicable, any products with which the Recalled Merchandise has been packaged, consolidated or commingled), including but not limited to refunds to customers, lost profits, transportation costs, the cost to Company of its associates' time, systems expenses in processing any Recall, and all other costs associated therewith; and

(c) Initial contact and reporting of the Recall to any government agency having jurisdiction over the affected Recalled Merchandise. Supplier shall promptly, and in no event later than twenty-four (24) hours after its decision to initiate a Recall or its receipt of a Recall notice from a government entity, inform Company of the Recall. Supplier shall promptly inform Company of its becoming aware of any defect in the Merchandise that could reasonably be expected to cause damage, illness, injury or death to humans, animals, or property, or the noncompliance of the Merchandise with any applicable safety or regulatory standard or Law, whether imposed by a government entity or by Company. If a government agency initiates any inquiry or investigation relating to the Merchandise or similar or related goods of Supplier, Supplier shall notify Company immediately thereof and take reasonable steps to resolve the matter without exposing Company to any liability or risk. After acceptance of delivery, Company may periodically conduct testing of Merchandise for compliance with Laws, and other standards and specifications, the costs of which shall be paid or reimbursed to Company by Supplier.

4

**EXHIBIT A**      **PAGE 026**

**16. LIMITATION OF DAMAGES.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY PUNITIVE, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING BUT NOT LIMITED TO LOST PROFITS, BUSINESS REVENUES, BUSINESS INTERRUPTION AND THE LIKE), ARISING FROM OR RELATING TO THE RELATIONSHIP BETWEEN SUPPLIER AND COMPANY, INCLUDING ALL PRIOR DEALINGS AND AGREEMENTS, OR THE CONDUCT OF BUSINESS UNDER OR BREACH OF THIS AGREEMENT OR ANY ORDER, CANCELLATION OF ANY ORDER OR ORDERS OR THE TERMINATION OF BUSINESS RELATIONS, REGARDLESS OF WHETHER THE CLAIM UNDER WHICH SUCH DAMAGES ARE SOUGHT IS BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY, STATUTE, REGULATION OR ANY OTHER LEGAL THEORY OR LAW, EVEN IF COMPANY OR SUPPLIER HAS BEEN ADVISED BY THE OTHER PARTY OF THE POSSIBILITY OF SUCH DAMAGES. PROVIDED, HOWEVER, THE FOREGOING SHALL NOT LIMIT THE SPECIFIC RIGHTS AND REMEDIES EXPRESSLY PROVIDED IN THIS AGREEMENT, INCLUDING SECTIONS 14 AND 15, OR LIMIT LIABILITY FOR NEGLIGENT OR WILLFUL BREACH OF SECTIONS 28 AND 30.

**17. REMEDIES.** Supplier's breach of or failure to comply with any of the terms and conditions of this Agreement or any Order shall be grounds for Company to exercise any one or more of the following remedies:

(a) Cancellation of all or any part of any undelivered Order without notice, including but not limited to the balance of any remaining installments on a multiple-shipment Order;

(b) Rejection (or revocation of acceptance) of all or any part of any delivered shipment. Upon rejection or revocation of acceptance of any part of or all of a shipment, Company may return the Merchandise or hold it at Supplier's risk and expense. Payment of any Invoice shall not limit Company's right to reject or revoke acceptance. Company's right to reject and return or hold Merchandise at Supplier's expense and risk shall also extend to Merchandise which is returned by Company's customers. Company may, at its option, require Supplier to grant a full refund or credit to Company of the price actually paid by any customer of Company for any such item in lieu of replacement with respect to any item. Company shall be under no duty to inspect the Merchandise, and notice to Supplier of rejection shall be deemed given within a reasonable time if given within a reasonable time after notice of defects or deficiencies has been given to Company by its customers. In respect of any Merchandise rejected (or acceptance revoked) by Company, there shall be charged to Supplier all expenses incurred by Company in: (i) unpacking, examining, repacking and storing such Merchandise (it being agreed that in the absence of proof of a higher expense that the Company shall claim an allowance for each rejection at the rate of 10% of the price for such rejection made by Company); and (ii) landing and reshipping such Merchandise. Unless Company otherwise agrees in writing, Supplier shall not have the right to make a conforming delivery within the contract time;

(c) Termination or suspension of all current and future business relationships;

(d) Recovery from Supplier of any damages or expenses sustained by Company as a result of Supplier's breach; and

(e) Buyer's remedies under the Uniform Commercial Code and such other remedies as are provided under applicable Law. These remedies are not exclusive and are in addition to all other remedies available to Company at law or in equity.

**18. INSURANCE REQUIREMENTS.** During the term of this Agreement and for at least two (2) years thereafter, Supplier at its own cost and expense will procure and maintain insurance coverage from qualified underwriters meeting or exceeding the requirements posted at http://corporate.walmart.com/suppliers/references-resources/insurance-requirements, which are incorporated into this Agreement.

(a) Company may change the requirements for insurance posted at http://corporate.walmart.com/suppliers/references-resources/insurance-requirements at any time. Changes to the insurance requirements posted after the Effective Date of this Agreement, however, will not be applicable to Supplier until twelve (12) months after Company's posting of such changes.

(b) Upon Supplier's execution of this Agreement, Supplier must provide Company with a current Certificate of Insurance verifying Supplier's compliance with the insurance requirements. The Certificate of Insurance must be dated not more than thirty (30) days before the Effective Date of this Agreement and not less than thirty (30) days before the expiration of the policy period of any policy identified in the Certificate of Insurance. Thereafter, Supplier must provide current Certificates of Insurance (i) at any time upon request of Company; and (ii) not less than thirty (30) days prior to expiration of any policy required by this Agreement.

(c) The Certificate of Insurance must include the Supplier's Supplier Number, if one has been assigned to Supplier.

(d) Supplier will provide written notice to Company at least thirty (30) days prior to any cancellation, expiration, substitution or material change of or to any policy of insurance required by this Agreement.

(e) Supplier's failure to procure and maintain the insurance required by this Agreement constitutes a material breach and default under this Agreement by Supplier. In addition to and without limiting any other remedy available to Company, upon a breach by Supplier of its obligations under this Section, Company may withhold payment of any invoice and/or any Order until Supplier has provided written documentation of Supplier's compliance with this Section.

SUPPLIER CONTACT FOR PRODUCT LIABILITY CLAIMS:

| | | | |
|---|---|---|---|
| Name: | BUY INSTA SLIM INC | Insuring Company: AMERICAN EXEER INX SVCS | |
| Address: | 17662 ARMSTRONG AVE | Telephone: 7144493379 | Extension #: 0 |
| City/State/Zip: | IRVINE, CA 92614 | | |
| Telephone: | 9492632301 | Extension #: 0 | |
| Fax Number: | 9492632323 | E-mail: SONIAS@INSTASLIM.COM | |

**19. FORCE MAJEURE.** If any place of business or other premises of Company or Supplier shall be affected by lockouts, strikes, riots, war, acts of terrorism, fire, civil insurrection, flood, earthquake, acts of God, or any other casualty beyond that party's control (but not including market fluctuations other than those caused by reason of the foregoing), which might reasonably tend to impede or delay the delivery, receipt, handling, inspection, processing, sale or marketing of the Merchandise covered by this Agreement, the party so impacted may, at its option, cancel all or any part of the undelivered Order hereunder by giving prompt written notice to the other party.

**20. ASSIGNMENT; SUPPLIER NUMBER.** Except as specifically set forth in Section 6, Supplier may not assign, delegate, or otherwise transfer to any entity any of its rights or obligations under this Agreement or under any Order (including any rights to any Company vendor number) without Company's written consent. For purposes of and without limiting the foregoing, a Change of Control of Supplier will be deemed to constitute an assignment (or purported assignment) of this Agreement by Supplier. A "Change of Control" of Supplier means an event by which any person or entity, other than person(s) or entity(ies) having Control of Supplier as of

5

the Effective Date, acquires Control of Supplier. "Control" means having direct or indirect power to direct, or cause the direction of, the management and policies of an entity, whether through the ownership of voting securities (even if less than majority ownership), contract, or otherwise. Any purported assignment in violation of this provision will be void. The vendor/supplier number assigned to Supplier in connection with this Agreement is unique and personal to Supplier and is non-transferable. Any person other than Supplier that purports to transact business with Company under Supplier's supplier number will be jointly and severally liable with Supplier for all Supplier obligations to Company arising under this Agreement and any Order.

**21. PUBLICITY; USE OF NAME AND INTELLECTUAL PROPERTY.**   Supplier shall not refer to Company in any advertising or published communication without the prior written approval of Company.  Supplier shall not produce, distribute, sell, or dispose of Merchandise that incorporates intellectual property that is owned by or licensed to Company, including Company's name, logo, trademarks, service marks, patents, copyrights or trade dress, without the prior written approval of Company.  Company may use Supplier's name, logo, trademarks, service marks, marketing materials or content, copyrights and trade dress in connection with Company's marketing of the Merchandise.

**22. COMPLIANCE WITH STANDARDS FOR SUPPLIER.**   Supplier warrants that it has read and understands and will comply with the requirements set forth in the Standards located at http://corporate.walmart.com/suppliers, and as may be amended from time to time by Company.

**23. SEVERABILITY; WAIVER.**   No finding that a part of this Agreement is invalid or unenforceable shall affect the validity of any other part hereof.  A party's failure to enforce at any time any provision of this Agreement will not be construed as a waiver of such provision or of any rights thereafter to enforce such provision.  Any waiver of any of the terms and conditions of this Agreement or any Order must be in writing signed by an authorized representative of Company or Supplier.

**24. FORUM SELECTION; CHOICE OF LAW; STATUTE OF LIMITATIONS.**   This Agreement, any and all Orders, and any and all disputes arising hereunder or relating hereto, whether sounding in contract or tort, shall be governed by and construed in accordance with the laws of the State of Arkansas without regard to the internal law of Arkansas regarding conflicts of law, and the federal and/or state courts of Benton and/or Washington County, Arkansas, shall have exclusive venue and jurisdiction over any actions or suits relating thereto.  The parties shall not raise, and hereby waive, any defenses based upon venue, inconvenience of forum or lack of personal jurisdiction in any action or suit brought in accordance with the foregoing.  Any legal action brought by Supplier against Company must be filed within two (2) years after the date payment on the Order was due or it shall be deemed forever waived. The parties acknowledge that they have read and understand this clause and agree willingly to its terms.

**25. INTEREST OBLIGATIONS; ACCOUNT RECONCILIATIONS.**   Supplier shall pay amounts due to Company within thirty (30) days of the accrual date of the obligation. Company may charge Supplier interest at a rate equal to the lesser of 12% per year or the maximum rate allowed under Law for any obligations owed by Supplier to Company under this Agreement, including debit balances not paid within twenty (20) days after due, until such amounts are paid in full.  To address uncertainties regarding unclaimed property and to provide for timely account reconciliations, Company may: (i) retain, without payment to Supplier, any Merchandise received by Company for which Supplier does not invoice Company within one-hundred-eighty (180) days of Merchandise receipt; (ii) resolve any immaterial discrepancy in Company's accounts payable balance for Supplier in favor of and credited to Company, unless Supplier establishes within one-hundred-eighty (180) days after receiving a notification of claim from Company that such discrepancy should be resolved in favor of Supplier; and (iii) reasonably request a binding statement of account from Supplier, and Supplier shall provide same within thirty (30) days of such request, reflecting the aggregate cumulative balance owed by Company to Supplier through the date of such statement of account and such additional detail concerning same as Company may request.

**26. CONFIDENTIALITY.**   Except as required by Law, Supplier will treat as confidential: (i) this Agreement; (ii) any Orders; (iii) Company's costs, pricing, marketing, sales, customer and strategic information; (iv) the nature or results of any testing, inspection, or audit; and (v) any other information Company designates as confidential. Upon Company's request, Supplier will promptly return or destroy Company's confidential information.

**27. SUPPLIER REPRESENTATIVES.**   Supplier will not allow any employee or agent to make deliveries or perform services on Company's premises unless and until Supplier conducts a reasonable investigation, including a criminal background check, and determines that such person does not pose a reasonably ascertainable risk to the safety or property of Company, its associates, customers, or invitees.  Supplier will maintain employment authorization records (including Form I-9 records) for any of its employees who perform services or make deliveries on Company's premises, and will make such records available for inspection and audit by Company for purposes of confirming compliance as Company may from time to time request.

**28. NOTICES.**   Unless otherwise specifically provided for herein, any notice or demand which under the terms of this Agreement or under any Law must or may be given or made shall be in writing and shall be given or made by overnight express service addressed as follows: If to Company: Wal-Mart Stores, Inc., Attn: General Merchandise Manager (identify department or category), 702 SW 8th Street, Bentonville, AR 72716 (or, if to Sam's Club, Attn: General Merchandise Manager (identify department or category), 2101 SE Simple Savings Drive, Bentonville, AR 72716).  If to Supplier: to Supplier's address set forth above.  Such notice or demand shall be deemed given on the second business day after deposit of such notice or demand with the overnight express service.

**29. TERM; TERMINATION.**   This Agreement will commence on the Effective Date and continue in effect until terminated.  Upon at least thirty (30) days notice, either party may terminate this Agreement for any or no reason and without penalty.  This Agreement will continue to apply to any Order dated before the termination of this Agreement, even if the Merchandise is delivered or accepted after termination of this Agreement.  The acceptance by Supplier of any Order shall constitute acknowledgment of, and agreement with, the terms and conditions of this Agreement, the Order, and any standards, directives or policies incorporated into this Agreement, and a reaffirmation of the representations and warranties made in this Agreement.

**30. INFORMATION SECURITY.**   Supplier represents that it currently follows industry best practices to prevent any compromise of its information systems, computer networks, or data files ("Systems") by unauthorized users, viruses, or malicious computer programs which could in turn be propagated via computer networks, email, magnetic media or other means to Company.  Supplier shall immediately notify Company if the security of Supplier's Systems is breached or compromised in any way.  Supplier shall apply appropriate internal information security practices, including, but not limited to, using appropriate firewall and antivirus software; maintaining countermeasures, operating systems, and other applications with up to date virus definitions and security patches; installing

6

and operating security mechanisms in the manner in which they were intended and sufficient to ensure the Company will not be impacted nor its operations disrupted; and permitting only authorized users access to computer systems, applications, and Retail Link.  Supplier shall: (i) use up-to-date antivirus tools to remove known viruses and malware from any email message or data transmitted to Company; (ii) prevent the transmission of attacks on Company via the network connections between Company and the Supplier; and (iii) prevent unauthorized access to Company systems via the Supplier's networks and access codes.  In accordance with all applicable US and international privacy Laws, Supplier shall safeguard confidential protected individually identifiable personal information (health, financial, identity) which is received, transmitted, managed, processed, etc. and require its subcontractors or agents to meet the above security precautions.  If Supplier receives personally identifiable financial information of Company's customers, it will maintain a current SAS70 Type II audit.

**31. NO THIRD PARTY BENEFICIARIES.**  Except as expressly provided in this Agreement, Company and Supplier intend the terms and provisions of this Agreement and any Order to solely benefit Company and Supplier.  Company and Supplier do not otherwise intend to, and do not, confer third-party beneficiary rights on any other person or entity.

**32. SURVIVAL OF PROVISIONS.**  Sections 5, 6, 13, 14, 15, 16, 17, 21, 24 and 25, and any other provisions of this Agreement that by their nature are reasonably intended to survive termination, will survive the termination of this Agreement.

**33. LEGAL COMPLIANCE; ETHICAL, SOCIAL AND ENVIRONMENTAL STANDARDS.**
(a) Supplier will comply with the Standards and Laws of the jurisdictions in which the Supplier and all factories that produce Merchandise operate.  Supplier shall ensure through self-audits, third party audits or approved certification programs that all factories producing Merchandise, including subcontractors' factories, are in compliance with the Standards and all Laws, including those pertaining to labor, worker safety, and the environment.
(b) All factories, including subcontractors' factories, supplying Merchandise may be subject to announced and unannounced audits and/or verification audits by Company, its third party service providers and, if applicable, governmental agencies.  Supplier shall cooperate and ensure that all factories cooperate with such audits.  Supplier shall, and shall cause its contract factories to, provide all reasonable assistance for the safety and convenience of such auditors and inspectors in the performance of such audits, including providing adequate working area at the production facilities.  Supplier will bear or reimburse Company for the costs of such audits.

**34. NO BUSINESS EXPECTATION.**  Company has no obligation and makes no promises to purchase any minimum amount of Merchandise from Supplier.  No person has authority, on Company's behalf, to make any representations or promises to Supplier of any expected or possible level of business with Supplier or about Company's intentions or expectations regarding any present or future business with Supplier.  Company will never assume that Supplier will be willing to continue to deliver Merchandise under this Agreement or to accept any specific volume of Orders.  Conversely, Supplier should never assume that Company will issue Orders for specific volumes, if any, of Merchandise, even if Supplier's impression is based on discussions Supplier may have had with Company representatives.  No Company representative has authority to order Merchandise except an Authorized Buyer through an Order issued pursuant to and subject to the terms of this Agreement.

**35. BUSINESS PROGRAMS AND PROCESSES.**  From time to time, Company may alter, amend, or create new business programs or processes.  When it does, Company may provide notice to Supplier of such changes via its Retail Link system, its corporate website (http://corporate.walmart.com/suppliers), and/or by such other means of direct notification to Supplier as Company may determine.  After receiving such notice(s), Supplier's acceptance of Orders will serve as confirmation of its acceptance of Company's new business programs or processes.

**36. ENTIRE AGREEMENT.**  This Agreement, the Standards and any Order constitute the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement.  All prior agreements, negotiations, dealings and understandings, whether written (including any electronic record) or oral, regarding the subject matter hereof, are superseded by this Agreement.  Any changes in this Agreement shall be in writing and executed by both parties.  Furthermore, if there is a conflict of terms between this Agreement and an Order, this Agreement shall be the controlling document.

7

Supplier No. 444349          Department No. 82          Effective Date: 10/03/2013

**APPENDIX**

This Appendix constitutes and is part and incorporated into the Supplier Agreement. The terms of the Supplier Agreement are binding and enforceable as to this Appendix.

**1. STANDARD PURCHASE ORDER ALLOWANCE**

These allowances apply to each Order issued, unless otherwise agreed to by the parties.

Please note:

1. Only the following combinations are permissible:
   A. If Off Invoice ("OI") is selected for How Paid, Each Invoice ("EI") must be selected for When Paid;
   B. If Credit Memo ("CM") is selected for How Paid, Monthly ("M") must be selected for When Paid;
   C. If Check ("CK") is selected for How Paid, When Paid may be Monthly, Quarterly, Semi-Annually; or Annually.
2. If no allowance is offered leave "Disc %" field blank. Do not enter zero.
3. If "WA" is selected, "QD" must also be selected and "Disc %" must be the same. The WA and QD discounts are not cumulative.

| | | DISC | HOW PAID | | | WHEN PAID | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **CODE** | **ALLOWANCE** | % | OI | CM | CK | EI | M | Q | S | A |
| SA | New Store/Club Discount (% Applied to each line item for each new store P.O.) | | | | | | | | | |
| OL | New Store/Club Discount (% Represents contribution of total business to New Store Program.) | | | | | | | | | |
| NW | New Distribution Center | | | | | | | | | |
| WA | Warehouse Allowance | | | | | | | | | |
| QD | Warehouse Distribution Allowance | | | | | | | | | |
| DM | Defective/Returned Mdse. Allowance – Not applicable in Puerto Rico. (When selected must mark Option 3 under Return Policy.) | 0.5 | X | | | X | | | | |
| SD | Soft Goods Defective Allow | | | | | | | | | |
| PA | Promotional Allowance | | | | | | | | | |
| VD | Volume Discount | | | | | | | | | |
| FA | Freight Allowance | | | | | | | | | |
| AA | Advertising Allowance | | | | | | | | | |
| TR | TV/Radio Media Allowance | | | | | | | | | |
| DA | Display/Endcap Allowance | | | | | | | | | |
| EB | Early Buy Allowance | | | | | | | | | |
| HA | Handling Allowance | | | | | | | | | |

OI–Off Invoice; CM–Credit Memo; CK–Check; EI–Each Invoice; M–Monthly; Q–Quarterly; S–Semi-Annually; A–Annually;

IMPORTANT NOTICE: ALL PAYMENTS OF MONIES OWED PURSUANT TO THIS SUPPLIER AGREEMENT AND PURCHASE ORDERS MUST BE MAILED TO THE FOLLOWING ADDRESS: WAL-MART STORES, INC./SAM'S CLUB, C/O CORPORATE ACCOUNTING, P.O. BOX 500787, ST. LOUIS, MISSOURI 63150-0787.

**2. PAYMENT TERMS**

  **2**    Cash Discount — Enter whole percents

  **10**    Cash Discount Days Available (Must be filled in if a Cash Discount is used)

  **30**    Net Payment Days Available (Must be at least one day more than Cash Discount Days Available)

**EXHIBIT A**          **PAGE 030**

**3. SHIPPING TERMS**

__ Collect – F.O.B Supplier

X Prepaid – F.O.B Company

__ Prepaid To consolidator – F.O.B. Company's Consolidator

No minimum purchase is required for prepaid freight terms. No freight charges are to be added to invoices. Refer to the current Routing Instructions for detailed instructions.

**4. CONDITION OF SALE**

| __ Guaranteed Sales | __ Consignment | __ Preticketing | __ Prepricing |
| __ Overstock/Stock Balancing | __ Shelf Labels | __ Point of Sale (Pay from Scan) | __ Other |

If "Consignment" or "Point of Sale (Pay from Scan)" is selected, title and risk of loss will remain with Supplier until Company's retail sale of the Merchandise. Company's obligation to pay Supplier for Merchandise will arise only upon retail sale and Supplier will accept returns of unsold Merchandise. If "Guaranteed Sales" is selected, Supplier will accept returns of unsold Merchandise and will refund Company's purchase price. If "Markdown" or "Other" is selected, Supplier will share (in an amount to be agreed upon by the parties) in each markdown of retail price taken after sixty (60) days or later from Company's initial store set of Merchandise. If "Stock Balancing" is selected, Supplier will accept returns of Merchandise that Company determines are overstock or surplus and refund the greater of Company's landed cost or the current Merchandise cost in Company's system. If "Pre-Pricing" is selected, the purchase price will include pre-pricing of Merchandise by Supplier. If "Pre-Ticketing" is selected, the purchase price includes pre-ticketing of Merchandise by Supplier. If "Shelf Labels" is selected, the purchase price includes side counter labeling by Supplier.

**5. PRODUCT CHEMICAL INFORMATION**

Does Supplier currently sell, or anticipate selling, to Company under this Agreement any item of Merchandise that contains a powder, gel, paste, or liquid that is not intended for human consumption or any of the following products that are intended for human inhalation, consumption, or absorption: Lozenges, pills or capsules (e.g. pain relievers, vitamins); Medicated swabs, wipes and bandages; Patches (heated and/or medicated); Energy bars, diet supplements and vitamin drinks; Liquids (e.g. cough medicine, eye drops, ear drops, nasal spray and inhalers); Medicated shampoos, gums, ointments and creams; Lip balm, lip creams and petroleum jelly; Contraceptive foam, films, and spermicides; and Product/Equipment sold with chemicals (e.g. vaporizer sold with medication), and electronic cigarettes?

__ Yes X No

**6. RETURN POLICY**

Company may return to Supplier, at Supplier's expense, Merchandise that is: (i) defective or nonconforming; (ii) returned to Company by customer (either in-store or online); (iii) subject to Conditions of a Guaranteed Sale or Overstock/Stock Balancing; or (iv) subject to a Recall or product withdrawal under Section 15 of the Supplier Agreement (in any case "Returned Merchandise"). Returned Merchandise will remain returnable for sixty (60) days after Company and Supplier mutually agree to shut-off returns. Company will manage Returned Merchandise as follows:

Supplier will be charged the greater of the landed price of the Merchandise or the current Merchandise cost plus a 10% handling charge for all Returned Merchandise. Returned Merchandise will be shipped with return freight charges billed back to Supplier. Returns are F.O.B Company's dock.

**SUPPLIER MUST CHOOSE ONE OPTION BELOW:**

__*SUPPLIER OPTION #1: SUPPLIER WANTS RETURNED MERCHANDISE SENT TO SUPPLIER (CHECK ONLY ONE):*
   __ A. Returned Merchandise will be sent to Supplier directly from the location where then located (e.g. store, distribution center, etc.).
   Permanent return authorization #: _____ (not to exceed 12 digits) (if required for return shipment).If permanent RA not possible provide contact information for questions regarding return authorization numbers:
   Phone: _____ Extension #: _____ Contact: _____
   __ B. Returned Merchandise will be sent from store locations to Company's Return Centers and then sent to Supplier.
   Permanent return authorization #: _____ (not to exceed 12 digits) (if required for return shipment). If permanent RA not possible, provide contact information for questions regarding return authorizations:
   Phone: _____ Extension #: _____ Contact: _____
   RETURN SHIPPING ADDRESS: Address: _____City: _____State: ____Zip: _____

__*SUPPLIER OPTION #2: SUPPLIER DOES NOT WANT COMPANY TO SEND IT RETURNED MERCHANDISE. COMPANY MAY PROCESS RETURNED MERCHANDISE BY RECYCLING, DISPOSAL, SALVAGE, LIQUIDATION, OR DONATION AS COMPANY MAY DETERMINE IN ITS SOLE DISCRETION. Note: Supplier may incur additional handling charges to cover costs of destruction.*

9

X  *SUPPLIER OPTION #3: DEFECTIVE/RETURNED MERCHANDISE ALLOWANCE:*
Supplier will allow the Customer Satisfaction Merchandise Allowance stated in this agreement. The percentage must be adequate to cover all costs associated with Returned Merchandise, including but not limited to merchandise and handling costs, or additional claims will be filed by the Return Center at our fiscal year end.
X  A. Supplier does not want Company to send it Returned Merchandise. Company may process Returned Merchandise by recycling, disposal, salvage, liquidation, or donation when and where Company may determine in its sole discretion. Company has no obligation to account for the proceeds, if any, of such processing. Destruction or disposal costs, if any, will also be charged to Supplier.
___B. Returned Merchandise will be sent from store locations to Company's Return Centers and sent to Supplier.
Permanent return authorization #: _____ (not to exceed 12 digits) (if required for return shipment). If permanent RA not possible, provide contact information for questions regarding return authorizations:
Phone: _____  Extension #: _____  Contact: _____
RETURN SHIPPING ADDRESS: Address: _____ City: _____ State: ____ Zip: _____

**Authorization for Merchandise Returns (Under Option 1 or Option 3B).** Unless a return authorization is required, no prior approval by, or notice to, Supplier is required prior to any return to Supplier of Returned Merchandise. No return authorization given may be revoked by Supplier. Supplier waives any return authorization requirement if Supplier fails to respond within two (2) business days of Company's first attempt to contact Supplier requesting authorization, or if Supplier fails to complete any requested inspection or pick-up of Returned Merchandise within ten (10) days of Company's first attempt to contact Supplier.

NOTWITHSTANDING THE FOREGOING (AND UNDER ANY OPTION), SUPPLIER AUTHORIZES COMPANY TO PROCESS AND MANAGE RETURNED MERCHANDISE AS COMPANY CHOOSES IN ITS DISCRETION (BUT WITHOUT AFFECTING RESPONSIBILITY FOR RETURN COSTS), IF COMPANY DETERMINES, FOR WHATEVER REASON (INCLUDING THE CONDITION OF THE MERCHANDISE AND ITS PACKAGING), THAT THE OPTION SELECTED BY SUPPLIER IS UNSUITABLE. IN ADDITION, COMPANY IS NOT REQUIRED TO RETURN EMPTY OR DAMAGED PACKAGING TO SUPPLIER (OR RETURN CENTER) TO SUPPORT A CLAIM FOR RETURNED MERCHANDISE.

**7. SHIPPING INSTRUCTIONS**

Supplier will ship all Merchandise in accordance with the then current Shipping and Routing Instructions, Wal-Mart Stores, Inc. (the "Routing Instructions"). Supplier acknowledges it has received a copy of the Routing Instructions. The current Routing Instructions, as may be reasonably amended by Company from time to time, shall be available on Retail Link. Each purchase order will show a routing, which is determined by Company's Traffic Department. Supplier is liable for the excess transportation cost if the designated routing is not followed. If Supplier has a question concerning the routing selected, Supplier must call Company's Traffic Department before releasing the shipment at the following number: (479) 277-8098.

| SHIPPING POINT | SHIPPING STATE |
|---|---|
| LONG BEACH | CA |

10

**EXHIBIT A**                                    **PAGE 032**

### AMENDMENT TO SUPPLIER AGREEMENT

This Amendment is to the Supplier Agreement dated // between WALMART with its corporate offices at 702 SW 8th St., Bentonville, AR 72716 (hereinafter "Company") and BUY INSTA SLIM INC with its corporate offices at 17662 ARMSTRONG AVE (hereinafter "Supplier").

This Amendment shall be fully incorporated into the Supplier Agreement and any conflict between the Supplier Agreement and this Amendment shall be resolved in favor of this Amendment. Subsequent modifications, amendments, or addenda shall not change or affect this Amendment in any way unless this Amendment is specifically referenced therein and executed by Supplier and Company.

Pursuant to the foregoing, Company and Supplier specifically agree to the following changes to the Agreement:

Except as modified by this Amendment or by any other written agreement between the parties executed after the date of this Amendment, the sale and purchase of merchandise or goods by the parties will be controlled by the terms of the Supplier Agreement. This Amendment and the Supplier Agreement constitute the entire agreement between the parties with respect to its subject matter and no modification, change or alteration shall be effective unless in writing and executed by both parties.

| Silva, Sonia | MACH, RYAN | Grady, Joe | Kistler, Matt |
|---|---|---|---|
| Supplier | Buyer | Divisional Merchandise Manager | General Merchandise Manager |

11

# EXHIBIT "B"

## EXCLUSIVE BROKER AGREEMENT

This Exclusive Broker Agreement is made and entered into this day of June 22, 2014, by and between Buy Insta Slim, Inc ("Manufacturer") and Faith Business Management Co, Inc. d/b/a National Direct Sales & Marketing ("Broker"). Manufacturer and Broker are sometimes referred to individually as a "Party" and collectively as the "Parties."

WHEREAS Manufacturer desires Broker to act as its sole and exclusive independent sales agent for all sales of the Manufacturer's Products (as defined) within the Territory (as defined), and Broker desires to act as Manufacturer's sole independent sales agent for sales of the Products within the Territory.

### Exception.

Since Manufacturer has a sales agreement for Wal-Mart account, in effect until August 22, 2014, with Smart Invention, Inc., therefore Sales Agreement with Broker pertaining Wal-Mart account will take effect as of August 22, 2014.

NOW THEREFORE, in consideration of the mutual promises and covenants set forth herein, and intending to be legally bound, the Parties agree as follows:

1.    **Grant of Exclusive Rights.**

1.1    Manufacturer hereby appoints Broker as its exclusive sales agent for the Manufacturer's Products (as hereafter defined) within the Territory (as hereafter defined). Manufacturer shall permit Broker to use Manufacturer's Products' name for promotion and advertisement in the sale of the Products. While this Agreement remains in effect, Manufacturer will not, directly or indirectly, sell or otherwise exploit the Products within the Territory and will not permit anyone else, either directly or indirectly, to sell or otherwise exploit the Products within the Territory. Nothing in this Agreement shall prohibit Broker from distributing products of other manufacturers, whether or not such products are competitive with Manufacturer's Products.

1.2    Broker will comply with all applicable laws, rules and regulations in selling and otherwise exploiting the Products and in otherwise dealing with the Products.

2.    **Duties and Responsibilities of Manufacturer.**

2.1    Manufacturer shall provide training to Broker, including its agents or independent contractors, regarding the sale, promotion and use of the Products.

Page 1 of 8

Initial Here

**EXHIBIT A**                                    **PAGE 035**

2.2    Manufacturer shall provide literature and/or advertising and promotional materials, displays, and samples to Broker to assist Broker in its distribution of the Products.    Manufacturer shall further provide consultation, on a commercially reasonable basis, covering specific field problems encountered by Broker in relation to the Products.

2.3    Upon receipt of a customer order from Broker, Manufacturer will ship Products directly to the customer site designated in the order.

2.4    Manufacturer will provide Broker access to all information reasonably necessary for Broker to manage Manufacturer's account with each individual customer, specifically including but not limited to log-in or other access information to the customer's system, in order to enable Broker to directly access all information and data in Manufacturer's account with the customer.

3.    **Duties and Responsibilities of Broker.**

3.1    Broker shall use its best efforts, in a commercially reasonable manner, to sell Manufacturer's Products to existing and prospective customers within the Territory.

3.2    Broker will limit its claims and representations regarding the Products to those made by Manufacturer in its published literature or promotional materials, or as otherwise authorized by Manufacturer.

3.3    Broker will maintain adequate support staff, whether as employees of Broker or independent contractors or sub-distributors of Broker, necessary to perform its obligations under this Agreement.

3.4    Broker will cooperate with Manufacturer in collection of sales and inventory data, including periodic Broker inventory reports as requested by Manufacturer to assist Manufacturer in scheduling production, advance procurement of materials and compliance with laws and regulations.

3.5    Broker shall not, without the written consent of the Manufacturer, offer, promote, sell in the Territory any products which are the same or substantially the same or in any way are in competition with the products of the Manufacturer.

4.    **Compensation.**

4.1    Broker will receive a commission of **Five percent (5%)** of the gross sales price for all Products sold by Broker within the Territory.  For purposes of this section,

Initial Here

"gross sales price" shall mean the invoice price of the Products to the customer after any discounts, returns, charge backs, and rebates. Simultaneously with each shipment of Products, Manufacturer will provide Broker copies of all shipping receipts, bills of lading or similar documents evidencing delivery of the Products to the customers.

4.2     Broker's commission will be payable by Manufacturer to Broker, monthly by the tenth (10) day after Manufacturer receives payment from the customer.   Broker shall have the right to inspect and audit, upon three (3) days written notice, Manufacturer's  books and records related to customer orders, shipment, invoicing and payments for the Products sold within the Territory pursuant to this Agreement.

4.3     Broker agrees to cooperate with Manufacturer in attempting to collect from delinquent customers.

4.4     Broker's right to compensation will continue and will survive termination of this agreement as set forth in section 7 below.


5.     **Manufacturer's Warranty and Indemnity.**

5.1     Manufacturer warrants to Broker that (i) the Products and the packaging are and will be safe, the units of the Products sold to customers under this Agreement will be properly, adequately and safely packaged and labeled, and the Products and any supplemental materials comply and will comply with all applicable laws, rules and regulations, (ii) there is not any and there will not be any defect in the design of the Products or in any units of the Products sold to customers under this Agreement, (iii) the Products do not and will not violate any patent, copyright, trademark, service mark or other right and do not and will not contain any item, part or material which Manufacturer is not authorized to use.

5.2     Manufacturer will maintain product liability insurance in commercially reasonable amounts and will include Broker as an additional insured on its policy.

5.3.     Manufacturer will indemnify Broker against any liability and will hold Broker harmless from any loss, damage, cost and expense (including, without limitations, legal fees and expenses) which Broker incurs arising out of or in connection with any claim alleging facts that would constitute a breach by Manufacturer of any of its warranties under Section 5.1 or because of a breach by Manufacturer of any of such warranties.  It will not be a defense to any of the provisions of this Section 5 that Broker is familiar with the Product.

5.4.     Broker will notify Manufacturer of any claim described in Section 5.2 which is asserted against Broker.  Manufacturer may, at its expense, defend and settle any such claim; and if Manufacturer assumes such defense, it will notify Broker thereof and

Initial Here

thereafter Manufacturer will not except as provided in the next sentence, be obligated to pay any expenses of Broker in connection with such claim. Broker will cooperate in the defense of any such claim, and Manufacturer will pay any costs approved by the Manufacturer, incurred by Broker in connection therewith. Broker will not settle any claim for which Manufacturer may be liable without the prior written consent of Manufacturer.

6.    **Term and Termination.**

6.1    This Agreement shall continue until terminated by either Party upon thirty (30) days notice to the other Party.

6.2    If any amount owing under this Agreement is not paid when due, such amount will bear interest at the rate of 18% per annum. The provisions of this Section will survive termination of this Agreement.

6.3    This Agreement will terminate upon the filing of a petition in bankruptcy, whether voluntary or involuntary, by either Party.

7.    **Rights following Termination of Agreement.**

7.1    Termination of this Agreement for any reason will be without prejudice to the rights and obligations accrued to the date of termination.

7.2    For all customer accounts introduced by Broker to Manufacturer, Broker will continue to be paid at the commission rate stated in this Agreement as long as Manufacturer is making sales of Products to that customer. However, after termination, by way of example, and not limitation, if Broker successfully introduces the Products to *Walgreen's* stores, then as long as the Manufacturer makes sales to Walgreen's stores, Broker will be paid the stated commission rate on each sale for 6 months after termination date. For purposes of this section, Manufacturer will not be considered to be "making sales" to a customer if the customer has not ordered any Products from the Manufacturer for a period of 6 consecutive months.

8.    **General Provisions.**

8.1    *Invalid or unenforceable provisions.* If any provision of this Agreement, or its application to any person or circumstance, is invalid or unenforceable, then the remainder of this Agreement or the application of those provisions to other persons or circumstances shall not be affected thereby.

8.2    *Notices.* All notices hereunder shall be sent by hand delivery, facsimile

Page 4 of 8

Initial Here

**EXHIBIT A**                                                                **PAGE 039**

(with original sent regular mail), overnight receipted delivery, or by registered or certified mail to Parties as follows:

If to Manufacturer:

Buy Insta Slim, Inc
17662 Armstrong Ave
Irvine, CA 92614
PH 949-263-2301
Fax 949-263-2323

If to Distributor:

Mr. Joe Namee
Faith Business Management Co, Inc.
DBA National Direct Sales and Marketing
13809 Research Blvd., Ste. 635
Austin, TX 78750
PH: 512-260-6911
Fax: 512-335-7028

Either Party may change the address and/or fax number above by written notice to the other Party. Any time periods under this Agreement will run from the date of actual delivery of the notice. If any notice is sent under this Agreement by certified mail, the notice will be presumed delivered three days from the date of mailing.

8.3    *Applicable law.* All disputes arising under this Agreement shall be resolved by binding arbitration with JAMS. The location of the arbitration shall be determined by the arbitrator (or case manager), giving due consideration to the convenience of the witnesses and the nature of the dispute. The costs of the arbitration proceeding shall be borne equally by the parties; however, the arbitrator shall apportion the costs upon conclusion of the hearing.

8.4    *Costs and Expenses of enforcement.* The prevailing Party shall recover the reasonable costs and expenses, including reasonable attorney's fees, incurred by that Party in connection with any legal proceeding involving the enforcement of any of the provisions of this Agreement.

8.5    *Terminology.* All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine

Initial Here

**EXHIBIT A**                    **PAGE 040**

or neuter, as the context or sense of this Agreement or any section, paragraph or clause in this Agreement may require, as if the work had been fully and properly written in the appropriate number and gender.

8.6    *Amendment and assignment of Agreement.*  This Agreement shall not be modified or amended except by written agreement executed by both Parties.  This Agreement is assignable by Broker with the consent of the Manufacturer, such consent to not be unreasonably withheld.  Manufacturer may transfer and assign its rights and obligations under this Agreement to any entity which succeeds to all or substantially all of Manufacturer's business and assets.

8.7    *Headings.*  The paragraph headings throughout this Agreement are for convenience and reference only, and the words contained therein shall not be held to expand, modify, amplify or aid in the interpretation, construction or meaning of this Agreement.

8.8    *Entire Agreement.*  No representation, promise, guarantee or warranty was made to induce the execution hereof or in connection herewith which is not expressly contained in this Agreement. Broker recognizes that neither the Manufacturer nor any other person can guarantee Broker's success in the business. By the Execution and acceptance of this Agreement, the Parties acknowledge that they have read the same and understand each provision hereof.

8.9    *Date of Effectiveness.*  This Agreement shall be effective as of the date set forth below.

9.    **Territory**.

The Territory included within this Agreement is: Wal-Mart, Walgreens, CVS, Meijer, Sam's Club and Kmart

The Territory listed above includes all sales made directly to any listed account and all sales that are in any way connected to such account, such as sales arranged through a website maintained by one of the customers in the listed Territory.

Manufacturer, at its own discretion, can remove any of the above stores in the Territory, from the inclusion in this Agreement, If no sales relationship is established with that store within the 180 days of signing this agreement..

10.    **Products**.

Page 6 of 8

Initial Here

The Products included in this Agreement consist of the following:

All SKU's manufactured and represented by Buy Insta Slim, Inc.

Additionally, all Products developed by Manufacturer in the future that are similar to the existing Products shall be considered Products subject to this Agreement.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement.

Dated: 6 - 26 - / 6

Broker:
Faith Business Management Co, Inc. d/b/a
National Direct Sales & Marketing

By: _____
     Joseph S. Namee

Its: ___CEO_____

Manufacturer:

By: _____

Printed Name _HOUSHANG  TALILI_

Page 7 of 8

Initial Here _____

**EXHIBIT A**                                        **PAGE 042**

Its: _VICE PRESIDENT_

Page 8 of 8

Initial Here

**EXHIBIT A**                    **PAGE 043**

# EXHIBIT "C"



20160927_134141.jpg
1



20160927_134222.jpg
2



20160927_134238.jpg
3



20160929_113158.jpg

5



WalMart_NOP_5_20161005.jpg
20

**EXHIBIT A**                                    **PAGE 049**



WalMart_NOP_4_20161005.jpg
19



WalMart_NOP_2_20161007.jpg
17

**EXHIBIT A**                    **PAGE 051**



Walmart_NOP_1_20161005.jpg
16

**EXHIBIT A**                                      **PAGE 052**

# EXHIBIT B

Houshang Jalili                                      January 18, 2019

```
 1                    UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA--SOUTHERN DIVISION

 3

 4   BUY INSTA SLIM, INC., a          )
     California Corporation,          )
 5                                    )   Case No.
              Plaintiff,             )   8:18-cv-00011 AG (KESx)
 6        vs.                         )
                                      )
 7   FAITH BUSINESS MANAGEMENT        )
     COMPANY, INC., a Corporation     )
 8   doing business as NATIONAL       )
     DIRECT SALES & MARKETING;        )
 9   WAL-MART STORES, INC., a         )
     Corporation doing business as    )
10   WAL-MART; and DOES 1 through 30, )
     inclusive,                       )
11                                    )
              Defendants.             )
12   _____)

13

14

15

16

17               DEPOSITION OF HOUSHANG JALILI

18                  LOS ANGELES, CALIFORNIA

19                     JANUARY 18, 2019

20

21

22   REPORTED BY:  JENNY ROSENSTEIN, CSR
                   Certified Shorthand Reporter
23                 License No. 3160

24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

**EXHIBIT B**                                    **PAGE 053**

Houshang Jalili                                                            January 18, 2019

```
 1                    UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA--SOUTHERN DIVISION

 3

 4   BUY INSTA SLIM, INC., a        )
     California Corporation,        )
 5                                  )   Case No.
               Plaintiff,          )   8:18-cv-00011 AG (KESx)
 6        vs.                       )
                                    )
 7   FAITH BUSINESS MANAGEMENT      )
     COMPANY, INC., a Corporation   )
 8   doing business as NATIONAL     )
     DIRECT SALES & MARKETING;      )
 9   WAL-MART STORES, INC., a       )
     Corporation doing business as  )
10   WAL-MART; and DOES 1 through 30, )
     inclusive,                     )
11                                  )
               Defendants.          )
12   _____)

13

14

15

16

17

18

19

20             DEPOSITION OF HOUSHANG JALILI, taken at

21   1840 Century Park East, Suite 1900, Los Angeles,

22   California, on Friday, January 18, 2019 at 10:35 a.m.,

23   before Jenny Rosenstein, Certified Shorthand Reporter, in

24   and for the state of California.

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

**EXHIBIT B**                                                          **PAGE 054**

```
 1   FOR THE PLAINTIFF:

 2       LAW OFFICES OF MOKRI & ASSOCIATES
         BY:  Brad A. Mokri, Esq.
 3       1851 East First Street, Suite 900
         Santa Ana, California  92705
 4       714-619-9395

 5

 6

 7   FOR THE DEFENDANTS:

 8       GREENBERG TRAURIG, LLP
         BY:  Radha D.S. Kulkarni, Esq.
 9       1840 Century Park East, Suite 1900
         Los Angeles, California  90067
10       310-586-7724
         kulkarnir@gtlaw.com
11

12   ALSO PRESENT:

13       Monir Jalili

14

15

16

17

18

19

20

21

22

23

24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

**EXHIBIT B**                                                    **PAGE 055**

Houshang Jalili                                          January 18, 2019

 1    buyer and buyer probably talked to merchandising.  They
 2    over-ordered for one store and the store didn't have the
 3    room.
 4            Q.   In the same paragraph you say that Walmart
 5    returned merchandise that was not subject to recall.
 6                 Why do you say that?  Were there any recalls
 7    ever?
 8            A.   I am sorry.  What page are you looking at?
 9            Q.   Page 10 of the Complaint.
10            MR. MOKRI:  Paragraph 45.
11            THE WITNESS:  Which paragraph?
12    BY MS. KULKARNI:
13            Q.   Forty-five.  You said Walmart charges
14    plaintiff for merchandise that was not subject to recall
15    if product is withdrawn.  Let's start with recall.
16            A.   Well, as I said, it was not -- we should not
17    be subject to Walmart's overstocking or, for that matter,
18    subject to recall or product withdrawal.
19                 If a store was taken out of the loop -- let's
20    say they had -- I remember that there were 3300 stores
21    carrying the merchandise.  Then they reduce it to 2700
22    because these were smaller stores and not too population
23    and so on.  And then the merchandise was just as good.
24    Well, take it and sell it to another place.
25                 They wanted us to get the merchandise back.

                              **EXHIBIT B**                    **PAGE 056**

Houshang Jalili                                        January 18, 2019

1   They would send it directly back to us, which we refused.

2   We shouldn't be in charge of that.  They can just as easily

3   send it to another store and sell it.

4        Q.   But when they sent back these products that

5   didn't have any defects, you could have resold those

6   products; right?

7        A.   We could have except we had to incur the costs

8   because, as we just discussed, we are paying $2.60 for

9   each garment to be packaged and so on.  We had to pay gas

10  and truck and driver to take the merchandise to the

11  fulfillment center, so these are additional costs that we

12  had to incur, which Walmart washes their hand of it.

13       Q.   So I guess you would have lost the costs

14  associated with the product but you still could have sold

15  the product; correct?

16       A.   I could have.

17       Q.   And did you?

18       MR. MOKRI:  Objection.  Vague; overbroad.

19       THE WITNESS:  Again, I have to know the exact

20  returns and why the reason.

21  BY MS. KULKARNI:

22       Q.   Were there instances where you received back

23  a product that was not defective that you then sold to

24  another retailer?

25       A.   Correct, yes.

Houshang Jalili                                    January 18, 2019

```
 1   purchase order.
 2        Q.   And that means all of the inventory that you
 3   had assumed would be -- it was like the inventory that
 4   you had remaining --
 5        A.   Not exactly but close.
 6        Q.   You shipped all of that?
 7        A.   Like I said, not exactly but close.
 8        Q.   Can you be more specific?
 9        A.   Again, if I have that page that has all my
10   finished garments on hand that it was already packaged and
11   ready to ship, they did not place the order for the total
12   amount but it was close.
13        Q.   Do you know what the amount was for?
14        A.   Dollar-wise it was like 40 some thousand
15   dollars.
16        Q.   And did you receive payment for that?
17        A.   I believe we did.
18        Q.   You did; right?
19        A.   Yeah.   I have to go back because accounts were
20   in a little bit of a mess.
21        Q.   Did you ever make payment on any of the
22   monthly installments in the amount of $6,000?
23        A.   Because they would start to take money out --
24   I mean not to pay invoice and apply whatever the dollar
25   amount, I don't know, based on subsequent things I believe
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

**EXHIBIT B**                                    **PAGE 058**

Houshang Jalili                                          January 18, 2019

```
 1   orders; correct?
 2        A.   Correct.
 3        Q.   And it looks like your invoices conclude in
 4   September of 2017.  Was that the last time you received
 5   an order from Walmart?
 6        A.   That's correct.
 7        Q.   And those would have been for that 40 odd
 8   thousand dollars; correct?
 9        A.   Forty some thousand dollars.
10        Q.   And that was for the excess inventory.
11        A.   Correct.
12        Q.   So orders stopped in September of 2017?
13        A.   Yes.
14        Q.   And you had been notified initially in about
15   July of 2017 that they no longer wanted --
16        A.   At the end of July Griffin in an e-mail said
17   that they have decided not to go forward.
18        Q.   To place any orders.
19        A.   Yes.
20        Q.   This is going to be Exhibit 18.
21             (Exhibit 18 marked for identification.)
22             This looks similar to the other Exhibit 7 that
23   I had shown you.  This is your Complaint for Damages filed
24   in the Superior Court of California in the County of Los
25   Angeles.  This is the initial Complaint filed in the
```

Houshang Jalili                                            January 18, 2019

```
 1    was on a 15-day pay up to that time.  So I give the
 2    Walmart benefit of the doubt.  I took 2 percent off of
 3    that, and so that was a certain amount, and then I applied
 4    2.5 percent allowance for return for the balance of the
 5    time, and still I allowed the 2 percent discount for
 6    payment of up to 60 days, and I totaled it up, and I then
 7    came up with the 350,000 deducted from that.  Again, I am
 8    sure I can get the numbers.
 9         Q.   Do you know what the break -- assuming the
10    balance of was $350,000, that's what you've alleged what
11    would be the breakdown in that amount for the returns
12    versus completely unpaid invoices?
13         A.   I'd have to look it up.  I don't know.
14         Q.   Do you have any statement of what the ratio
15    would have been?
16         A.   I can't.
17         Q.   You wouldn't know if one was more than the
18    other?  Like --
19         A.   No, I can't.
20         Q.   Okay.  And then in Paragraph 60, Page 12, you
21    calculate that you were damaged over $500,000.  What does
22    that take into account?
23         A.   In that $500,000 came about that -- again,
24    what I calculated was if at .5 percent return allowance
25    for that portion and another one, and then --
```

Houshang Jalili                                    January 18, 2019

1          Q.   But that was the $350,000; right?

2          A.   Yes.  But in that I was offering in my

3    calculations much more than allowance that I should have.

4    In this one my allowance, again, based on the amount of

5    merchandise between the trims and fabric because we

6    purchased over $200,000 worth of fabric, which didn't

7    materialize because Walmart stopped purchasing in July.

8               I am fully aware that the contract says they

9    can do that any time.  When you work with a buyer for a

10   certain amount of time and he is representing Walmart and

11   they don't want their shelves to be left empty and they

12   tell us that this is what we are purchasing and we go and

13   spend our money and buying the fabric that sits for another

14   many months --

15         Q.   Stay on topic.

16         MR. MOKRI:  500,000.

17         THE WITNESS:  Okay.  $500,000.

18   BY MS. KULKARNI:

19         Q.   So that $500,000 is taking into account the

20   fabric that you had, the other supplies, in addition to

21   the balance on the invoices; correct?

22         A.   Yes.

23         MR. MOKRI:  Objection.  Calls for a legal

24   conclusion.

25   ///

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

**EXHIBIT B**                                      **PAGE 061**

Houshang Jalili                                                    January 18, 2019

```
 1                     REPORTER CERTIFICATE

 2             I, JENNY ROSENSTEIN, Certified Shorthand

 3     Reporter, Certificate No. 3160, for the State of

 4     California, hereby certify that HOUSHANG JALILI was

 5     by me duly sworn/affirmed to testify to the truth,

 6     the whole truth and nothing but the truth in the

 7     within-entitled cause; that said deposition was

 8     taken at the time and place herein named; that the

 9     deposition is a true record of the witness's

10     testimony as reported to the best of my ability by

11     me, a duly certified shorthand reporter and a

12     disinterested person, and was thereafter transcribed

13     under my direction into typewriting by computer;

14     that request:   [ X ] was   [ ] was not

15     made to read and correct said deposition.

16             I further certify that I am not interested

17     in the outcome of said action, nor connected with,

18     nor related to any of the parties in said action,

19     nor to their respective counsel.

20             IN WITNESS WHEREOF, I have hereunto set my

21     hand this 30th day of January, 2019.

22
                _____
23
                JENNY ROSENSTEIN
24              Certified Shorthand Reporter #3160

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

**EXHIBIT B**                                             **PAGE 062**

# EXHIBIT C

GREENBERG TRAURIG, LLP
Robert J. Herrington (SBN 234417)
Email: herringtonr@gtlaw.com
Robert S. Freund (SBN 287566)
Email: freundr@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone:  (310) 586-7700
Facsimile:  (310) 586-7800
Attorneys for Defendant,
WALMART INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—SOUTHERN DIVISION

| BUY INSTA SLIM, INC., a California Corporation | CASE NO.  8:18-cv-00011 AG (KESx) |
|---|---|
| Plaintiff, | **DEFENDANT WALMART INC.'S ANSWER TO SECOND AMENDED COMPLAINT** |
| v. | |
| FAITH BUSINESS MANAGEMENT COMPANY, INC., a Corporation doing business as NATIONAL DIRECT SALES & MARKETING; WAL-MART STORES, INC., a Corporation doing business as WAL-MART; and DOES 1 through 30, inclusive, | Action Filed:      December 5, 2017 Action Removed:  January 5, 2018 |
| Defendants. | |

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

OC 287860626v2

**EXHIBIT C**                              **PAGE 063**

1   Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc. ("Walmart"),
2   by and through its attorneys of record, hereby responds to the allegations of the Second
3   Amended Complaint filed by Plaintiff Buy Insta Slim, Inc. ("Plaintiff") in this action as
4   follows:

5       1.   Walmart lacks sufficient information to form a belief as to the truth of the
6   allegations in paragraph 1 and therefore denies those allegations.

7       2.   Walmart admits that Plaintiff's claims against Defendant Faith Business
8   Management Company are stayed pending arbitration.  Walmart lacks sufficient
9   information to form a belief as to the truth of the remaining allegations in paragraph 2
10  and therefore denies those allegations.

11      3.   Walmart avers that it is authorized to do business in California but denies
12  the remaining allegations in paragraph 3.

13      4.   To the extent the allegations in paragraph 4 set forth one or more legal
14  conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
15  information to form a belief as to the truth of the allegations in paragraph 4 and therefore
16  denies those allegations.

17      5.   To the extent the allegations in paragraph 5 set forth one or more legal
18  conclusions, they require no response.  Subject to the foregoing, Walmart states that it is
19  not challenging venue or the Court's jurisdiction.  Walmart denies that Plaintiff has any
20  claim against it and denies any remaining allegations in paragraph 5.

21      6.   To the extent the allegations in paragraph 6 set forth one or more legal
22  conclusions, they require no response.  Subject to the foregoing, Walmart avers that the
23  Court granted Plaintiff leave to file its Second Amended Complaint following dismissal
24  of the First Amended Complaint.  Walmart denies any remaining allegations in paragraph
25  6.

26      7.   Walmart admits that Plaintiff has supplied it product.  Walmart lacks
27  sufficient information to form a belief as to the truth of the remaining allegations in
28  paragraph 7 and therefore denies those allegations.

1
DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

**EXHIBIT C**                                                    **PAGE 064**

8.     To the extent the allegations in paragraph 8 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart admits that it entered a written agreement with Plaintiff dated October 3, 2013 (the "Agreement") but denies the remaining allegations in paragraph 8.

9.     To the extent the allegations in paragraph 9 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 9 and therefore denies those allegations.

10.     To the extent the allegations in paragraph 10 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 10 and therefore denies those allegations.

11.     To the extent the allegations in paragraph 11 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 11 and therefore denies those allegations.

12.     To the extent the allegations in paragraph 12 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart admits that it ordered merchandise from Plaintiff under the Agreement, but denies the remaining allegations in paragraph 12.

13.     To the extent the allegations in paragraph 13 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart admits that it ordered merchandise from Plaintiff under the Agreement, but denies the remaining allegations in paragraph 13.

14.     To the extent the allegations in paragraph 14 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 14.

2

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

**EXHIBIT C**                              **PAGE 065**

15.     To the extent the allegations in paragraph 15 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized returns" and lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 15 and therefore denies those allegations.

16.     To the extent the allegations in paragraph 16 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized returns" or "charge backs" and denies any wrongdoing. Walmart lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 16 and therefore denies those allegations.

17.     To the extent the allegations in paragraph 17 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized returns" or "improper charge backs" and denies any wrongdoing. Walmart lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 17 and therefore denies those allegations.

18.     To the extent the allegations in paragraph 18 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 18 and therefore denies those allegations.

19.     To the extent the allegations in paragraph 19 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 19.

20.     In response to paragraph 20, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 19 of the Second Amended Complaint.

21.     To the extent the allegations in paragraph 21 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient

3

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

EXHIBIT C                                                    PAGE 066

1  information to form a belief as to the truth of the allegations in paragraph 21 and
2  therefore denies those allegations.

3    22.    To the extent the allegations in paragraph 22 set forth one or more legal
4  conclusions, they require no response.  Subject to the foregoing, Walmart denies there
5  were any "unauthorized merchandise returns" or "charge backs," denies it acted
6  improperly regarding Plaintiff's participation in any "mark down program" and denies
7  any wrongdoing.  Walmart lacks sufficient information to form a belief as to the truth of
8  the remaining allegations in paragraph 22 and therefore denies those allegations.

9    23.    To the extent the allegations in paragraph 23 set forth one or more legal
10 conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
11 information to form a belief as to the truth of the allegations in paragraph 23 and
12 therefore denies those allegations.

13   24.    To the extent the allegations in paragraph 24 set forth one or more legal
14 conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
15 information to form a belief as to the truth of the allegations in paragraph 24 and
16 therefore denies those allegations.

17   25.    To the extent the allegations in paragraph 25 set forth one or more legal
18 conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
19 information to form a belief as to the truth of the allegations in paragraph 25 and
20 therefore denies those allegations.

21   26.    In response to paragraph 26, Walmart adopts, realleges, and incorporates by
22 reference its responses to the allegations in paragraphs 1 through 25 of the Second
23 Amended Complaint.

24   27.    To the extent the allegations in paragraph 27 set forth one or more legal
25 conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
26 information to form a belief as to the truth of the allegations in paragraph 27 and
27 therefore denies those allegations.

28

4

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

EXHIBIT C                                    PAGE 067

28.     To the extent the allegations in paragraph 28 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29.     To the extent the allegations in paragraph 29 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 29 and therefore denies those allegations.

30.     To the extent the allegations in paragraph 30 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 30 and therefore denies those allegations.

31.     To the extent the allegations in paragraph 31 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 31 and therefore denies those allegations.

32.     In response to paragraph 32, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 31 of the Second Amended Complaint.

33.     To the extent the allegations in paragraph 33 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 33 and therefore denies those allegations.

34.     To the extent the allegations in paragraph 34 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized merchandise returns" or "charge backs," denies it acted improperly regarding Plaintiff's participation in any "mark down program" and denies

5

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

EXHIBIT C                                              PAGE 068

any wrongdoing.  Walmart lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 34 and therefore denies those allegations.

35.    To the extent the allegations in paragraph 35 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 35 and therefore denies those allegations.

36.    To the extent the allegations in paragraph 36 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 36 and therefore denies those allegations.

37.    In response to paragraph 37, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 36 of the Second Amended Complaint.

38.    To the extent the allegations in paragraph 38 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart admits that it entered a written Agreement with Plaintiff dated October 3, 2013 and ordered merchandise from Plaintiff under the Agreement.

39.    To the extent the allegations in paragraph 39 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart admits that it ordered merchandise from Plaintiff under the Agreement and received invoices from Plaintiff but denies the remaining allegations in paragraph 39.

40.    To the extent the allegations in paragraph 40 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 40.

41.    To the extent the allegations in paragraph 41 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 41.

6

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

42.     To the extent the allegations in paragraph 42 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart avers that the parties' Agreement speaks for itself and denies any characterizations inconsistent with the terms of the Agreement.  Walmart denies any remaining allegations in paragraph 42.

43.     To the extent the allegations in paragraph 43 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 43.

44.     To the extent the allegations in paragraph 44 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart admits it had the right to return merchandise to Plaintiff under the Agreement.  Walmart denies any remaining allegations in paragraph 44.

45.     To the extent the allegations in paragraph 45 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 45.

46.     To the extent the allegations in paragraph 46 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 46.

47.     To the extent the allegations in paragraph 47 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 47.

48.     To the extent the allegations in paragraph 48 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 48.

49.     To the extent the allegations in paragraph 49 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the remaining allegations in paragraph 49.

7

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

50.     In response to paragraph 50, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 49 of the Second Amended Complaint.

51.     To the extent the allegations in paragraph 51 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized returns and charge backs" and lacks sufficient information to form a belief as to the truth of the allegations in paragraph 51 and therefore denies those allegations.

52.     To the extent the allegations in paragraph 52 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 52 and therefore denies those allegations.

53.     To the extent the allegations in paragraph 53 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there was any "February 2017 oral agreement" between Walmart and Plaintiff, denies there were any "unauthorized merchandise returns" or "charge backs," denies it acted improperly regarding Plaintiff's participation in any "mark down program," and denies any wrongdoing.  Walmart lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 53 and therefore denies those allegations.

54.     To the extent the allegations in paragraph 54 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 54 and therefore denies those allegations.

55.     To the extent the allegations in paragraph 55 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 55 and therefore denies those allegations.

8

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

OC 287860626v2

**EXHIBIT C**                                              **PAGE 071**

56.    To the extent the allegations in paragraph 56 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 56 and therefore denies those allegations.

57.    In response to paragraph 57, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 56 of the Second Amended Complaint.

58.    To the extent the allegations in paragraph 58 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized merchandise returns" or "charge backs," denies it acted improperly regarding Plaintiff's participation in any "mark down program," and denies any wrongdoing.  Walmart lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 58 and therefore denies those allegations.

59.    To the extent the allegations in paragraph 59 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 59 and therefore denies those allegations.

60.    To the extent the allegations in paragraph 60 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized merchandise returns" or "charge backs," denies it acted improperly regarding Plaintiff's participation in any "mark down program," and denies any wrongdoing.  Walmart lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 60 and therefore denies those allegations.

61.    To the extent the allegations in paragraph 61 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 61 and therefore denies those allegations.

9

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

62.     To the extent the allegations in paragraph 62 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 62 and therefore denies those allegations.

63.     To the extent the allegations in paragraph 63 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 63 and therefore denies those allegations.

64.     To the extent the allegations in paragraph 64 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 64 and therefore denies those allegations.

65.     In response to paragraph 65, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 64 of the Second Amended Complaint.

66.     To the extent the allegations in paragraph 66 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 66 and therefore denies those allegations.

67.     To the extent the allegations in paragraph 67 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies there were any "unauthorized merchandise returns" or "charge backs," denies it acted improperly regarding a "drop in orders" or Plaintiff's participation in any "mark down program," and denies any wrongdoing.  Walmart lacks sufficient information to form a belief as to the truth of the remaining allegations in paragraph 67 and therefore denies those allegations.

68.     To the extent the allegations in paragraph 68 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

EXHIBIT C                                              PAGE 073

1  information to form a belief as to the truth of the allegations in paragraph 68 and
2  therefore denies those allegations.

3      69.    To the extent the allegations in paragraph 69 set forth one or more legal
4  conclusions, they require no response.  Subject to the foregoing, Walmart denies that it
5  terminated its agreement with Plaintiff.  Walmart lacks sufficient information to form a
6  belief as to the truth of the allegations in paragraph 69 and therefore denies those
7  allegations.

8      70.    To the extent the allegations in paragraph 70 set forth one or more legal
9  conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
10  information to form a belief as to the truth of the allegations in paragraph 70 and
11  therefore denies those allegations.

12      71.    To the extent the allegations in paragraph 71 set forth one or more legal
13  conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
14  information to form a belief as to the truth of the allegations in paragraph 71 and
15  therefore denies those allegations.

16      72.    In response to paragraph 72, Walmart adopts, realleges, and incorporates by
17  reference its responses to the allegations in paragraphs 1 through 71 of the Second
18  Amended Complaint.

19      73.    To the extent the allegations in paragraph 73 set forth one or more legal
20  conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient
21  information to form a belief as to the truth of the allegations in paragraph 73 and
22  therefore denies those allegations.

23      74.    To the extent the allegations in paragraph 74 set forth one or more legal
24  conclusions, they require no response.  Subject to the foregoing, Walmart denies there
25  were any "unauthorized merchandise returns" or "charge backs," denies it acted
26  improperly regarding a "drop in orders" or Plaintiff's participation in any "mark down
27  program," and denies any wrongdoing.  Walmart lacks sufficient information to form a
28

11

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

EXHIBIT C                                    PAGE 074

belief as to the truth of the remaining allegations in paragraph 74 and therefore denies those allegations.

75.    To the extent the allegations in paragraph 75 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 75 and therefore denies those allegations.

76.    To the extent the allegations in paragraph 76 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 76 and therefore denies those allegations.

77.    To the extent the allegations in paragraph 77 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 77 and therefore denies those allegations.

78.    To the extent the allegations in paragraph 78 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 78 and therefore denies those allegations.

79.    In response to paragraph 79, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 78 of the Second Amended Complaint.

80.    To the extent the allegations in paragraph 80 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient information to form a belief as to the truth of the allegations in paragraph 80 and therefore denies those allegations.

81.    To the extent the allegations in paragraph 81 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart lacks sufficient

12

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

EXHIBIT C

1  information to form a belief as to the truth of the allegations in paragraph 81 and
2  therefore denies those allegations.

3       82.    In response to paragraph 82, Walmart adopts, realleges, and incorporates by
4  reference its responses to the allegations in paragraphs 1 through 81 of the Second
5  Amended Complaint.

6       83.    To the extent the allegations in paragraph 83 set forth one or more legal
7  conclusions, they require no response.  Subject to the foregoing, Walmart denies the
8  allegations in paragraph 83.

9       84.    To the extent the allegations in paragraph 84 set forth one or more legal
10  conclusions, they require no response.  Subject to the foregoing, Walmart denies the
11  allegations in paragraph 84.

12       85.    To the extent the allegations in paragraph 85 set forth one or more legal
13  conclusions, they require no response.  Subject to the foregoing, Walmart denies the
14  allegations in paragraph 85.

15       86.    To the extent the allegations in paragraph 86 set forth one or more legal
16  conclusions, they require no response.  Subject to the foregoing, Walmart denies that
17  Plaintiff is entitled to any legal or equitable relief regarding Plaintiff's claim for open
18  book account, and denies any remaining allegations in paragraph 86.

19       87.    In response to paragraph 87, Walmart adopts, realleges, and incorporates by
20  reference its responses to the allegations in paragraphs 1 through 86 of the Second
21  Amended Complaint.

22       88.    To the extent the allegations in paragraph 88 set forth one or more legal
23  conclusions, they require no response.  Subject to the foregoing, Walmart denies the
24  allegations in paragraph 88.

25       89.    To the extent the allegations in paragraph 89 set forth one or more legal
26  conclusions, they require no response.  Subject to the foregoing, Walmart denies the
27  allegations in paragraph 89.

28

13

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

OC 287860626v2

**EXHIBIT C**

90.     To the extent the allegations in paragraph 90 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies that Plaintiff is entitled to any legal or equitable relief regarding Plaintiff's claim for account stated and denies any remaining allegations in paragraph 90.

91.     In response to paragraph 91, Walmart adopts, realleges, and incorporates by reference its responses to the allegations in paragraphs 1 through 90 of the Second Amended Complaint.

92.     To the extent the allegations in paragraph 92 set forth one or more legal conclusions, they require no response.  Subject to the foregoing, Walmart denies the allegations in paragraph 92.

### WALMART'S ANSWER TO PRAYER FOR RELIEF

93.     Plaintiff's Prayer does not require a response.  To the extent a response is required, however, Walmart denies the allegations contained in the prayer for relief following paragraph 92 of the Second Amended Complaint and further denies that Plaintiff is entitled to any of the relief sought or any relief whatsoever.

### GENERAL DENIAL

Except as specifically admitted, Walmart denies every other allegation and implication of wrongdoing in the Second Amended Complaint.

### AFFIRMATIVE DEFENSES

Walmart sets forth the following affirmative defenses.  By asserting these defenses, Walmart does not assume the burden of establishing or refuting any fact, element, or proposition as to which Plaintiff bears the burden of proof.  Walmart reserves the right to raise additional defenses as the facts and discovery in this case warrant and in response to any new or amended claims or allegations asserted by Plaintiff.

### FIRST AFFIRMATIVE DEFENSE

#### (Failure to State a Claim for Relief)

1.     The Second Amended Complaint, and each claim for relief alleged, fails to state facts sufficient to constitute a claim for relief against Walmart under Fed. R. Civ. P.

14

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

**EXHIBIT C**                                                      **PAGE 077**

1  8(a) and 12(b)(6).  Plaintiff's breach of contract claim and common counts are vague and

2  conclusory.

## SECOND AFFIRMATIVE DEFENSE

### (No Injury)

5  2.  The Second Amended Complaint is barred, in whole or part, because

6  Plaintiff does not have any particularized or concrete injury. Walmart did not breach the

7  Agreement and does not owe Plaintiff any outstanding balance.

## THIRD AFFIRMATIVE DEFENSE

### (Good Faith)

10  3.  Plaintiff's claims are barred, in whole or part, because the acts or omissions

11  alleged to have been performed by Walmart, if performed at all, were done in good faith.

12  Walmart did not Breach the Agreement and carried out its obligations under the

13  Agreement in good faith.

## FOURTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

16  4.  Plaintiff's claims are barred, in whole or part, due to Plaintiff's failure to

17  mitigate its alleged damages, if any.  Plaintiff alleges it incurred losses due to

18  unauthorized merchandise returns.  Plaintiff should have attempted to mitigate any such

19  damages by, for example, selling the returned elsewhere and taking other measures to

20  recover the alleged losses.

## FIFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

23  5.  Plaintiff's claims are barred, in whole or part, by the doctrine of unclean

24  hands.  Plaintiff alleges it incurred losses due to a "drop in orders" from Walmart, despite

25  express language in the Agreement prohibiting Plaintiff from relying on any expectation

26  of continuing business with Walmart.

27

28

---

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

OC 287860626v2

**EXHIBIT C**                                   **PAGE 078**

## SIXTH AFFIRMATIVE DEFENSE

### (Waiver)

6.     Plaintiff's claims are barred, in whole or part, by the doctrine of waiver. Plaintiff alleges it incurred losses due to a "drop in orders" from Walmart.  Plaintiff expressly waived reliance on any expectation of continuing business with Walmart under the Agreement.

## SEVENTH AFFIRMATIVE DEFENSE

### (Estoppel)

7.     Plaintiff's claims are barred, in whole or part, by the doctrine of estoppel. The language in the Agreement estops Plaintiff from asserting claims based on any alleged losses incurred resulting from any anticipation of continued business with Walmart.

## EIGHTH AFFIRMATIVE DEFENSE

### (Full Payment)

8.     Plaintiff's claims are barred because the amounts and items to be owed to Plaintiff were, in fact, paid or provided to Plaintiff.  Walmart paid Plaintiff for merchandise properly received under the Agreement.

## NINTH AFFIRMATIVE DEFENSE

### (No Breach)

9.     Plaintiff's claims are barred, in whole or part, because Walmart did not breach any agreement between Walmart and Plaintiff.

## TENTH AFFIRMATIVE DEFENSE

### (No Attorneys' Fees)

10.     There is no basis in statute or contract for Plaintiff's request for attorneys' fees.

16

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

1    **ELEVENTH AFFIRMATIVE DEFENSE**

2    **(Accord and Satisfaction)**

3    11.    Plaintiff's claims are barred, in whole or part, by the equitable doctrine of

4 accord and satisfaction.  Plaintiff accepted payment from Walmart in satisfaction of any

5 obligations Walmart owed Plaintiff under the Agreement.

6    **TWELFTH AFFIRMATIVE DEFENSE**

7    **(Statute of Frauds)**

8    12.    Plaintiff's claims are barred, in whole or part, by the statute of frauds to the

9 extent the claims arise out of any alleged oral agreement between Plaintiff and Walmart.

10 The written Agreement expressly precludes oral modification and prohibits Plaintiff from

11 relying on any oral representations by any Walmart employee.

12    **THIRTEENTH AFFIRMATIVE DEFENSE**

13    **(Offset)**

14    13.    Without conceding that any act or omission of Walmart caused damage to

15 Plaintiff, Walmart alleges it is entitled to offset and recoup against any judgment that

16 may recoup against any judgment that may be entered against it all obligations that

17 Plaintiff owes Walmart.

18    **FOURTEENTH AFFIRMATIVE DEFENSE**

19    **(Contract Governed by Arkansas Law)**

20    14.    Plaintiff's claims against Walmart for breach of contract and the common

21 counts arise out of the written Agreement between Plaintiff and Walmart.  The

22 Agreement is governed by Arkansas law.  (*See* Dkt. No. 35-1 [Agreement] at p. 7, ¶ 24.)

23 Therefore, Plaintiff cannot assert claims under California law.

24    **RIGHT TO ASSERT ADDITIONAL DEFENSES**

25    Walmart has insufficient knowledge or information on which to form a belief as to

26 whether it may have additional, as yet unstated, defenses available in this action.

27 Walmart therefore reserves the right to assert additional defenses in the event discovery

28 indicates that they may be appropriate.  Walmart further reserves the right to amend its

1 Answer or otherwise plead in response to Plaintiff's Second Amended Complaint, and to
2 file such other Motions as it may deem advisable in defense of the case or as warranted
3 by information adduced through the discovery process

### WALMART'S PRAYER FOR RELIEF

5     **WHEREFORE**, Walmart prays for relief as follows:

6     1.    That Plaintiff take nothing by way of the Second Amended Complaint and
7 the Court dismiss the Second Amended Complaint with prejudice;

8     2.    That the Court enter judgment that Walmart is the prevailing party in this
9 action;

10     3.    That the Court award Walmart all costs, expenses, and attorneys' fees that it
11 is entitled to under applicable law; and

12     4.    For such other and further relief as the Court deems just and proper.

14 DATED: August 27, 2018           GREENBERG TRAURIG, LLP

15                   By    */s/ Robert J. Herrington*
16                         Robert J. Herrington
                        Attorneys for Defendant,
17                         WALMART INC.

18
19
20
21
22
23
24
25
26
27
28

18

DEFENDANT'S ANSWER TO SECOND AMENDED COMPLAINT

OC 287860626v2

**EXHIBIT C**            **PAGE 081**

# EXHIBIT D

**Maribel C**

| | |
|---|---|
| **From:** | John Edgmon <jedgmon@ndirsales.com> |
| **Sent:** | Thursday, May 12, 2016 12:04 PM |
| **To:** | Houshang Jalili; Sonia Silva |
| **Cc:** | Joe Namee |
| **Subject:** | FW: InstaSlim Item Selection Update |
| | |
| **Importance:** | High |

Sonia/ Houshang,

As per our conversation today, Walmart is planning on deleting the Insta-Slim Shirts from the ASOTV Modular.  This is due to the items are not hitting the hurdle rates on an Units/Store/Week basis, the hurdle rate for this category is 0.75-1.0 U/S/W and we've been consistently below this hurdle rate at 0.34 U/S/W on the Large and 0.24 U/S/W on the XL.

I have requested that the buyer take a second look at it and possibly keep the items in a smaller store count to allow the Return Deduction payment plan to be taken care of and extend the items' life in the stores.  Until I get confirmation from Walmart on the potential of a reduced store count, we should plan in the interim that the items will be deleted on the August Modular.  I've outlined the Modular time line below so that we know when to expect orders to stop coming in.


Modular Effective in Store = WK 29 – 8/15/16
Item Deleted in Store = WK 26 – 7/28/16
Last set of orders = WK 24 – 7/14/16

Walmart will also begin buying down their inventory as to help sell-through as much inventory on-hand prior to the deletion to help minimize the markdown risk for items that are deleted.  Expect this inventory buy-down to begin taking place now, and our orders each week will continue to decline leading up to the deletion.

If you have any questions please give me a call.

Thanks.


John Edgmon
National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Office  479.855.7354
Cell 479.633.2041
jedgmon@ndirsales.com

**From:** Griffin Sorenson
**Sent:** Friday, May 6, 2016 1:50 PM
**To:** John Edgmon <JEdgmon@ndirsales.com>
**Cc:** Ragen Turner <Ragen.Turner@walmart.com>
**Subject:** InstaSlim Item Selection Update

John,

1

InstaSlim000140

**EXHIBIT D**                                   **PAGE 082**

We have decided to delete the products going forward.

| UPC | Manufacturer | Item # | Item Description | Item Type | EST STORE CT | Retail |
|---|---|---|---|---|---|---|
| 0085047600401 | SMART INVENTIONS | 554361144 | INSTA SLIM LARGE | DELETE | 0 | $19.88 |
| 0085047600402 | SMART INVENTIONS | 554361147 | INSTA SLIM XL Tank | DELETE | 0 | $19.88 |

Thanks,

Griffin

**Griffin Sorenson Buyer – ASOTV & GM Checkout**

This email and any files transmitted with it are confidential and intended solely for the individual or entity to whom they are addressed. If you have received this email in error destroy it immediately. *** Walmart Confidential ***

2

InstaSlim000141

**EXHIBIT D**                    **PAGE 083**

# EXHIBIT E

**Maribel C**

| | |
|---|---|
| **From:** | John Edgmon <jedgmon@ndirsales.com> |
| **Sent:** | Thursday, November 03, 2016 8:14 AM |
| **To:** | Sonia Silva; Houshang Jalili; Joe Namee |
| **Cc:** | Monir Jalili |
| **Subject:** | RE: Action Needed: Start Sustainability Index Surveys |

Sonia / Houshang,

I finally got ahold of Griffin at WM and we will stay on the modular past Feb/March, however our store counts will be reduced to 1200-1500 stores each for the shirts.

As such you'll need to complete the index and pay the subscription fee.

John Edgmon
National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Office  479.855.7354
Cell 479.633.2041
jedgmon@ndirsales.com

---

**From:** Sonia Silva [mailto:Sonia.Silva@instaslim.com]
**Sent:** Tuesday, November 1, 2016 1:11 PM
**To:** John Edgmon <JEdgmon@ndirsales.com>; Houshang Jalili <Houshang.Jalili@instaslim.com>; Joe Namee <jnamee@ndirsales.com>
**Cc:** Monir Jalili <Monir.Jalili@instaslim.com>
**Subject:** RE: Action Needed: Start Sustainability Index Surveys

Hi John,

We know you're trying to get a hold of the buyer, but just as an fyi, we have 4 more days to deadline.

**EXHIBIT E**                    **PAGE 084**

# EXHIBIT F

**From:** Sonia Silva [mailto:Sonia.Silva@instaslim.com]
**Sent:** Friday, July 14, 2017 6:25 PM
**To:** Sandra Windham
**Cc:** Houshang Jalili
**Subject:** EXT: Buy Insta Slim Supplier # 44349 - Re: Walmart Orders
**Importance:** High

Dear Sandra,

I hope this email will find you in good health.

The purpose of this email is to get some clarification for the drastic drop in Walmart Orders in the last 2 order cycles of 7/06/2017 and 7/13/2017. As per attached, please find the inventory levels downloaded from Walmart Retail Link Portal.          It indicates that while these 2 items are currently active (item #s 554361144 & 554361147), in the most stores, they are out of stock. In February, we were advised that these 2 items will be carried over till February of 2018. Yet we have not received orders to replenish these stores.

We appreciate if you please advise what the status of these 2 items are. In the last 4 years, we have always provided WalMart with the highest quality, best prices, and always on time. In the past 4 years, all orders given to us on Thursday of the week for shipment the following Monday. To meet such a tight delivery requirements,  we have always, based on the last 4 prior weeks, maintained at least 3-4 weeks of inventory to make on time delivery.

Thank you,
Sonia Silva



17662 Armstrong Ave
Irvine Ca 92614
Ph: 949 263-2301 ext. 203
Fax: 949 263-2323
Email: sonias@instaslim.com

Follow Us for Deals, Tips and More!



2

**EXHIBIT F**                                    **PAGE 085**

# EXHIBIT G

**From:** John Edgmon <JEdgmon@ndirsales.com>
**Sent:** Wednesday, August 02, 2017 1:06 PM CDT
**To:** Griffin Sorenson <Griffin.Sorenson@walmart.com>
**Subject:** EXT: RE: Orders Question

Griffin,
I really need to schedule a call concerning the MD Payments and the inventory that I have produced due to the fact we were unaware of the decision to delete the items until this week.

I'm getting the details on what I have inventory/raw materials wise.  If we would have been notified earlier we could have made adjustments to our production/raw material supply to be in a better positon once the items were deleted.

Let me know.
Thanks.


John Edgmon
National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Office  479.855.7354
Cell 479.633.2041
jedgmon@ndirsales.com

**From:** John Edgmon
**Sent:** Monday, July 31, 2017 3:56 PM
**To:** 'Griffin Sorenson' <Griffin.Sorenson@walmart.com>; Coree West <Coree.West@walmart.com>
**Subject:** RE: Orders Question

Griffin,
Thanks for the info and I completed understand.  Do you have time for a quick 3-5 min call as I wanted to discuss the MD Payments we've been making over the past 4 months?

Thanks.


John Edgmon
National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Office  479.855.7354
Cell 479.633.2041
jedgmon@ndirsales.com

**From:** Griffin Sorenson [mailto:Griffin.Sorenson@walmart.com]
**Sent:** Monday, July 31, 2017 7:59 AM
**To:** John Edgmon <JEdgmon@ndirsales.com>; Coree West <Coree.West@walmart.com>
**Subject:** RE: Orders Question

John,

We are not going to go forward with your items any  longer.

Thanks,

Grifin

**Griffin Sorenson** **Senior Buyer – ASOTV, Checkout & Batteries**
Phone 479.204.3945 Fax: 479.204.9869
griffin.sorenson@walmart.com

**From:** John Edgmon [mailto:JEdgmon@ndirsales.com]
**Sent:** Thursday, July 27, 2017 1:52 PM
**To:** Coree West; Griffin Sorenson
**Subject:** EXT: RE: Orders Question

Griffin,
I haven't heard back from you, do you have time for a call?  I really need to get to the bottom of this as it's having an impact on our ability to pay back the markdown as per our agreement earlier this year.

Did something change on the items store count going past August?

Let me know.

CONFIDENTIAL

**EXHIBIT G**

John Edgmon
National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Cell:  479.633.2041
Office:  479.855.7354
jedgmon@ndirsales.com

---

**From:** John Edgmon
**Sent:** Friday, July 21, 2017 9:14 AM
**To:** Coree West <Coree.West@walmart.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Griffin Sorenson <griffin.sorenson@walmart.com>
**Subject:** Re: Orders Question

We haven't been notified of any changes. The plan we set with Griffin back in March was to stay the course till next year as we are paying back a markdown with payments each month for 12 months.

John Edgmon
National Account Manager
Cell - 479.633.2041
Office - 479.855.7354
Jedgmon@ndirsales.com

On Jul 21, 2017, at 8:51 AM, Coree West <Coree.West@walmart.com> wrote:

> Is there store count changes on your item on the new modular?
>
> Thanks,
> **Coree West**
> Replenishment Manager | Candy & Impulse
> Ph 479-258-6803
> Coree.West@walmart.com
> Walmart
> 702 Southwest 8th Street
> Bentonville, AR 72716-0265
> Save money. Live better.

---

**From:** John Edgmon [mailto:JEdgmon@ndirsales.com]
**Sent:** Thursday, July 20, 2017 4:38 PM
**To:** Coree West; Griffin Sorenson
**Subject:** EXT: RE: Orders Question

Griffin/Coree,
Orders this week came in again lower than normal, in looking at the forecast in CPFR it's decreasing to almost zero on WK 28.  Why is that?

John Edgmon
National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Office  479.855.7354
Cell 479.633.2041
jedgmon@ndirsales.com

---

**From:** John Edgmon
**Sent:** Thursday, July 20, 2017 11:30 AM
**To:** 'Coree West' <Coree.West@walmart.com>
**Subject:** RE: Orders Question

I also noted that the CPFR forecast pretty much dies off beginning WK 28, do you know what's causing this?

Item # 554361144 - INSTA SLIM LARGE
Item # 554361147 - INSTA SLIM XL TANK

Thanks.

John Edgmon

---

CONFIDENTIAL

**EXHIBIT G**

National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Office  479.855.7354
Cell 479.633.2041
jedgmon@ndirsales.com

---

**From:** Coree West [mailto:Coree.West@walmart.com]
**Sent:** Thursday, July 20, 2017 11:01 AM
**To:** John Edgmon <JEdgmon@ndirsales.com>
**Subject:** RE: Orders Question

I am not too worried. If this persist let me know.

Thanks,
**Coree West**
Replenishment Manager | Candy & Impulse
Ph 479-258-6803
Coree.West@walmart.com
Walmart
702 Southwest 8th Street
Bentonville, AR 72716-0265
Save money. Live better.

---

**From:** John Edgmon [mailto:JEdgmon@ndirsales.com]
**Sent:** Monday, July 10, 2017 9:19 AM
**To:** Coree West
**Subject:** EXT: Orders Question

Coree,
I was out of the office Thursday and Friday last week thus the delay in reaching out.  We didn't much in orders, just 2 POs for 36 units total.  I wanted to see if this is correct as we have usually averaged between 600-800 units per week in orders.

Vendor # 444349-82-0
Item # 554361144 - INSTA SLIM LARGE
Item # 554361147 - INSTA SLIM XL TANK


Thanks.

John Edgmon
National Account Manager
37 Queensferry Circle
Bella Vista, AR 72715
Cell:  479.633.2041
Office:  479.855.7354
jedgmon@ndirsales.com

EXHIBIT H

**Maribel C**

| | |
|---|---|
| **From:** | Houshang Jalili |
| **Sent:** | Tuesday, September 05, 2017 12:36 PM |
| **To:** | Coree West; Griffin Sorenson |
| **Cc:** | John Edgmon; Joe Namee; Brian O'Toole (botoole@otoole-atwell.com); sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili; Monir Jalili; Sonia Silva; Houshang Jalili |
| **Subject:** | RE: CANCELLATION OF PURCHASE AGREEMENT |

Hi Coree/ Griffin,

We have had no response to my email below, sent to you on 8/28/2017. We have consulted with our counsel and an independent attorney. We are confident that if we will be forced to take legal action, we will be able to establish that WalMart breached its contract with Buy Insta Slim, Inc, breached the covenant of good faith and fair dealing, intentionally and negligently made misrepresentations to Buy Insta Slim, Inc. to defraud it. In short, WalMart will be liable for damages including attorney fees which will be substantially higher than our settlement proposal for its unfair business practices.

Unless we receive your acceptance of our terms, specified in my email below, within the next 72 hours, we will not have any choice but to initiate a lawsuit to recover the damages caused by WalMart's unfair business practices. We are hoping to resolve these issues in an amicable manner and will not be forced to take any legal action.

Please advise.

Best Regards,
Houshang Jalili
Vice President
INSTA SLIM
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

1

InstaSlim000577

**From:** Houshang Jalili
**Sent:** Monday, August 28, 2017 2:03 PM
**To:** Coree West <Coree.West@walmart.com>; Griffin Sorenson <Griffin.Sorenson@walmart.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Joe Namee <jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Sonia Silva <Sonia.Silva@instaslim.com>; Houshang Jalili <houshang.jalili@instaslim.com>
**Subject:** FW: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree/Griffin,

I hope you are doing well. As per your request in our conference call on August 10, 2017, below please find the finished, ready to ship, inventory of item # 554361144 – INSTA SLIM LARGE TANK and item # 554361147 INSTA SLIM XL TANK as well as the inventory of additional fabric, supplies, WM retail box, trays, and cartons:

The following is the detail of the excess inventory:

ITEM # 55431144 – INSTA SLIM LARGE TANK: 1,655
ITEM # 55431147 – INSTA SLIM XL TANK: 2,298

SUPPLIES (TRIMS, ELASTIC, CARE LABELS, USA FLAG LABELS):
FOR 12,606 TANKS.
OUR COSTS: 12,606 X $0.79= $9,958.74

PACKAGING MATERIALS (RETAIL BOX, TRAY, INNERS, CARTON):

LARGE: 1,230,
 OUR COST: 1,230 X $1.72= $2,115.60
X-LARGE: 1,508,
OUR COST: 1,508 X $1.72= $2,593.76

FABRIC ON HAND: 4,912 YARDS,
OUR COST: 4,912 X $7.23= $ 35,513.76
FABRIC ON ROUTE: 9,628 YARDS,
OUR COST: 9,628X $7.23= $69,610.44

As you are aware, in February of 2017 we entered into an agreement with Walmart for the purchase of Insta Slim Products until March of 2018. However, you have chosen to stop ordering Insta Slim Products. We relied on our agreement with Walmart to carry these 2 items till March of 2018. Therefore, we are left with excess inventory. This excess inventory was

2

InstaSlim000578

**EXHIBIT H**                                    **PAGE 090**

completed based on justifiable reliance on our agreement with you, following the same procedure as past 4.5 years of our relationship.

Please note that in the past 4.5 years of being a Walmart supplier, Walmart orders have been given to us on every Thursday afternoon to be shipped 4 days later the following Monday. We are proud to say that we have never been late. To continue with on time fulfillment of Walmart orders, we have ordered fabric, elastic, care label, USA flag label, trim, and packaging materials to be able to fulfill timely, Walmart's weekly orders of approximately $10,000.00 per week for at least the next 13 weeks (13X$10,000.00).

In the spirit of cooperation, we are willing to accept the following:

- All open existing invoices for products shipped to Walmart, be paid in full value of the invoice.
- THERE WILL BE NO DEDUCTIONS AND NO ADDITIONAL CHARGE BACK, WHAT SO EVER FROM WALMART. NO REQUEST FOR PARTCIPATION IN THE PAST, PRESENT, OR FUTURE MARK DOWN OF INSTA SLIM PRODUCTS.
- Walmart will purchase ONLY the excess finished inventory:
  ITEM # 55431144- INSTA SLIM LARGE TANK, 1,655 X $11.60= $19,198.00
  ITEM # 55431147- INSTA SLIM XL TANK, 2,298 X $11.60= $26,656.80
  TOTAL PURCHASE: $19,198.00 + $26,656.80 = $45,854.80
- TERMS OF PURCHASE: NET, 15 DAYS.

  If you accept our terms stated above, we will not hold Walmart liable for all the losses due to purchases of excess trims and supplies, excess packaging materials, and excess fabrics.
  We will also release Walmart from its obligations to continue to order additional products for the balance of the term, till March 2018.

Additionally, since November of 2016, we have been charged back for returned merchandise, (211unitsX$11.60= $2,447.60). We have reached out to everyone at Walmart in the past 8 months and provided the pictures and documents of these unauthorized returns and have received NO response.

Attached to this email are few sample pictures of the unauthorized products returned to us (to attach all the pictures the file would be huge, but we can provide). As you can see none of these returned merchandise was our merchandise. Therefore, please arrange for the reimbursement of $2,447.60.

Please confirm receipt of this email and advise your acceptance of the above. We are hoping to resolve these issues in an amicable manner.

3

InstaSlim000579

**EXHIBIT H**                                   **PAGE 091**

Best Regards,
Houshang Jalili
Vice President

**INSTA**〓〓

17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

4

InstaSlim000580

**EXHIBIT H**                                          **PAGE 092**

EXHIBIT I

Case 8:18-cv-00011-AG-KES   Document 49-3   Filed 02/25/19   Page 102 of 184   Page ID
#:779
Case 8:18-cv-00011-AG-KES   Document 9   Filed 02/01/18   Page 1 of 3   Page ID #:48

1   MULCAHY, LLP
2   Kevin Adams (SBN 239171)
    Email: kadams@mulcahyllp.com
3   4 Park Plaza, Suite 1230
4   Irvine, California 92614
    Phone: (949) 252-9377
5   Fax: (949) 252-0090

6

7   O'TOOLE ATWELL, PC
    Brian O'Toole (SBN 15340510)
8   Email: botoole@otoole-atwell.com
9   504 Lavaca, Suite 1010
    Austin, Texas 78701
10  Telephone: (512) 476-4740
11  Facsimile: (512) 476-1228
    Attorneys for Defendant,
12  FAITH BUSINESS MANAGEMENT
13  COMPANY, INC., d/b/a NATIONAL
    DIRECT SALES AND MARKETING

14

15              **UNITED STATES DISTRICT COURT**

16      **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

17

18  BUY INSTA SLIM, INC., a          CASE NO. 8:18-cv-00011 AG (KESx)
19  California Corporation,
                                     **DEFENDANT FAITH BUSINESS**
20              Plaintiff,           **MANAGEMENT COMPANY, INC.'S**
                                     **NOTICE OF MOTION AND MOTION**
21      v.                           **TO COMPEL ARBITRATION**

22  FAITH BUSINESS
    MANAGEMENT COMPANY,
23  INC., a Corporation doing business   Date: March 5, 2018
    as NATIONAL DIRECT SALES &       Time: 10:00 a.m.
24  MARKETING; WAL-MART              Courtroom: 10D
    STORES, INC., a Corporation doing
25  business as WAL-MART; and        Complaint filed: December 5, 2017
    DOES 1 through 30, inclusive,
26                                   Case Removed: January 5, 2018
                Defendants.
27

28
                                     1
        Case No. 8:18-cv-00011 AG (KESx)

**EXHIBIT I**                                        **PAGE 093**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on March 5, 2018, at 10:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Andrew J. Guilford, United States District Court Judge, located at Courtroom 10D of the United States Courthouse, 11 West 4th Street, Santa Ana, CA 92701, Defendant Faith Business Management Co., Inc. d/b/a National Direct Sales & Marketing ("Defendant NDSM") will, and herby does, move the Court for an order compelling arbitration of the Complaint and all claims filed by Plaintiff Buy Insta Slim, Inc. ("BISI").

This Motion is based on this Notice of Motion and Motion to Compel Arbitration, the Memorandum of Points and Authorities in support of this Motion, the Declaration of Brian O'Toole and exhibits thereto, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at or before the time of the hearing.

/ / /

/ / /

/ / /

2

Case No. 8:18-cv-00011 AG (KESx)

**EXHIBIT I**                    **PAGE 094**

1       This motion is made following the attempted conference of counsel pursuant

2

3 to L.R. 7-3 which took place on September 20, 2017 and December 5, 2017.

4                               Respectfully submitted,

5 DATED: February 1, 2018           MULCAHY, LLP

6                    By: /s/ Kevin Adams /s/

7                        Kevin Adams

8                    O'TOOLE ATWELL, PC

9                    Brian O'Toole

10                    Attorneys for Defendant,

                   Faith Business Management

11                    Company, Inc., a Corporation

                   doing business as National

12                    Direct Sales & Marketing

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Case No. 8:18-cv-00011 AG (KESx)

MULCAHY, LLP
Kevin Adams (SBN 239171)
Email: kadams@mulcahyllp.com
4 Park Plaza, Suite 1230
Irvine, California 92614
Phone: (949) 252-9377
Fax: (949) 252-0090

O'TOOLE ATWELL, PC
Brian O'Toole (SBN 15340510)
Email: botoole@otoole-atwell.com
504 Lavaca, Suite 1010
Austin, Texas 78701
Telephone: (512) 476-4740
Facsimile: (512) 476-1228
Attorneys for Defendant,
FAITH BUSINESS MANAGEMENT
COMPANY, INC., d/b/a NATIONAL
DIRECT SALES AND MARKETING

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| BUY INSTA SLIM, INC., a California Corporation, <br><br> Plaintiff, <br><br> v. <br><br> FAITH BUSINESS MANAGEMENT COMPANY, INC., a Corporation doing business as NATIONAL DIRECT SALES & MARKETING; WAL-MART STORES, INC., a Corporation doing business as WAL-MART; and DOES 1 through 30, inclusive, <br><br> Defendants. | CASE NO. 8:18-cv-00011 AG (KESx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT FAITH BUSINESS MANAGEMENT COMPANY, INC.'S MOTION TO COMPEL ARBITRATION** <br><br> Date: March 5, 2018 <br> Time: 10:00 a.m. <br> Courtroom: 10D <br><br> Complaint filed: December 5, 2017 <br><br> Case Removed: January 5, 2018 |

1

**EXHIBIT I**                    **PAGE 096**

1    COMES NOW Defendant Faith Business Management Co., Inc. d/b/a

2    National Direct Sales & Marketing ("Defendant NDSM") and files this Motion to

3    Compel Arbitration and would respectfully show as follows:

4    **BACKGROUND FACTS**

5    1.    Plaintiff Buy Insta Slim, Inc. ("Plaintiff") and Defendant NDSM executed a

6    written contract entitled "Exclusive Broker Agreement" ("Agreement") on June 26,

7    2014, whereby Defendant NDSM was to act as the sole and exclusive independent

8    sales agent for Plaintiff for a number of products, including but not limited to sales

9    agreements with Defendant Wal-Mart Stores, Inc. d/b/a Wal-Mart ("Defendant

10   Wal-Mart"). Declaration of Brian O'Toole ("O'Toole Decl."), Ex. A.

11   2.    On August 20, 2014, Plaintiff and Defendant NDSM executed the

12   Amendment to Exclusive Broker Agreement ("Amendment"), whereby Defendant

13   NDSM formally took over the broker role for the Defendant Wal-Mart account

14   from that date forward. O'Toole Decl., Ex. B.

15   3.    In the course of acting as broker for the Wal-Mart account, Defendant

16   NDSM successfully arranged a large number of sales orders on behalf of Plaintiff.

17   The Agreement entitles Defendant NDSM to a commission of 5% of the gross sales

18   price for all products sold by Defendant NDSM within the relevant territory. At the

19   date of the filing of this motion, Plaintiff owes Defendant NDSM approximately

20   $21,879.03: $19,379.03 for sales that Plaintiff has already been paid for and that

21   Defendant NDSM has record of, and additional commissions estimated to total at

22   least $2,500.00 but that Defendant NDSM is unable to confirm at this time due to

23   Plaintiff's refusal to provide the necessary records. Plaintiff has failed to make

24   payment despite attempts to collect by both Defendant NDSM and its counsel.

25   4.    Section 8.3 ("Applicable Law") of the Agreement states the following: "All

26   disputes arising under this Agreement shall be resolved by binding arbitration with

27   JAMS. The location of the arbitration shall be determined by the arbitrator (or case

28

2

**EXHIBIT I**                                                    **PAGE 097**

1   manager), giving due consideration to the convenience of the witnesses and the

2   nature of the dispute. The costs of the arbitration proceeding shall be borne equally

3   by the parties; however, the arbitrator shall apportion the costs upon conclusion of

4   the hearing." *See* O'Toole Decl., Ex. B.

5   5.     Counsel for Defendant NDSM first discussed arbitrating the case via email in

6   September 2017. Counsel for Plaintiff replied to counsel for Defendant NDSM on

7   September 20, 2017, advising that he was unaware of "any enforceable arbitration

8   agreement" and requesting that counsel for Defendant NDSM provide him with a

9   copy. O'Toole Decl., Ex. C (A copy of the email thread containing both counsel for

10  Defendant's statement regarding arbitrating the case sent on September 19, 2017,

11  and counsel for Plaintiff's reply). That same day, counsel for Defendant NDSM

12  provided a copy of both the Agreement and the Amendment to counsel for Plaintiff.

13  O'Toole Decl., Ex. D. Counsel for Plaintiff never replied to that email.

14  6.     Defendant NDSM properly sent notice of a Demand for Arbitration with

15  JAMS to counsel for Plaintiff on November 6, 2017 and submitted the same

16  Demand to JAMS. *See* O'Toole Decl., Ex. D (A copy of the email and the attached

17  Demand). JAMS sent an email to both parties notifying them of JAMS' intent to

18  initiate arbitration on November 11, 2017. O'Toole Decl., Ex. E (A copy of that

19  email and the attached notice of Intent to Initiate Arbitration). JAMS then sent a

20  second email to both parties confirming Commencement of Arbitration on

21  November 28, 2017. *See* O'Toole Decl., Ex. F (A copy of that email and the

22  attached notice of Commencement of Arbitration). A week later on December 5,

23  2017, counsel for Plaintiff stated via email that while he was retained counsel for

24  Plaintiff, he would not be participating in the arbitration because "Buy Insta Slim

25  contests the enforceability of the arbitration agreement." *See* O'Toole Decl., Ex. G.

26  Defendant NDSM later discovered that Plaintiff filed suit in this Court that same

27  day.

28

3

**EXHIBIT I**                                    **PAGE 098**

7.      As delineated above, in a good faith attempt to comply with L.R. 7-3, counsel for Defendant NDSM attempted to confer with Plaintiff's counsel regarding the arbitration clause and any possible grounds for disputing the enforceability thereof, but received no response whatsoever from Plaintiff's counsel. Counsel for Defendant sent another unanswered email to counsel for Plaintiff, this time specifically inquiring as to Plaintiff's reason to contest the arbitration clause in the Agreement. *See* O'Toole Decl., Ex. H. Counsel for Plaintiff filed this suit a full month after first receiving Defendant NDSM's demand for arbitration.

## ARGUMENTS & AUTHORITIES

8.      If a Plaintiff brings a suit in federal court that is subject to mandatory binding arbitration, either party can file a motion to compel arbitration. *See* 9 U.S.C. § 4. The Federal Arbitration Act ("the Act") applies to all contracts involving interstate commerce and was enacted to overcome courts' reluctance to enforce arbitration agreements. *See* 9 U.S.C. § 2; *Allied-Bruce Terminix Cos. V. Dobson,* 513 U.S. 265, 270-71 (1995). The Act establishes a strong federal policy in favor of enforcing arbitration agreements. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002).

9.      Plaintiff and Defendant NDSM contractually agreed to arbitration, and all of the claims at issue are arbitrable. *See* O'Toole Decl., Ex. A; *see also* Plaintiff's Complaint for Damages. The entirety of Plaintiff's claims that pertain to Defendant NDSM arise from the written Agreement. Similarly, the claims asserted by Defendant NDSM in its Demand for Arbitration are based on that same Agreement. *See* O'Toole Decl., Ex. C. Even if this Court were to find that only some of the issues in this suit can be addressed at arbitration, the Supreme Court has interpreted the Act to require that if a dispute present multiple claims, some arbitrable and some not, the former must be sent to arbitration, even if it results in piecemeal

4

EXHIBIT I                                              PAGE 099

litigation. *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011); see *Dean Witter Reynolds Inc. v. Byrd*, 470 U. S. 213, 217, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985).

10.     Plaintiff and Defendant NDSM's agreement to arbitrate was and is valid. The validity of an agreement to arbitrate is determined by the relevant state's law governing the formation of contracts generally. *First Options v. Kaplan*, 514 U.S. 938, 944 (1995). The Agreement specified no controlling law or state, but both Texas and California law support compelling arbitration in this case. *See* O'Toole Decl., Ex. A.

11.     According to Texas law, where Defendant NDSM is headquartered, the court must broadly interpret the scope of an arbitration clause in light of the federal policy favoring arbitration. *In re NEXT Fin. Grp., Inc.*, 271 S.W.3d 263, 267 (Tex. 2008) (orig. proceeding). A party seeking to compel arbitration must establish that there is a valid arbitration agreement and that the claims raised fall within that agreement's scope. *In re Kellogg, Brown & Root, Inc.*, 166 SW.3d 732, 737 (Tex. 2005) (orig. proceeding). In order to establish a valid arbitration agreement, Texas courts look to the parties' intent as expressed in the contract. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.,* 297 S.W.3d 248, 252 (Tex. 2009). Texas courts have stated that arbitration agreements, like other contracts, must be supported by consideration, which may take the form of bilateral promises to arbitrate. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 676 (Tex. 2006); *see In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005) (per curiam). The Agreement binds both Plaintiff and Defendant NDSM to arbitration of any disputes. *See* O'Toole Decl., Ex. A. The Texas Supreme Court in In re Palm Harbor further held that when an arbitration clause is part of a larger, underlying contract, the remainder of that contract may suffice as consideration for the arbitration clause. *In re Palm Harbor Homes, Inc* at *id*. If the court determines that the arbitration agreement is valid, any doubts concerning the scope of the arbitrable issues should

5

EXHIBIT I                                    PAGE 100

1  be resolved in light of the policy and presumption favoring arbitration. *Granite Re*
2  *Inc. v. Jay Mills Contr. Inc.*, 2015 Tex. App. LEXIS 4182, 7-8 (Fort Worth – 2nd
3  Dist.), citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1,
4  24-25 (1983); accord *Ellis v. Schlimmer*, 337 S.W.3d 860, 861-62 (Tex. 2011). But
5  there are no such doubts in the case at hand. All claims presented by Defendant
6  NDSM in its Demand for Arbitration as well as those brought by Plaintiff in its
7  Complaint arise from the same written Agreement.

8  12.    According to California law, where Plaintiff is headquartered, when a written
9  agreement to arbitrate exists, the court shall compel the parties to arbitrate their
10  dispute unless it determines that grounds exist for the revocation of the
11  agreement. Cal. Civ. Proc. Code § 1281.2(b); *Moncharsh v. Heily & Blase* (1992)
12  3 Cal. 4th 1, 6 [10 Cal. Rptr. 2d 183, 184]. No such grounds exist, and Plaintiff has
13  pleaded none. Plaintiff's claims as set forth in its Complaint are based upon the
14  written Agreement, which Plaintiff has not alleged is illegal or unenforceable –
15  indeed, Plaintiff has brought suit for alleged breach of the Agreement. *See*
16  Plaintiff's Complaint for Damages.

17  13.    Even the state where Defendant Wal-Mart is headquartered favors
18  compelling arbitration. The Arkansas Supreme Court has ruled that to show a valid
19  arbitration provision, the issue is simply whether the language of the arbitration
20  provision constitutes a valid contract to arbitrate. *Money Place, LLC v. Barnes*, 349
21  Ark. 411, 414, (Ark. 2002), citing *Showmethemoney Check Cashers, Inc. v.*
22  *Williams*, 342 Ark. 112 (Ark. 2000). If a party can demonstrate the essential
23  elements of a contract, i.e. competent parties, subject matter, legal consideration,
24  mutual agreement, and mutual obligation, then a valid contract exists. *Id*. All of
25  these elements are present in the Agreement.

26  14.    The dispute that gave rise to this suit is within the scope of the arbitration
27  agreement. Defendant NDSM's claims in the demand for arbitration and Plaintiff's

28

6

Case No. 8:18-cv-00011 AG (KESx)

EXHIBIT I                                           PAGE 101

claims in its Complaint are all based upon the written Agreement between Plaintiff and Defendant NDSM. *See* O'Toole Decl., Ex. C; *see also* Plaintiff's Complaint for Damages.

15.    Defendant NDSM did not waive its right to have this dispute arbitrated. Federal courts have established a strong presumption against finding that a party waived its contractual right to arbitrate, and any doubts must be resolved in favor of arbitration. *Texaco Expl. & Prod. V. AmClyde Engineered Prods.*, 243 F.3d 906, 911 (5th. Cir. 2011). In the instant case, there can be no argument that Defendant NDSM waived its right to arbitrate, since Defendant NDSM properly initiated arbitration proceedings by sending its Demand for Arbitration to counsel for Plaintiff a full month prior to the filing of this suit. *See* O'Toole Decl., Ex. C. This Court should order that this case be arbitrated with JAMS.

16.    Per 9 U.S.C. § 3, Defendant NDSM further requests that this Court stay any further litigation of this suit pending the resolution of arbitration proceedings with JAMS.

17.    The California Supreme Court has stated that Title 9 of the Code of Civil Procedure represents the Legislature's expression of a "strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution." *Moncharsh v. Heily & Blase*, at 9, citing *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251]. This Court should resolve any doubts about the arbitrability of claims in favor of arbitration when deciding whether to grant or deny the motion to compel. *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006); see *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st. Cir. 2003) (as long as parties are bound to arbitrate and court has personal jurisdiction over them, court is under "unflagging, nondiscretionary duty" to grant timely motion to compel arbitration).

7

EXHIBIT I                                    PAGE 102

1

### **P**RAYER

2

3        WHEREFORE, Defendant NDSM respectfully requests that this Court grant

4   Defendant NDSM's Motion to Compel Arbitration, stay proceedings in this case,

5   and order arbitration with JAMS. Defendant NDSM further requests that this court

6   order arbitration of all claims in this case, as stated above; or in the alternative, all

7   claims that this court determines are arbitrable.

8                                                  Respectfully submitted,

9   DATED: February 1, 2018                        MULCAHY, LLP

10                                                 By: /s/ Kevin Adams /s/
                                                       Kevin Adams

11

12                                                 O'TOOLE ATWELL, PC
                                                   Brian O'Toole

13
                                                   Attorneys for Defendant,
14                                                 Faith Business Management
                                                   Company, Inc., a Corporation
15                                                 doing business as National
                                                   Direct Sales & Marketing

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      8

**EXHIBIT I**                                                        **PAGE 103**

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Brad A. Mokri
Law Offices of Mokri & Associates
1851 E. First Street, Suite 900
Santa Ana, California 92705
*Attorney for Plaintiff Buy Insta Slim, Inc.*


Robert J. Herrington
Robert S. Freund
Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
*Attorneys for Defendant Wal-Mart Stores, Inc.*


                    _____/s/ Kevin Adams /s/_____
                    Kevin Adams

9

Case No. 8:18-cv-00011 AG (KESx)

EXHIBIT I                                    PAGE 104

MULCAHY, LLP
Kevin Adams (SBN 239171)
Email: kadams@mulcahyllp.com
4 Park Plaza, Suite 1230
Irvine, California 92614
Phone: (949) 252-9377
Fax: (949) 252-0090

O'TOOLE ATWELL, PC
Brian O'Toole (SBN 15340510)
Email: botoole@otoole-atwell.com
504 Lavaca, Suite 1010
Austin, Texas 78701
Telephone: (512) 476-4740
Facsimile: (512) 476-1228
Attorneys for Defendant,
FAITH BUSINESS MANAGEMENT
COMPANY, INC., d/b/a NATIONAL
DIRECT SALES AND MARKETING

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| BUY INSTA SLIM, INC., a California Corporation,<br><br>    Plaintiff,<br><br>   v.<br><br>FAITH BUSINESS MANAGEMENT COMPANY, INC., a Corporation doing business as NATIONAL DIRECT SALES & MARKETING; WAL-MART STORES, INC., a Corporation doing business as WAL-MART; and DOES 1 through 30, inclusive,<br><br>    Defendants. | CASE NO. 8:18-cv-00011 AG (KESx)<br><br>**DECLARATION OF BRIAN O'TOOLE IN SUPPORT OF MOTION TO COMPEL ARBITRATION** |

1

**EXHIBIT I**        **PAGE 105**

1

I, Brian O'Toole, declare as follow:

2

1.      I am one of the attorneys of record for Faith Business Management

3

Company, Inc., d/b/a National Direct Sales and Marketing ("NDSM") in the above-

4

named action. I am a member in good standing of the State Bar of Texas and have

5

submitted a pro hac vice admission to practice law before this Court in connection

6

with this action.

7

1.      I make this declaration in support of MDSM's motion to compel arbitration

8

concurrently filed herewith.  As counsel for NDSM, I am intimately familiar with

9

10

its contracts and the other documents that I hereby submit with my declaration, and

11

I have been representing NDSM and its principals for more than fifteen years.  I

12

have personal knowledge of the facts stated herein and they are true and correct.

13

14

2.      Attached hereto are true and correct copies of the following documents:

15

16

a.  Exclusive Broker Agreement dated June 22, 2014 between NDSM and

17

Buy InstaSlim, the Plaintiff in this case (Exhibit A);

18

19

b.  Amendment to Exclusive Broker Agreement dated August 20, 2014

20

(Exhibit B);

21

22

c.  Email correspondence from Plaintiff's attorney Brad Mokri to me

23

dated September 20, 2017, including a string of email correspondence

24

between party representatives prior to September 20 (Exhibit C);

25

26

27

28

2

**EXHIBIT I**                                                        **PAGE 106**

d.  Email correspondence from me to Brad Mokri dated September 20, 2017, forwarding a copy of the contract and referencing the arbitration clause (Exhibit D);

e.  Email correspondence dated November 6, 2017 from Bridget O'Shaughnessy, an associate attorney in our firm, enclosing NDSM's demand for arbitration filed with JAMS (Exhibit E);

f.  Email Correspondence dated November 16, 2017 from JAMS to me and Mr. Mokri regarding commencement of arbitration (Exhibit F);

g.  Email correspondence from JAMS dated November 28, 2017 regarding Arbitration (Exhibit G);

h.  Email correspondence dated December 5, 2017, with prior correspondence included, between Mr. Mokri and a JAMS representative, wherein Mr. Mokri advises that his client disputes the enforceability of the arbitration agreement (Exhibit H);

3

**EXHIBIT I**                                                          **PAGE 107**

1       I declare under penalty of perjury under the laws of the State of California,

2  the State of Texas, and the laws of the United States of America that the foregoing

3  is true and correct and that this Declaration was executed this 1st day of February,

4  2018 at Austin, Texas.

5

6  DATED: February 1, 2018          O'TOOLE ATWELL, PC

7

8                     By:  /s/ Brian O'Toole

9                      Attorneys for Defendant,
Faith Business Management

10                   Company, Inc., a Corporation
doing business as National

11                   Direct Sales & Marketing

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

## EXCLUSIVE BROKER AGREEMENT

This Exclusive Broker Agreement is made and entered into this day of June 22, 2014, by and between Buy Insta Slim, Inc ("Manufacturer") and Faith Business Management Co, Inc. d/b/a National Direct Sales & Marketing ("Broker").  Manufacturer and Broker are sometimes referred to individually as a "Party" and collectively as the "Parties."

WHEREAS Manufacturer desires Broker to act as its sole and exclusive independent sales agent for all sales of the Manufacturer's Products (as defined) within the Territory (as defined), and Broker desires to act as Manufacturer's sole independent sales agent for sales of the Products within the Territory.

### Exception.

Since Manufacturer has a sales agreement for Wal-Mart account, in effect until August 22, 2014, with Smart Invention, Inc., therefore Sales Agreement with Broker pertaining Wal-Mart account will take effect as of August 22, 2014.

NOW THEREFORE, in consideration of the mutual promises and covenants set forth herein, and intending to be legally bound, the Parties agree as follows:

1.    **Grant of Exclusive Rights.**

1.1    Manufacturer hereby appoints Broker as its exclusive sales agent for the Manufacturer's Products (as hereafter defined) within the Territory (as hereafter defined).  Manufacturer shall permit Broker to use Manufacturer's Products' name for promotion and advertisement in the sale of the Products.  While this Agreement remains in effect, Manufacturer will not, directly or indirectly, sell or otherwise exploit the Products within the Territory and will not permit anyone else, either directly or indirectly, to sell or otherwise exploit the Products within the Territory.  Nothing in this Agreement shall prohibit Broker from distributing products of other manufacturers, whether or not such products are competitive with Manufacturer's Products.

1.2    Broker will comply with all applicable laws, rules and regulations in selling and otherwise exploiting the Products and in otherwise dealing with the Products.

2.    **Duties and Responsibilities of Manufacturer.**

2.1    Manufacturer shall provide training to Broker, including its agents or independent contractors, regarding the sale, promotion and use of the Products.

Initial Here

**Exhibit A**

EXHIBIT I                                        PAGE 109

EXHIBIT I                                                PAGE 110

2.2    Manufacturer shall provide literature and/or advertising and promotional materials, displays, and samples to Broker to assist Broker in its distribution of the Products.    Manufacturer shall further provide consultation, on a commercially reasonable basis, covering specific field problems encountered by Broker in relation to the Products.

2.3    Upon receipt of a customer order from Broker, Manufacturer will ship Products directly to the customer site designated in the order.

2.4    Manufacturer will provide Broker access to all information reasonably necessary for Broker to manage Manufacturer's account with each individual customer, specifically including but not limited to log-in or other access information to the customer's system, in order to enable Broker to directly access all information and data in Manufacturer's account with the customer.

3.    **Duties and Responsibilities of Broker.**

3.1    Broker shall use its best efforts, in a commercially reasonable manner, to sell Manufacturer's Products to existing and prospective customers within the Territory.

3.2    Broker will limit its claims and representations regarding the Products to those made by Manufacturer in its published literature or promotional materials, or as otherwise authorized by Manufacturer.

3.3    Broker will maintain adequate support staff, whether as employees of Broker or independent contractors or sub-distributors of Broker, necessary to perform its obligations under this Agreement.

3.4    Broker will cooperate with Manufacturer in collection of sales and inventory data, including periodic Broker inventory reports as requested by Manufacturer to assist Manufacturer in scheduling production, advance procurement of materials and compliance with laws and regulations.

3.5    Broker shall not, without the written consent of the Manufacturer, offer, promote, sell in the Territory any products which are the same or substantially the same or in any way are in competition with the products of the Manufacturer.

4.    **Compensation.**

4.1    Broker will receive a commission of **Five percent (5%)** of the gross sales price for all Products sold by Broker within the Territory.  For purposes of this section,

Page 2 of 8

Initial Here

EXHIBIT I                    PAGE 111

"gross sales price" shall mean the invoice price of the Products to the customer after any discounts, returns, charge backs, and rebates. Simultaneously with each shipment of Products, Manufacturer will provide Broker copies of all shipping receipts, bills of lading or similar documents evidencing delivery of the Products to the customers.

4.2    Broker's commission will be payable by Manufacturer to Broker, monthly by the tenth (10) day after Manufacturer receives payment from the customer.   Broker shall have the right to inspect and audit, upon three (3) days written notice, Manufacturer's books and records related to customer orders, shipment, invoicing and payments for the Products sold within the Territory pursuant to this Agreement.

4.3    Broker agrees to cooperate with Manufacturer in attempting to collect from delinquent customers.

4.4    Broker's right to compensation will continue and will survive termination of this agreement as set forth in section 7 below.

5.    **Manufacturer's Warranty and Indemnity.**

5.1    Manufacturer warrants to Broker that (i) the Products and the packaging are and will be safe, the units of the Products sold to customers under this Agreement will be properly, adequately and safely packaged and labeled, and the Products and any supplemental materials comply and will comply with all applicable laws, rules and regulations, (ii) there is not any and there will not be any defect in the design of the Products or in any units of the Products sold to customers under this Agreement, (iii) the Products do not and will not violate any patent, copyright, trademark, service mark or other right and do not and will not contain any item, part or material which Manufacturer is not authorized to use.

5.2    Manufacturer will maintain product liability insurance in commercially reasonable amounts and will include Broker as an additional insured on its policy.

5.3.    Manufacturer will indemnify Broker against any liability and will hold Broker harmless from any loss, damage, cost and expense (including, without limitations, legal fees and expenses) which Broker incurs arising out of or in connection with any claim alleging facts that would constitute a breach by Manufacturer of any of its warranties under Section 5.1 or because of a breach by Manufacturer of any of such warranties.  It will not be a defense to any of the provisions of this Section 5 that Broker is familiar with the Product.

5.4.    Broker will notify Manufacturer of any claim described in Section 5.2 which is asserted against Broker.  Manufacturer may, at its expense, defend and settle any such claim; and if Manufacturer assumes such defense, it will notify Broker thereof and

Page 3 of 8

Initial Here

EXHIBIT I                                    PAGE 112

thereafter Manufacturer will not except as provided in the next sentence, be obligated to pay any expenses of Broker in connection with such claim.  Broker will cooperate in the defense of any such claim, and Manufacturer will pay any costs approved by the Manufacturer, incurred by Broker in connection therewith.  Broker will not settle any claim for which Manufacturer may be liable without the prior written consent of Manufacturer.

6.    **Term and Termination.**

6.1    This Agreement shall continue until terminated by either Party upon thirty (30) days notice to the other Party.

6.2    If any amount owing under this Agreement is not paid when *due, such* amount will bear interest at the rate of 18% per annum.  The provisions of this Section will survive termination of this Agreement.

6.3    This Agreement will terminate upon the filing of a petition in bankruptcy, whether voluntary or involuntary, by either Party.

7.    **Rights following Termination of Agreement.**

7.1    Termination of this Agreement for any reason will be without prejudice to the rights and obligations accrued to the date of termination.

7.2    For all customer accounts introduced by Broker to Manufacturer, Broker will continue to be paid at the commission rate stated in this Agreement as long as Manufacturer is making sales of Products to that customer.  However, after termination, by way of example, and not limitation, if Broker successfully introduces the Products to *Walgreen's* stores, then as long as the Manufacturer makes sales to Walgreen's stores, Broker will be paid the stated commission rate on each sale for 6 months after termination date.  For purposes of this section, Manufacturer will not be considered to be "making sales" to a customer if the customer has not ordered any Products *from the* Manufacturer for a period of 6 consecutive months.

8.    **General Provisions.**

8.1    *Invalid or unenforceable provisions.*  If any provision of this Agreement, or its application to any person or circumstance, is invalid or unenforceable, then the remainder of this Agreement or the application of those provisions to other persons or circumstances shall not be affected thereby.

8.2    *Notices.*  All notices hereunder shall be sent by hand delivery, facsimile

Initial Here

**EXHIBIT I**                              **PAGE 113**

(with original sent regular mail), overnight receipted delivery, or by registered or certified mail to Parties as follows:

If to Manufacturer:

Buy Insta Slim, Inc
17662 Armstrong Ave
Irvine, CA  92614
PH   949-263-2301
Fax  949-263-2323

If to Distributor:

Mr. Joe Namee
Faith Business Management Co, Inc.
DBA National Direct Sales and Marketing
13809 Research Blvd., Ste. 635
Austin, TX  78750
PH: 512-260-6911
Fax:  512-335-7028

Either Party may change the address and/or fax number above by written notice to the other Party.  Any time periods under this Agreement will run from the date of actual delivery of the notice.  If any notice is sent under this Agreement by certified mail, the notice will be presumed delivered three days from the date of mailing.

8.3    *Applicable law.*   All disputes arising under this Agreement shall be resolved by binding arbitration with JAMS.   The location of the arbitration shall be determined by the arbitrator (or case manager), giving due consideration to the convenience of the witnesses and the nature of the dispute.  The costs of the arbitration proceeding shall be borne equally by the parties; however, the arbitrator shall apportion the costs upon conclusion of the hearing.

8.4    *Costs and Expenses of enforcement.*   The prevailing Party shall recover the reasonable costs and expenses, including reasonable attorney's fees, incurred by that Party in connection with any legal proceeding involving the enforcement of any of the provisions of this Agreement.

8.5    *Terminology.*  All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine

Page 5 of 8

Initial Here

**EXHIBIT I**                                                    **PAGE 114**

or neuter, as the context or sense of this Agreement or any section, paragraph or clause in this Agreement may require, as if the work had been fully and properly written in the appropriate number and gender.

8.6    *Amendment and assignment of Agreement.*  This Agreement shall not be modified or amended except by written agreement executed by both Parties.  This Agreement is assignable by Broker with the consent of the Manufacturer, such consent to not be unreasonably withheld.  Manufacturer may transfer and assign its rights and obligations under this Agreement to any entity which succeeds to all or substantially all of Manufacturer's business and assets.

8.7    *Headings.*  The paragraph headings throughout this Agreement are for convenience and reference only, and the words contained therein shall not be held to expand, modify, amplify or aid in the interpretation, construction or meaning of this Agreement.

8.8    *Entire Agreement.*   No representation, promise, guarantee or warranty was made to induce the execution hereof or in connection herewith which is not expressly contained in this Agreement. Broker recognizes that neither the Manufacturer nor any other person can guarantee Broker's success in the business. By the Execution and acceptance of this Agreement, the Parties acknowledge that they have read the same and understand each provision hereof.

8.9    *Date of Effectiveness.*  This Agreement shall be effective as of the date set forth below.

9.    **Territory**.

The Territory included within this Agreement is: Wal-Mart, Walgreens, CVS, Meijer, Sam's Club and Kmart

The Territory listed above includes all sales made directly to any listed account and all sales that are in any way connected to such account, such as sales arranged through a website maintained by one of the customers in the listed Territory.

Manufacturer, at its own discretion, can remove any of the above stores in the Territory, from the inclusion in this Agreement, If no sales relationship is established with that store within the 180 days of signing this agreement..

10.    **Products**.

Initial Here

**EXHIBIT I**                                                **PAGE 115**

The Products included in this Agreement consist of the following:

All SKU's manufactured and represented by Buy Insta Slim, Inc.

Additionally, all Products developed by Manufacturer in the future that are similar to the existing Products shall be considered Products subject to this Agreement.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement.

Dated: 6 - 26 - 16

Broker:
Faith Business Management Co, Inc. d/b/a
National Direct Sales & Marketing

By: _____
        Joseph S. Namee

Its:   ___CEO_____

Manufacturer:

By: _____

Printed Name HOUSHANG TALILI

Page 7 of 8

Initial Here

**EXHIBIT I**                                    **PAGE 116**

Its: _VICE PRESIDENT_

Page 8 of 8

Initial Here

**EXHIBIT I**                                              **PAGE 117**

**AMENDMENT TO EXCLUSIVE BROKER AGREEMENT**

This Amendment is made, on this day of August 20, 2014, to Exclusive Broker Agreement entered into on June 22, 2014, by and between Buy Insta Slim, Inc. ("Manufacturer") and Faith Business Management Co, Inc. d/b/a National Direct Sales & Marketing ("Broker").

Since Manufacturer's Sales Agreement with Smart Inventions, Inc. was terminated as of February 22, 2014 with effective termination date of May 22, 2014, therefore the Exclusive Broker Agreement with Broker pertaining the Wal-Mart account becomes effective as of May 23, 2014.

IN WITNESS WHEREOF, the parties have duly executed this Amendment dated: August 20, 2014.

Broker:
FAITH Business Management Co, Inc. d/b/a
National Direct Sales & Marketing

By:

Printed Name: Joseph S. Namee

Its:   CEO

Manufacturer:

By:

Printed Name: Houshang Jalili

**Exhibit B**

**EXHIBIT I**                                      **PAGE 118**

| | |
|---|---|
| **From:** | Brian OToole |
| **To:** | Bridget OShaughnessy |
| **Subject:** | FW: CANCELLATION OF PURCHASE AGREEMENT |
| **Date:** | Thursday, February 1, 2018 2:06:43 PM |

**From:** Brad A. Mokri [mailto:amirmokri1@yahoo.com]
**Sent:** Wednesday, September 20, 2017 12:53 AM
**To:** Brian OToole <botoole@otoole-atwell.com>
**Subject:** Re: CANCELLATION OF PURCHASE AGREEMENT

Dear Mr. OToole:
 I represent Insta Slim in the dispute with your client NDSM. As my client informed you, I am out of the country with a limited access to email and will be back on next Tuesday, September 26, 2017. I am glad that your client decided to hire an attorney, as my client has already authorized my office to proceed and file a lawsuit against your client for causes of action including but not limited for Breach of contract, Breach of Fiduciary Duty, Fraud, Negligent Misrepresentation, Common Count, etc. I was going to file the complaint after my return to the office next week. However, I will not proceed as planned in light of your claim that there is an enforceable arbitration agreement.

I am not aware of any enforceable arbitration agreement. If you are aware of an enforceable arbitration agreement, please forward it to my office or email it to me so I can respond accordingly.

I do my best to respond to your email in a timely manner. However, please note that I may not have access to email at all time until September 26, 2017. I'll be glad to talk to you upon my return back to my office.
Thanks,


*Brad A. Mokri*

**LAW OFFICES OF**
_____
**MOKRI & ASSOCIATES**
**1851 E. First Street, Suite 900**
**Santa Ana, California 92705**
**Tel:  (714) 619-9395**
**Fax: (888) 342-1406**

*******************************************************
*The information contained in this email is CONFIDENTIAL and/or privileged, including attachments. This EMAIL and ATTACHMENT is intended to be reviewed by only the individual named in the body of the above email. Any improper use or disclosure of the information contained herein is strictly prohibited.*

**Exhibit C**

**EXHIBIT I**                    **PAGE 119**

**From:** Brian OToole <botoole@otoole-atwell.com>
**To:** Houshang Jalili <houshang.jalili@instaslim.com>; Joe Namee <jnamee@ndirsales.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Sharon Burton <sburton@ndirsales.com>; "amirmokri1@yahoo.com" <amirmokri1@yahoo.com>; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>
**Sent:** Tuesday, September 19, 2017 3:31 PM
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

This is Brian O'Toole, NDSM's attorney.

I don't understand the communication below.  I was planning to initiate arbitration pursuant to the Broker Agreement but will hold off a little if the commissions are going to be paid.

No threats, no insults and I'm not interested in debating the liability.  Just three questions I would like answered:

1.  Are you going to pay?
2.  What amount (our last reconciliation indicates approximately $15,000 due, likely has increased slightly since then)?
3.  When?

Thank you,
Brian O'Toole


**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Tuesday, September 19, 2017 5:21 PM
**To:** Joe Namee <jnamee@ndirsales.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Brian OToole <botoole@otoole-atwell.com>; Sharon Burton <sburton@ndirsales.com>; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Houshang Jalili <houshang.jalili@instaslim.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Joe,

We will ignore your language, insults, your unprofessionalism, and your one liner threats. We will continue to honor our agreement as long as, you do your job and fulfill your obligations, representing us, as our sole agent with Walmart.
However, this is to serve you as our notice that any future unprofessional communication from you will be dealt with accordingly..

Best Regards,
Houshang Jalili
Vice President

**INSTA SLIM**

**EXHIBIT I**                                    **PAGE 120**

17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to the intended recipient you are
hereby notified that any dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in error, please notify us
immediately by telephone or e-mail, and destroy this message. Thank you.


**From:** Joe Namee [mailto:jnamee@ndirsales.com]
**Sent:** Tuesday, September 19, 2017 1:28 PM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com)
<botoole@otoole-atwell.com>; Sharon Burton <sburton@ndirsales.com>;
amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili
<monir.jalili@instaslim.com>
**Subject:** Re: CANCELLATION OF PURCHASE AGREEMENT


Does this mean your going to pay us?


Joe Namee
National Accounts
13809 Research Blvd Ste 635
Austin, TX 78750
512-260-6911 Direct
512-335-7028 FX
Sent via my super handy dandy Samsung Galaxy S8+


-------- Original message --------
From: Houshang Jalili <houshang.jalili@instaslim.com>
Date: 9/19/17 4:03 PM (GMT-05:00)
To: Coree West <Coree.West@walmart.com>
Cc: John Edgmon <JEdgmon@ndirsales.com>, Joe Namee <jnamee@ndirsales.com>, "Brian
O'Toole (botoole@otoole-atwell.com)" <botoole@otoole-atwell.com>, Sharon Burton
<sburton@ndirsales.com>, amirmokri1@yahoo.com, Eemaan Jalili <eemaanj@gmail.com>,
Monir Jalili <monir.jalili@instaslim.com>, Griffin Sorenson
<Griffin.Sorenson@walmart.com>, Houshang Jalili <houshang.jalili@instaslim.com>
Subject: RE: CANCELLATION OF PURCHASE AGREEMENT


**EXHIBIT I**                                      **PAGE 121**

Hi Coree,

Will do. Upon receiving the EDI, we will verify the accuracy and will advise you of discrepancy or concern immediately. We appreciate your cooperation.

Best Regards,
Houshang Jalili
Vice President
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Coree West [mailto:Coree.West@walmart.com]
**Sent:** Tuesday, September 19, 2017 7:52 AM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee <jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Griffin Sorenson <Griffin.Sorenson@walmart.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Jalili,
Orders have been sent to the OS team to process. You should receive EDI transmission within 24 hours. After receipt please verify accuracy of MABD and quantities and advise of any concerns. After the PO's have closed I will not modify or send orders for additional product.

Thanks,
**Coree West**
Replenishment Manager | Candy & Impulse
Ph 479-258-6803
Coree.West@walmart.com
Walmart
702 Southwest 8th Street
Bentonville, AR 72716-0265
Save money. Live better.

**EXHIBIT I**                                                           **PAGE 122**

**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Monday, September 18, 2017 12:52 PM
**To:** Coree West
**Cc:** S&E Gourmet Cuts - John Edgmon; Joe Namee; Brian O'Toole (botoole@otoole-atwell.com); sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili; Monir Jalili; Griffin Sorenson; Houshang Jalili
**Subject:** EXT: RE: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree,

As per attached last purchase dated August 3, 2017, this is to confirm the item numbers:
ITEM # 554361144    INSTA SLIM  LARGE  TANK
ITEM # 554361147    INSTA SLIM  XLG      TANK
Are the correct item numbers.

Best Regards,
Houshang Jalili
Vice President
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Coree West [mailto:Coree.West@walmart.com]
**Sent:** Sunday, September 17, 2017 2:16 PM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee <jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Griffin Sorenson <Griffin.Sorenson@walmart.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Jalili,
I am trying to put together an Order however those item numbers are not valid in the Walmart

**EXHIBIT I**                                                    **PAGE 123**

system. Please verify they are correct.

Thanks,
**Coree West**
Replenishment Manager | Candy & Impulse
Ph 479-258-6803
Coree.West@walmart.com
Walmart
702 Southwest 8th Street
Bentonville, AR 72716-0265
Save money. Live better.

---

**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Friday, September 15, 2017 1:12 PM
**To:** Griffin Sorenson; Coree West
**Cc:** S&E Gourmet Cuts - John Edgmon; Joe Namee; Brian O'Toole (botoole@otoole-atwell.com); sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili; Monir Jalili; Houshang Jalili
**Subject:** EXT: FW: CANCELLATION OF PURCHASE AGREEMENT

Hi Griffin / Coree,

Gentlemen, it has been 10 days since we emailed you our acceptance of your offer, you sent to us in your email, on Sep. 7, 2017. We have not received your purchase order for the remainder of the inventory, as you specified in your email. Please advise when can we expect your purchase order. We appreciate your urgent attention to this matter.

Best Regards,
Houshang Jalili
Vice President
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Houshang Jalili

**EXHIBIT I**                                              **PAGE 124**

**Sent:** Friday, September 08, 2017 9:00 AM
**To:** 'Griffin Sorenson' <Griffin.Sorenson@walmart.com>; Coree West
<Coree.West@walmart.com>
**Cc:** 'houshang@instaslim.com' <houshang@instaslim.com>
**Subject:** FW: CANCELLATION OF PURCHASE AGREEMENT

Hi Griffin/Coree,

Please advise when we can expect the purchase order for the remainder of
inventory as specified below. I appreciate if you let me know as soon as
possible.

Best Regards,
Houshang Jalili
Vice President
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to the intended recipient you are
hereby notified that any dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in error, please notify us
immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Houshang Jalili
**Sent:** Thursday, September 07, 2017 2:20 PM
**To:** Griffin Sorenson <Griffin.Sorenson@walmart.com>; Coree West
<Coree.West@walmart.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee
<jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-
atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili
<eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Houshang Jalili
<houshang.jalili@instaslim.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Hi Griffin,

In the spirit of cooperation, we are willing to accept your offer of purchasing
the remainder of the inventory, of:

**EXHIBIT I**                                        **PAGE 125**

ITEM # 55431144- INSTA SLIM LARGE TANK:  QUANTITY: 1,655
ITEM # 55431147- INSTA SLIM XL TANK: QUANTITY : 2,298
AT THE STANDARD PAYMENT TERMS, PROVIDED:

WALMART WILL REIMBURSE US FOR THE UNAUTHORIZED
PRODUCTS RETURNED TO US AS INSTA SLIM PRODUCTS, ( pictures
have been provided many times before and can be provided again).
The quantity is 211units. 211 X $11.60 = $2,447.60.

Best Regards,
Houshang Jalili
Vice President
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to the intended recipient you are
hereby notified that any dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in error, please notify us
immediately by telephone or e-mail, and destroy this message. Thank you.


**From:** Griffin Sorenson [mailto:Griffin.Sorenson@walmart.com]
**Sent:** Thursday, September 07, 2017 10:32 AM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>; Coree West
<Coree.West@walmart.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee
<jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-
atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili
<eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Sonia Silva
<Sonia.Silva@instaslim.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Houshang,

We do not have a contract to purchase any units. Per the Walmart vendor agreement, we
reserve the right to cancel POs or stop issuing POs at any time. I am willing to discuss taking
the remainder of the inventory that you have remaining, however it would be at the standard
payment terms.

**EXHIBIT I**                    **PAGE 126**

Griffin

**Griffin Sorenson Senior Buyer – ASOTV, Checkout & Batteries**
Phone 479.204.3945 Fax: 479.204.9869
griffin.sorenson@walmart.com

**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Tuesday, September 05, 2017 2:36 PM
**To:** Coree West; Griffin Sorenson
**Cc:** S&E Gourmet Cuts - John Edgmon; Joe Namee; Brian O'Toole (botoole@otoole-atwell.com); sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili; Monir Jalili; Sonia Silva; Houshang Jalili
**Subject:** EXT: RE: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree/ Griffin,

We have had no response to my email below, sent to you on 8/28/2017. We have consulted with our counsel and an independent attorney. We are confident that if we will be forced to take legal action, we will be able to establish that WalMart breached its contract with Buy Insta Slim, Inc, breached the covenant of good faith and fair dealing, intentionally and negligently made misrepresentations to Buy Insta Slim, Inc. to defraud it. In short, WalMart will be liable for damages including attorney fees which will be substantially higher than our settlement proposal for its unfair business practices.

Unless we receive your acceptance of our terms, specified in my email below, within the next 72 hours, we will not have any choice but to initiate a lawsuit to recover the damages caused by WalMart's unfair business practices. We are hoping to resolve these issues in an amicable manner and will not be forced to take any legal action.

Please advise.

Best Regards,
Houshang Jalili
Vice President
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com .

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are

**EXHIBIT I**                                                    **PAGE 127**

hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Houshang Jalili
**Sent:** Monday, August 28, 2017 2:03 PM
**To:** Coree West <Coree.West@walmart.com>; Griffin Sorenson <Griffin.Sorenson@walmart.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Joe Namee <jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Sonia Silva <Sonia.Silva@instaslim.com>; Houshang Jalili <houshang.jalili@instaslim.com>
**Subject:** FW: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree/Griffin,

I hope you are doing well. As per your request in our conference call on August 10, 2017, below please find the finished, ready to ship, inventory of item # 554361144 – INSTA SLIM LARGE TANK and item # 554361147 INSTA SLIM XL TANK as well as the inventory of additional fabric, supplies, WM retail box, trays, and cartons:

The following is the detail of the excess inventory:

ITEM # 55431144 – INSTA SLIM LARGE TANK: 1,655
ITEM # 55431147 – INSTA SLIM XL TANK: 2,298

SUPPLIES (TRIMS, ELASTIC, CARE LABELS, USA FLAG LABELS): FOR 12,606 TANKS.
OUR COSTS: 12,606 X $0.79= $9,958.74

PACKAGING MATERIALS (RETAIL BOX, TRAY, INNERS, CARTON):

LARGE: 1,230,
 OUR COST: 1,230 X $1.72= $2,115.60
X-LARGE: 1,508,
OUR COST: 1,508 X $1.72= $2,593.76

FABRIC ON HAND: 4,912 YARDS,

**EXHIBIT I**                    **PAGE 128**

OUR COST: 4,912 X $7.23= $ 35,513.76
FABRIC ON ROUTE: 9,628 YARDS,
OUR COST: 9,628X $7.23= $69,610.44

As you are aware, in February of 2017 we entered into an agreement with
Walmart for the purchase of Insta Slim Products until March of 2018.
However, you have chosen to stop ordering Insta Slim Products. We relied on
our agreement with Walmart to carry these 2 items till March of 2018.
Therefore, we are left with excess inventory. This excess inventory was
completed based on justifiable reliance on our agreement with you, following
the same procedure as past 4.5 years of our relationship.

Please note that in the past 4.5 years of being a Walmart supplier, Walmart
orders have been given to us on every Thursday afternoon to be shipped 4 days
later the following Monday. We are proud to say that we have never been late.
To continue with on time fulfillment of Walmart orders, we have ordered
fabric, elastic, care label, USA flag label, trim, and packaging materials to be
able to fulfill timely, Walmart's weekly orders of approximately $10,000.00
per week for at least the next 13 weeks (13X$10,000.00).

In the spirit of cooperation, we are willing to accept the following:

- All open existing invoices for products shipped to Walmart, be paid in full
  value of the invoice.
- THERE WILL BE NO DEDUCTIONS AND NO ADDITIONAL
  CHARGE BACK, WHAT SO EVER FROM WALMART. NO
  REQUEST FOR PARTCIPATION IN THE PAST, PRESENT, OR
  FUTURE MARK DOWN OF INSTA SLIM PRODUCTS.
- Walmart will purchase ONLY the excess finished inventory:

ITEM # 55431144- INSTA SLIM LARGE TANK, 1,655 X $11.60=
$19,198.00
ITEM # 55431147- INSTA SLIM XL TANK, 2,298 X $11.60= $26,656.80
     TOTAL PURCHASE: $19,198.00 + $26,656.80 = $45,854.80

- TERMS OF PURCHASE: NET, 15 DAYS.

If you accept our terms stated above, we will not hold Walmart liable for all the
losses due to purchases of excess trims and supplies, excess packaging
materials, and excess fabrics.

**EXHIBIT I**                                        **PAGE 129**

We will also release Walmart from its obligations to continue to order additional products for the balance of the term, till March 2018.

Additionally, since November of 2016, we have been charged back for returned merchandise, (211unitsX$11.60= $2,447.60). We have reached out to everyone at Walmart in the past 8 months and provided the pictures and documents of these unauthorized returns and have received NO response.

Attached to this email are few sample pictures of the unauthorized products returned to us (to attach all the pictures the file would be huge, but we can provide). As you can see none of these returned merchandise was our merchandise. Therefore, please arrange for the reimbursement of $2,447.60.

Please confirm receipt of this email and advise your acceptance of the above. We are hoping to resolve these issues in an amicable manner.

Best Regards,
Houshang Jalili
Vice President
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**EXHIBIT I**                              **PAGE 130**

| | |
|---|---|
| **From:** | Brian OToole |
| **To:** | Bridget OShaughnessy |
| **Subject:** | FW: CANCELLATION OF PURCHASE AGREEMENT |
| **Date:** | Thursday, February 1, 2018 2:08:16 PM |
| **Attachments:** | Insta Slim_SIGNED_brkg agrmnt_02-22-14_Revised.pdf |
| | Insta Slim_Amendment_08-20-14.pdf |

**From:** Brian OToole
**Sent:** Wednesday, September 20, 2017 7:03 AM
**To:** Brad A. Mokri <amirmokri1@yahoo.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

See attached.

I'm not sure where your client is getting the idea that this is anything but a contract case – maybe the client forgot about the written contract.  In any event, enjoy your vacation and we can discuss when you get back.

Thank you,
Brian O'Toole

**From:** Brad A. Mokri [mailto:amirmokri1@yahoo.com]
**Sent:** Wednesday, September 20, 2017 12:53 AM
**To:** Brian OToole <botoole@otoole-atwell.com>
**Subject:** Re: CANCELLATION OF PURCHASE AGREEMENT

Dear Mr. OToole:
 I represent Insta Slim in the dispute with your client NDSM. As my client informed you, I am out of the country with a limited access to email and will be back on next Tuesday, September 26, 2017. I am glad that your client decided to hire an attorney, as my client has already authorized my office to proceed and file a lawsuit against your client for causes of action including but not limited for Breach of contract, Breach of Fiduciary Duty, Fraud, Negligent Misrepresentation, Common Count, etc. I was going to file the complaint after my return to the office next week. However, I will not proceed as planned in light of your claim that there is an enforceable arbitration agreement.

I am not aware of any enforceable arbitration agreement. If you are aware of an enforceable arbitration agreement, please forward it to my office or email it to me so I can respond accordingly.

I do my best to respond to your email in a timely manner. However, please note that I may not have access to email at all time until September 26, 2017. I'll be glad to talk to you upon my return back to my office.
Thanks,

**Exhibit D**

**EXHIBIT I**                                              **PAGE 131**

*Brad A. Mokri*

**LAW OFFICES OF**

**MOKRI & ASSOCIATES**
**1851 E. First Street, Suite 900**
**Santa Ana, California 92705**
**Tel: (714) 619-9395**
**Fax: (888) 342-1406**

*****************************************************
*The information contained in this email is CONFIDENTIAL and/or privileged, including attachments. This EMAIL and ATTACHMENT is intended to be reviewed by only the individual named in the body of the above email. Any improper use or disclosure of the information contained herein is strictly prohibited.*

---

**From:** Brian OToole <botoole@otoole-atwell.com>
**To:** Houshang Jalili <houshang.jalili@instaslim.com>; Joe Namee <jnamee@ndirsales.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Sharon Burton <sburton@ndirsales.com>; "amirmokri1@yahoo.com" <amirmokri1@yahoo.com>; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>
**Sent:** Tuesday, September 19, 2017 3:31 PM
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

This is Brian O'Toole, NDSM's attorney.

I don't understand the communication below.  I was planning to initiate arbitration pursuant to the Broker Agreement but will hold off a little if the commissions are going to be paid.

No threats, no insults and I'm not interested in debating the liability.  Just three questions I would like answered:

1. Are you going to pay?
2. What amount (our last reconciliation indicates approximately $15,000 due, likely has increased slightly since then)?
3. When?

Thank you,
Brian O'Toole

-

**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Tuesday, September 19, 2017 5:21 PM
**To:** Joe Namee <jnamee@ndirsales.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Brian OToole <botoole@otoole-

**EXHIBIT I**                                    **PAGE 132**

atwell.com>; Sharon Burton <sburton@ndirsales.com>; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Houshang Jalili <houshang.jalili@instaslim.com>
Subject: RE: CANCELLATION OF PURCHASE AGREEMENT

Joe,

We will ignore your language, insults, your unprofessionalism, and your one liner threats. We will continue to honor our agreement as long as, you do your job and fulfill your obligations, representing us, as our sole agent with Walmart.
However, this is to serve you as our notice that any future unprofessional communication from you will be dealt with accordingly.

Best Regards,
Houshang Jalili
Vice President
**INSTA SLIM**
17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Joe Namee [mailto:jnamee@ndirsales.com]
**Sent:** Tuesday, September 19, 2017 1:28 PM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-atwell.com>; Sharon Burton <sburton@ndirsales.com>; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>
**Subject:** Re: CANCELLATION OF PURCHASE AGREEMENT

**EXHIBIT I**                              **PAGE 133**

Does this mean your going to pay us?


Joe Namee
National Accounts
13809 Research Blvd Ste 635
Austin, TX 78750
512-260-6911 Direct
512-335-7028 FX
Sent via my super handy dandy Samsung Galaxy S8+


-------- Original message --------
From: Houshang Jalili <houshang.jalili@instaslim.com>
Date: 9/19/17 4:03 PM (GMT-05:00)
To: Coree West <Coree.West@walmart.com>
Cc: John Edgmon <JEdgmon@ndirsales.com>, Joe Namee
<jnamee@ndirsales.com>, "Brian O'Toole (botoole@otoole-atwell.com)"
<botoole@otoole-atwell.com>, Sharon Burton <sburton@ndirsales.com>,
amirmokri1@yahoo.com, Eemaan Jalili <eemaanj@gmail.com>, Monir Jalili
<monir.jalili@instaslim.com>, Griffin Sorenson <Griffin.Sorenson@walmart.com>,
Houshang Jalili <houshang.jalili@instaslim.com>
Subject: RE: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree,

Will do. Upon receiving the EDI, we will verify the accuracy and will
advise you of discrepancy or concern immediately. We appreciate your
cooperation.


Best Regards,
Houshang Jalili
Vice President

17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the

**EXHIBIT I**                                                    **PAGE 134**

employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

---

**From:** Coree West [mailto:Coree.West@walmart.com]
**Sent:** Tuesday, September 19, 2017 7:52 AM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee <jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Griffin Sorenson <Griffin.Sorenson@walmart.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Jalili,
Orders have been sent to the OS team to process. You should receive EDI transmission within 24 hours. After receipt please verify accuracy of MABD and quantities and advise of any concerns. After the PO's have closed I will not modify or send orders for additional product.

Thanks,
**Coree West**
Replenishment Manager | Candy & Impulse
Ph 479-258-6803
Coree.West@walmart.com
Walmart
702 Southwest 8th Street
Bentonville, AR 72716-0265
Save money. Live better.

---

**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Monday, September 18, 2017 12:52 PM
**To:** Coree West
**Cc:** S&E Gourmet Cuts - John Edgmon; Joe Namee; Brian O'Toole (botoole@otoole-atwell.com); sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili; Monir Jalili; Griffin Sorenson; Houshang Jalili
**Subject:** EXT: RE: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree,

As per attached last purchase dated August 3, 2017, this is to confirm the item numbers:
ITEM # 554361144   INSTA SLIM  LARGE  TANK

**EXHIBIT I**                                    **PAGE 135**

ITEM # 554361147   INSTA SLIM  XLG      TANK
Are the correct item numbers.

Best Regards,
Houshang Jalili
Vice President

17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to the intended recipient
you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error,
please notify us immediately by telephone or e-mail, and destroy this message.
Thank you.

**From:** Coree West [mailto:Coree.West@walmart.com]
**Sent:** Sunday, September 17, 2017 2:16 PM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee
<jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com)
<botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com;
Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>;
Griffin Sorenson <Griffin.Sorenson@walmart.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Jalili,
I am trying to put together an Order however those item numbers are not valid in the
Walmart system. Please verify they are correct.

Thanks,
**Coree West**
Replenishment Manager | Candy & Impulse
Ph 479-258-6803
Coree.West@walmart.com
Walmart
702 Southwest 8th Street
Bentonville, AR 72716-0265

**EXHIBIT I**                                    **PAGE 136**

Save money. Live better.

---

**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Friday, September 15, 2017 1:12 PM
**To:** Griffin Sorenson; Coree West
**Cc:** S&E Gourmet Cuts - John Edgmon; Joe Namee; Brian O'Toole (botoole@otoole-atwell.com);
sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili; Monir Jalili; Houshang Jalili
**Subject:** EXT: FW: CANCELLATION OF PURCHASE AGREEMENT

Hi Griffin / Coree,

Gentlemen, it has been 10 days since we emailed you our acceptance of your offer, you sent to us in your email, on Sep. 7, 2017. We have not received your purchase order for the remainder of the inventory, as you specified in your email. Please advise when can we expect your purchase order. We appreciate your urgent attention to this matter.

Best Regards,
Houshang Jalili
Vice President

17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Houshang Jalili
**Sent:** Friday, September 08, 2017 9:00 AM
**To:** 'Griffin Sorenson' <Griffin.Sorenson@walmart.com>; Coree West <Coree.West@walmart.com>
**Cc:** 'houshang@instaslim.com' <houshang@instaslim.com>
**Subject:** FW: CANCELLATION OF PURCHASE AGREEMENT

**EXHIBIT I**                                                          **PAGE 137**

Hi Griffin/Coree,

Please advise when we can expect the purchase order for the remainder of inventory as specified below. I appreciate if you let me know as soon as possible.

Best Regards,
Houshang Jalili
Vice President

17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and destroy this message. Thank you.

**From:** Houshang Jalili
**Sent:** Thursday, September 07, 2017 2:20 PM
**To:** Griffin Sorenson <Griffin.Sorenson@walmart.com>; Coree West <Coree.West@walmart.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee <jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com) <botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>; Houshang Jalili <houshang.jalili@instaslim.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Hi Griffin,

In the spirit of cooperation, we are willing to accept your offer of purchasing the remainder of the inventory, of:
ITEM # 55431144- INSTA SLIM LARGE TANK:  QUANTITY: 1,655

**EXHIBIT I**                                                                **PAGE 138**

ITEM # 55431147- INSTA SLIM XL TANK: QUANTITY : 2,298
AT THE STANDARD PAYMENT TERMS, PROVIDED:

WALMART WILL REIMBURSE US FOR THE UNAUTHORIZED
PRODUCTS RETURNED TO US AS INSTA SLIM PRODUCTS, (
pictures have been provided many times before and can be provided
again).
The quantity is 211units. 211 X $11.60 = $2,447.60.

Best Regards,
Houshang Jalili
Vice President

17662 Armstrong Avenue
Irvine, Ca. 92614 USA
Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to the intended recipient
you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error,
please notify us immediately by telephone or e-mail, and destroy this message.
Thank you.


**From:** Griffin Sorenson [mailto:Griffin.Sorenson@walmart.com]
**Sent:** Thursday, September 07, 2017 10:32 AM
**To:** Houshang Jalili <houshang.jalili@instaslim.com>; Coree West
<Coree.West@walmart.com>
**Cc:** S&E Gourmet Cuts - John Edgmon <jedgmon@ndirsales.com>; Joe Namee
<jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com)
<botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com;
Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>;
Sonia Silva <Sonia.Silva@instaslim.com>
**Subject:** RE: CANCELLATION OF PURCHASE AGREEMENT

Houshang,

We do not have a contract to purchase any units. Per the Walmart vendor agreement,

**EXHIBIT I**                          **PAGE 139**

we reserve the right to cancel POs or stop issuing POs at any time. I am willing to discuss taking the remainder of the inventory that you have remaining, however it would be at the standard payment terms.

Griffin

**Griffin Sorenson Senior Buyer – ASOTV, Checkout & Batteries**
Phone 479.204.3945 Fax: 479.204.9869
griffin.sorenson@walmart.com

**From:** Houshang Jalili [mailto:houshang.jalili@instaslim.com]
**Sent:** Tuesday, September 05, 2017 2:36 PM
**To:** Coree West; Griffin Sorenson
**Cc:** S&E Gourmet Cuts - John Edgmon; Joe Namee; Brian O'Toole (botoole@otoole-atwell.com);
sburton@ndirsales.com; amirmokri1@yahoo.com; Eemaan Jalili; Monir Jalili; Sonia Silva; Houshang Jalili
**Subject:** EXT: RE: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree/ Griffin,

We have had no response to my email below, sent to you on 8/28/2017. We have consulted with our counsel and an independent attorney. We are confident that if we will be forced to take legal action, we will be able to establish that WalMart breached its contract with Buy Insta Slim, Inc, breached the covenant of good faith and fair dealing, intentionally and negligently made misrepresentations to Buy Insta Slim, Inc. to defraud it. In short, WalMart will be liable for damages including attorney fees which will be substantially higher than our settlement proposal for its unfair business practices.

Unless we receive your acceptance of our terms, specified in my email below, within the next 72 hours, we will not have any choice but to initiate a lawsuit to recover the damages caused by WalMart's unfair business practices. We are hoping to resolve these issues in an amicable manner and will not be forced to take any legal action.

Please advise.

Best Regards,
Houshang Jalili
Vice President

17662 Armstrong Avenue
Irvine, Ca. 92614 USA

**EXHIBIT I**                    **PAGE 140**

Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to the intended recipient
you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error,
please notify us immediately by telephone or e-mail, and destroy this message.
Thank you.

**From:** Houshang Jalili
**Sent:** Monday, August 28, 2017 2:03 PM
**To:** Coree West <Coree.West@walmart.com>; Griffin Sorenson
<Griffin.Sorenson@walmart.com>
**Cc:** John Edgmon <JEdgmon@ndirsales.com>; Joe Namee
<jnamee@ndirsales.com>; Brian O'Toole (botoole@otoole-atwell.com)
<botoole@otoole-atwell.com>; sburton@ndirsales.com; amirmokri1@yahoo.com;
Eemaan Jalili <eemaanj@gmail.com>; Monir Jalili <monir.jalili@instaslim.com>;
Sonia Silva <Sonia.Silva@instaslim.com>; Houshang Jalili
<houshang.jalili@instaslim.com>
**Subject:** FW: CANCELLATION OF PURCHASE AGREEMENT

Hi Coree/Griffin,

I hope you are doing well. As per your request in our conference call on
August 10, 2017, below please find the finished, ready to ship, inventory
of item # 554361144 – INSTA SLIM LARGE TANK and item #
554361147 INSTA SLIM XL TANK as well as the inventory of additional
fabric, supplies, WM retail box, trays, and cartons:

The following is the detail of the excess inventory:

ITEM # 55431144 – INSTA SLIM LARGE TANK: 1,655
ITEM # 55431147 – INSTA SLIM XL TANK: 2,298

SUPPLIES (TRIMS, ELASTIC, CARE LABELS, USA FLAG LABELS):

**EXHIBIT I**                                        **PAGE 141**

FOR 12,606 TANKS.
OUR COSTS: 12,606 X $0.79= $9,958.74

PACKAGING MATERIALS (RETAIL BOX, TRAY, INNERS, CARTON):

LARGE: 1,230,
 OUR COST: 1,230 X $1.72= $2,115.60
X-LARGE: 1,508,
OUR COST: 1,508 X $1.72= $2,593.76

FABRIC ON HAND: 4,912 YARDS,
OUR COST: 4,912 X $7.23= $ 35,513.76
FABRIC ON ROUTE: 9,628 YARDS,
OUR COST: 9,628X $7.23= $69,610.44

As you are aware, in February of 2017 we entered into an agreement with Walmart for the purchase of Insta Slim Products until March of 2018. However, you have chosen to stop ordering Insta Slim Products. We relied on our agreement with Walmart to carry these 2 items till March of 2018. Therefore, we are left with excess inventory. This excess inventory was completed based on justifiable reliance on our agreement with you, following the same procedure as past 4.5 years of our relationship.

Please note that in the past 4.5 years of being a Walmart supplier, Walmart orders have been given to us on every Thursday afternoon to be shipped 4 days later the following Monday. We are proud to say that we have never been late. To continue with on time fulfillment of Walmart orders, we have ordered fabric, elastic, care label, USA flag label, trim, and packaging materials to be able to fulfill timely, Walmart's weekly orders of approximately $10,000.00 per week for at least the next 13 weeks (13X$10,000.00).

In the spirit of cooperation, we are willing to accept the following:

- All open existing invoices for products shipped to Walmart, be paid in full value of the invoice.

**EXHIBIT I**                                    **PAGE 142**

- THERE WILL BE NO DEDUCTIONS AND NO ADDITIONAL CHARGE BACK, WHAT SO EVER FROM WALMART. NO REQUEST FOR PARTCIPATION IN THE PAST, PRESENT, OR FUTURE MARK DOWN OF INSTA SLIM PRODUCTS.
- Walmart will purchase ONLY the excess finished inventory:

ITEM # 55431144- INSTA SLIM LARGE TANK, 1,655 X $11.60= $19,198.00
ITEM # 55431147- INSTA SLIM XL TANK, 2,298 X $11.60= $26,656.80
      TOTAL PURCHASE: $19,198.00 + $26,656.80 = $45,854.80

- TERMS OF PURCHASE: NET, 15 DAYS.

If you accept our terms stated above, we will not hold Walmart liable for all the losses due to purchases of excess trims and supplies, excess packaging materials, and excess fabrics.
We will also release Walmart from its obligations to continue to order additional products for the balance of the term, till March 2018.

Additionally, since November of 2016, we have been charged back for returned merchandise, (211unitsX$11.60= $2,447.60). We have reached out to everyone at Walmart in the past 8 months and provided the pictures and documents of these unauthorized returns and have received NO response.

Attached to this email are few sample pictures of the unauthorized products returned to us (to attach all the pictures the file would be huge, but we can provide). As you can see none of these returned merchandise was our merchandise. Therefore, please arrange for the reimbursement of $2,447.60.

Please confirm receipt of this email and advise your acceptance of the above. We are hoping to resolve these issues in an amicable manner.

Best Regards,
Houshang Jalili
Vice President

17662 Armstrong Avenue
Irvine, Ca. 92614 USA

**EXHIBIT I**                                        **PAGE 143**

Phone: (949) 263-2301
Fax: (949) 263-2323
Email: houshang@instaslim.com

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT
IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER
APPLICABLE LAW. If the reader of this message is not the intended recipient or the
employee or agent responsible for delivering the message to the intended recipient
you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error,
please notify us immediately by telephone or e-mail, and destroy this message.
Thank you.

**EXHIBIT I**                                    **PAGE 144**

| | |
|---|---|
| **From:** | Bridget OShaughnessy |
| **To:** | amirmokri1@yahoo.com |
| **Cc:** | Brian OToole; Maria Rogers |
| **Subject:** | Demand for Arbitration |
| **Date:** | Monday, November 6, 2017 11:52:00 AM |
| **Attachments:** | Signed Demand for Arbitration.pdf |
| | Exclusive Broker Agreement.pdf |
| | Amendment to Exclusive Broker Agreement.pdf |

Mr. Mokri,

Attached please find our Demand for Arbitration as well as the relevant contract documents. Let us know if you have any questions.

Thank you,

**Bridget K. O'Shaughnessy**
Associate Attorney
**O'Toole Atwell, PC**
504 Lavaca, Suite 1010
Austin, Texas 78701
Phone: (512) 610-0152
Fax: (512) 476-1228
www.otoole-atwell.com

CONFIDENTIALITY NOTICE:  The information contained in this ELECTRONIC MAIL transmission is confidential.  It may also be subject to the attorney/client privilege or be privileged work product or proprietary information.  This information is intended for the exclusive use of the addressee(s).  If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution (other than to the addressee(s)), copying, or taking of any action because of this information is strictly prohibited.

**Exhibit E**

**EXHIBIT I**                                         **PAGE 145**

| From: | Lerone Landis |
|---|---|
| To: | Brian OToole; mokri@sbcglobal.net; Bridget OShaughnessy |
| Cc: | gmokrilaw@yahoo.com; Carolina ElAzar |
| Subject: | Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417 |
| Date: | Thursday, November 16, 2017 3:15:20 PM |
| Attachments: | SKM_22717111615070.pdf |

Dear Counsel,

Please find the attached Notice of Intent to Initiate Arbitration in the above matter.

If you have any questions please contact me or the Case Manager, Carolina El'Azar at 214-891-4525.

Regards,
Mr. Lerone Landis



**Mr. Lerone Landis**
Case Coordinator
8401 N. Central Expressway, Suite 610
Dallas, TX 75225
**P:** 214.744.5267
**F:** 214.720-6010

JAMS Named Mediation Firm of the Year in *Who's Who Legal* 2016.

U.S. | International | LinkedIn | Twitter

**Exhibit F**

**EXHIBIT I**                                    **PAGE 146**



# NOTICE OF INTENT TO INITIATE ARBITRATION

November 16, 2017

Brian J. O'Toole, Esq.
Bridget K. O'Shaughnessy, Esq.
O'Toole Atwell, PC
504 Lavaca St.
Suite 1010
Austin, TX  78701

Brad Amir Mokri, Esq.
Mokri & Associates
1851 E. First Street
Suite 900
Santa Ana, CA  92705

RE:    **Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc.**

Reference #: 1310023417

Dear Parties:

JAMS has received a Demand for Arbitration and proof of service in the above-referenced matter pursuant to a mandatory pre-dispute arbitration clause contained in a contract between the parties.

Pursuant to the parties' pre-dispute arbitration agreement and JAMS policy, this arbitration shall be conducted in accordance with the JAMS Streamlined Arbitration Rules & Procedures. It is important to familiarize yourself with the arbitration rules. A copy of these rules can be obtained by visiting our website at www.jamsadr.com.

Claimant has paid the $1,200.00 Filing Fee. Under appropriate circumstances, the Arbitrator may award JAMS fees and expenses against any party. JAMS agreement to render services is not only with the parties, but extends to the attorneys or other representatives of the parties in arbitration.

JAMS will formally commence this matter and proceed with the arbitrator selection process.

Contact me at 214-891-4525 or celazar@jamsadr.com if you have questions.

Sincerely,

Carolina ELAzar
Senior Case Manager
celazar@jamsadr.com

**EXHIBIT I**                                        **PAGE 147**

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc.
Reference No. 1310023417

I, Lerone Landis, not a party to the within action, hereby declare that on November 16, 2017, I served the attached NOTICE OF INTENT TO INITIATE ARBITRATION on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Dallas, TEXAS, addressed as follows:

Brian J. O'Toole Esq.
Bridget K. O'Shaughnessy Esq.
O'Toole Atwell, PC
504 Lavaca St.
Suite 1010
Austin, TX  78701
Phone: 512-476-4537
botoole@otoole-atwell.com
boshaughnessy@otoole-atwell.com
    Parties Represented:
    Faith Business Management Co., Inc dba Natio

Brad Amir Mokri Esq.
Mokri & Associates
1851 E. First Street
Suite 900
Santa Ana, CA  92705
Phone: 714-619-9395
mokri@sbcglobal.net
    Parties Represented:
    Buy Insta Slim, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Dallas, TEXAS on November 16, 2017.

_Lerone Landis_
Lerone Landis
llandis@jamsadr.com

**EXHIBIT I**                                    **PAGE 148**

| | |
|---|---|
| **From:** | Carolina ElAzar |
| **To:** | Brian OToole; mokri@sbcglobal.net; Bridget OShaughnessy |
| **Cc:** | gmokrilaw@yahoo.com |
| **Subject:** | Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417 |
| **Date:** | Tuesday, November 28, 2017 7:31:33 AM |
| **Attachments:** | SKonica C3617112808530.pdf |

Dear Counsel,

Please find attached the Commencement of Arbitration in the above matter. If you have any questions, please feel free to contact  me directly at 214-891-4525.

Best regards,
Carolina El'Azar



**Carolina El'Azar**

Sr. Case Manager

8401 N. Central Expressway, Suite 610
Dallas, TX 75225
**P:** 214.891.4525
**F:** 214.720-6010

JAMS was named Mediation Firm of the Year in *Who's Who Legal* 2017.

U.S. | International | LinkedIn | Twitter

**Exhibit G**

**EXHIBIT I**                    **PAGE 149**



# COMMENCEMENT OF ARBITRATION

NOTICE TO ALL PARTIES                                            November 28, 2017

RE:     <u>**Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc.**</u>
        JAMS Ref. No. : 1310023417

Dear Parties:

This confirms the commencement of this arbitration as of the date of this letter. This arbitration shall be conducted in accordance with JAMS Comprehensive Rules and Procedures, and the enclosed Fee Schedule and Arbitration Administrative Policies regarding payment of fees, document retention, and limitations of liability.

Enclosed is a list of available arbitrators. Résumés and rules are available on our website, www.jamsadr.com, or by contacting me. The parties are encouraged to mutually agree to an arbitrator. If the parties are unable to mutually agree to an arbitrator, then using the following list of arbitrator candidates each party may strike two name(s) and rank the remaining candidates in order of preference. The deadline for return of your strike list is close of business on **Tuesday, December 5, 2017** [Note: Strike lists should not be exchanged amongst the parties.]:

       **Hon. Glen M. Ashworth (Ret.)**
       **Hon. Jeff Kaplan (Ret.)**
       **Cecilia H. Morgan, Esq.**
       **Hon. Linda Thomas (Ret.)**
       **Hon. Mark Whittington Ret.**

If a party fails to respond to the list of arbitrator candidates by the deadline, that party shall be deemed agreeable to all the proposed candidates.  JAMS will then confirm the appointment of the Arbitrator and begin scheduling.

The Arbitrator shall bill in accordance with the enclosed Fee Schedule.  Each party will be assessed a pro-rata share of JAMS fees and expenses, unless JAMS is notified otherwise by the Arbitrator or parties. JAMS agreement to render services is not only with the parties, but extends to the attorney or other representative of the parties in arbitration.

Contact me at 214-891-4525 or celazar@jamsadr.com if you have questions. We look forward to working with you.

Sincerely,

Carolina ElAzar
Senior Case Manager
celazar@jamsadr.com

Enclosures

8401 NORTH CENTRAL EXPRESSWAY   SUITE 610   DALLAS, TX 75225   TEL  214-744-5267   FAX  214-720-6010

**EXHIBIT I**                                            **PAGE 150**



## JAMS ARBITRATION ADMINISTRATIVE POLICIES

### I. Fees for the Arbitration

The Parties and their attorneys agree to pay JAMS for the arbitration as set forth in the Fee and Cancelation Policy attached to and incorporated in this Agreement. JAMS agreement to render services is jointly with the Party and attorney or other representative of the Party in Arbitration.

Unless otherwise agreed by JAMS, the Parties agree that they are liable for and agree to pay their portion of JAMS' fees and expenses and for all time spent by the arbitrator, including any time spent in rendering services before or after the arbitration hearing. Parties are billed a preliminary retainer to cover the expense of all pre-hearing work, including conference calls. Payment of the preliminary retainer is required prior to scheduling a Preliminary Arbitration Management Conference with the Arbitrator. The Parties agree to pay all invoices received prior to the hearing in advance of the arbitration hearing. If such fees have not been paid prior to the arbitration hearing, the Party or Parties who have not paid remain liable for such fees. The Parties further agree to payment of an Abeyance Fee to be charged 12 months from the date of last billing, and every six months thereafter. The Parties agree that JAMS may cancel an arbitration hearing and will not deliver the arbitrator's decision to any Party without full payment of all invoices.

### II. Records

JAMS does not maintain a duplicate file of documents filed in the Arbitration. If the parties wish to have any documents returned to them, they must advise JAMS in writing within 30 days of the conclusion of the Arbitration. If special arrangements are required regarding file maintenance or document retention, they must be agreed to in writing and JAMS reserves the right to impose an additional fee for such special arrangements.

### III. Disqualification of the Arbitrator and JAMS as Witness/Limitation of Liability

The Parties have agreed or hereby agree that they will not call the arbitrator or any employee or agent of JAMS as a witness or as an expert in any proceeding involving the Parties and relating to the dispute which is the subject of the arbitration, nor shall they subpoena any notes or other materials generated by the arbitrator during the arbitration. The Parties further agree to defend the arbitrator and JAMS and its employees and agents from any subpoenas from outside Parties arising out of this Agreement or arbitration.

The Parties agree that neither the arbitrator nor JAMS, including its employees or agents, is a necessary Party in any proceeding involving the participants and relating to the dispute which is the subject of the arbitration. The Parties further agree that the arbitrator and JAMS, including its employees or agents, shall have the same immunity from liability for any act or omission in connection with the arbitration as judges and court employees would have under federal law.

### IV. Party

The term "Party" as used in these Policies includes Parties to the Arbitration and their counsel or representative.

**EXHIBIT I**                                              **PAGE 151**

11/28/2017                                    Ashworth_Glen_GeneralBiography_872





**T:** 214-744-5267
**F:** 214-720-6010

**Case Manager**
Carolina El'Azar
JAMS
8401 N. Central
Expressway
Suite 610
Dallas, TX 75225
**T:** 214-891-4525
**F:** 214-720-6010
celazar@jamsadr.com

### Hon. Glen M. Ashworth (Ret.)

**Hon. Glen M. Ashworth (Ret.)** presided over hundreds of settlements and bench and jury trials during his 22 years of distinguished service on the 86th Judicial District Court. He is known for his ability to quickly grasp key issues and develop creative solutions for the resolution of the most complex matters. Widely recognized for his dedication and persistence in the most contentious disputes, Judge Ashworth has earned a reputation for fairness and independence.

### ADR Experience and Qualifications
Judge Ashworth has extensive experience in the resolution of complex multi-party disputes in all areas of civil litigation, including:

- Banking
- Business/Commercial
- Catastrophic Personal Injury
- Class Action
- Construction Defect
- Employment
- Environmental
- Family Law
- Insurance
- Partnership Dissolution
- Professional Liability
- Real Estate
- Securities
- Sports
- Trade Secrets

### Representative Matters
Since joining JAMS, Judge Ashworth has served as an arbitrator, mediator, and special master of complex cases including:

### Arbitrations
- Breach of contract and misuse of proprietary information claims brought between NBA team and former coach
- Dispute between major oil and chemical companies regarding subrogation and contribution of damage claims and attorneys fees arising from national toxic tort class action
- Disputes involving real estate syndications, management fees and breach of contract/fiduciary duty claims between partners
- Dissolution of law firms and apportionment of assets, incoming fees, work in progress, and tax liabilities
- Multi-million dollar claims for breach of contract and breach of fiduciary duty arising from financing and development agreements for the research and development of a wireless personal security transmitter to be monitored both privately and by law-enforcement; issues included both technological and commercial feasibility of the product and its application
- Multi-week arbitration involving personal injuries to a driver of a national multi-line transport carrier and associated non-subscriber issues

### Mediations
- Breach of fiduciary duty and fraud claims against executive office and board chairman of international retailer
- Claims by guardian of severely brain damaged child against operating room physician, anesthetist, and hospital
- Construction defect and fraud claims brought by homeowner and homeowners association against national homebuilder and numerous subcontractors involving 247-home development
- Litigation between investor and IRS involving tax implications of billion dollar overseas distressed property portfolio
- Minority stockholder oppression claims against large, privately held publishing company
- Multiple amputation and electrical burn case
- Multi-vehicle collision resulting in 10 fatalities with extensive insurance coverage issues
- Multi-vehicle fatality involving NFL player and "Dram Shop" liability
- Numerous partnership dissolutions involving law firms, medical group and real estate developers

### Special Master
- Managed all discovery and privilege issues in the dissolution of law firm and partnership

**EXHIBIT I**                                                                        **PAGE 152**

11/28/2017                                    Ashworth_Glen_GeneralBiography_872

- Presided over all aspects of mortgage backed securities litigation between large national bank and an international investment firm involving real estate trusts with numerous issues, including breach of contract, due diligence, breach of representations and warranties, and bad faith claims
- Presided over lengthy jury trial involving products liability and negligence from SUV rollover, including pre- and post-trial matters

### Honors, Memberships, and Professional Activities

- Selected as a Best Lawyer in Alternative Dispute Resolution/Mediation, *D Magazine* reader survey, 2011-2014
- Co-Author of chapter, "Judicial Aspects of the Securitization Case," *Mortgage and Asset Backed Securities Litigation Handbook*, Thompson West Publishing Company, 2008
- Advanced Judicial Certificate, Texas College of Advanced Judicial Studies, 2004
- Mediation Training, Course Director, Texas College of Advanced Judicial Studies, 1993 and 1997
- Frequent Lecturer on Ethics, Trial Management, and Mediation, including for the Texas Center for the Judiciary and the Texas Association of Court Administrators

### Background and Education

- Senior District Judge, sitting by assignment, 2003-present
- Judge, 86th District Court of Texas, 1981-2002
- District Attorney, Kaufman County, Texas, 1978-1980
- General practice, 1973-1978
- J.D., University of Texas School of Law, Austin, TX, 1973
- B.S., University of Texas at Austin, 1970

### Disclaimer

This page is for general information purposes. JAMS makes no representations or warranties regarding its accuracy or completeness. Interested persons should conduct their own research regarding information on this website before deciding to use JAMS, including investigation and research of JAMS neutrals. See More

**EXHIBIT I**                                        **PAGE 153**



# General Fee Schedule
*Hon. Glen M. Ashworth (Ret.)*

## PROFESSIONAL FEES

**Daily Rate** ..................................................**$5,000**        **Outside of Texas** ...................................................**$6,000**
Includes up to 8 hours of hearing time on the scheduled day, and up to 2
hours reading and research.

- Includes up to 8 hours of hearing time on the scheduled day, and up to 2 hours reading and research.
- Other professional time, including additional session time, pre and post session reading and research, and conference calls, will be billed at $500 per hour.
- Includes up to 8 hours of hearing time on the scheduled day, and up to 2 hours reading and research.

## ARBITRATION FEES
**Filing Fee**
$1,200 – Two Party Matter
$2,000 – Matters involving three or more parties
- Entire filing fee must be paid in full to expedite the commencement of the proceedings
- A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the Filing Fee is non-refundable

**Case Management Fee**
- 12% of Professional Fees
- Professional Fees include time spent for hearings, pre- and post-hearing reading and research, and award preparation.
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support. Weekends and holidays are subject to additional charges.

## FEES FOR OTHER MATTERS
**(Discovery, Special Master, Reference, Appraisal and Neutral Analysis Matters)**
Initial non-refundable fee of $600 per party
Plus 12% of Professional Fees

## CANCELLATION/CONTINUANCE POLICY
| Number of Days | Cancellation/Continuance Period | Fee |
|---|---|---|
| 1 day or less | 30 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 2 to 4 days | 45 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 5 days or more | 60 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| Hearings of any length | Inside the cancellation/continuance period | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued after the cancellation date unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the cancelling or continuing party is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing.  JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration order or award.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is $400. The employer must bear the remainder of the employee's share of the filing fee and all Case Management Fees. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. The company must bear the remainder of the consumer's share of the filing fee and all Case Management Fees.
- Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $500, and $500 every six months thereafter. If a party refuses to pay the assessed fee, the other party or parties may opt to pay the entire fee on behalf of all parties, otherwise the matter will be closed.

JAMS agreement to render services is with the attorney, the party and/or other representatives of the party.

**Atlanta • Boston • Chicago • Dallas • Greenbelt • Miami • Minneapolis • New York • Philadelphia • Washington**
www.jamsadr.com • Updated 11/01/16

**EXHIBIT I**                    **PAGE 154**

11/28/2017                                    Kaplan_Jeff_GeneralBiography_1152





T: 214-744-5267
F: 214-720-6010

**Case Manager**

Judy Stephenson
JAMS
8401 N. Central
Expressway
Suite 610
Dallas, TX 75225
T: 214-891-4523
F: 214-720-6010
jstephenson@jamsadr.com

**Hon. Jeff Kaplan (Ret.)**

**Hon. Jeff Kaplan (Ret.)** joined JAMS after nearly 20 years of service as a federal and state court judge. During his 18 years as a federal magistrate judge for the Northern District of Texas, Judge Kaplan presided over more than 60 jury trials and authored more than 2,100 opinions and recommendations in a variety of civil cases, including intellectual property, class action, employment, personal injury, civil rights, insurance, and complex business disputes. He is highly respected for his integrity, impartiality, and ability to quickly grasp and analyze complicated legal issues.

Prior to his appointment to the federal bench, Judge Kaplan served as a state appellate judge, where he participated in more than 220 appeals and authored more than 80 opinions, and as a civil trial lawyer representing clients on both sides of the docket.

**ADR Experience and Qualifications**

- Successfully mediated sexual abuse case brought by student against public school district
- Settled multi-million-dollar federal antitrust action against manufacturer of industrial pumps used in petroleum and power industries
- Conducted settlement conferences in civil rights, employment, and contract disputes

**Representative Matters**

As a federal judge, Judge Kaplan presided over jury and non-jury trials and resolved thousands of pretrial motions in a wide variety of civil cases, including:

- **Business/Commercial**
  - $10 million civil RICO and fraud action brought by national insurance company against more than 60 chiropractors, telemarketers, and lawyers in five states
  - Breach of contract, breach of fiduciary duty, fraud, and negligent misrepresentation action brought by pet products company against distributor arising out of failed negotiations for recapitalization and financing
  - Settled lawsuit between church and religious denomination's governing body involving dispute over financial obligations outlined by parties' trust agreement
  - Trade secret dispute between former business partners involving right to use technology for virtual payment of health insurance claims
- **Civil Rights**
  - Civil rights and wrongful death action brought against city involving fatal police shooting
  - First Amendment retaliation case brought against county and newly-elected sheriff by five former deputies
  - High-profile civil action brought by former school board trustee against local television station and reporter for alleged violations of federal and state wiretap laws
  - High-profile multi-million-dollar civil RICO and tort action brought by physician against anti-abortion activists and organizations over protest activities
- **Class Action/Mass Torts**
  - Putative class action against owners and operators of dating service website
  - Securities fraud class action brought by shareholders of nationwide specialty retailer
  - Shareholder derivative action against directors of Fortune 500 company
- **Employment**
  - Disability discrimination case brought by former regional sales manager of multinational corporation
  - High-profile sexual harassment and discrimination case brought by high-ranking female official in municipal fire department
  - Sex discrimination case brought by former assistant police chief of major city
- **Insurance**
  - Coverage dispute arising out of multiple lawsuits against bus company brought by families of 40 passengers killed or injured in accident
  - Coverage dispute involving damage to recycling facility
  - Coverage dispute involving interpretation of pollution exclusion provision of commercial liability insurance policy

**EXHIBIT I**                                                                    **PAGE 155**

11/28/2017                                Kaplan_Jeff_GeneralBiography_1152

- **Intellectual Property**
  - Patent and trademark infringement action involving glyconutritional dietary supplements
  - Patent infringement action brought against more than 40 defendants involving base design for blow-moulded plastic containers
  - Patent infringement action brought against pharmaceutical company involving multifocal intraocular lens device
  - Patent infringement action brought against telecommunications providers involving fiber optic information transmission system
  - Patent infringement action brought by national research university involving polymer-free liquid crystal display (LCD) technology
  - Patent infringement action involving PIN-less debit bill payment system
  - Trademark infringement action between owners of competing adult entertainment clubs
  - Trademark infringement action between two large hospitals over use of the name for a pediatric facility
- **Personal Injury**
  - $5 million medical malpractice action brought by Army veteran against VA Hospital alleging failure to timely diagnose and treat perforated esophagus
- **Securities**
  - Multi-million-dollar securities fraud action brought by Securities and Exchange Commission involving sale of nonexistent "prime bank" securities

### Honors, Memberships, and Professional Activities

- Board Certified in Civil Trial Law (1987-present) and Civil Appellate Law (1993-present) by Texas Board of Legal Specialization
- Judge of the Year, Dallas Chapter of American Board of Trial Advocates, 2007
- Consistently received 90% approval rating in Dallas Bar Association Judicial Evaluation Poll
- Board of Editors, *Federal Courts Law Review*, 2001-2007
- Emeritus Member, William "Mac" Taylor Inn of Court (President, 2002-2004)
- Master, Barbara M.G. Lynn Inn of Court (Intellectual Property)
- Dallas Bar Association (Board of Directors, 2004)
- Life Fellow, Texas Bar Foundation
- Federal Magistrate Judges Association
- Federal Bar Association
- State Bar of Texas, District 6A Grievance Committee, 1993-1994
- District 6A Nominating Committee, Texas Bar Foundation

### Background and Education

- U.S. Magistrate Judge, Northern District of Texas, 1994-2012
- Justice, Fifth District Court of Appeals, Dallas, Texas, 1991-1992
- Attorney, Private Practice, 1982-1991 and 1993-1994
- Briefing Attorney, Fifth District Court of Appeals, Dallas, Texas, 1981-1982
- J.D., Southern Methodist University, 1981
- B.A., *cum laude*, Vanderbilt University, 1978

### Disclaimer

This page is for general information purposes.  JAMS makes no representations or warranties regarding its accuracy or completeness.  Interested persons should conduct their own research regarding information on this website before deciding to use JAMS, including investigation and research of JAMS neutrals. See More

**EXHIBIT I**                                                                    **PAGE 156**



# General Fee Schedule
### Hon. Jeff Kaplan (Ret.)

**PROFESSIONAL FEES**

**Daily Rate** ................................................................ **$5,000**
(Each day not to exceed 10 hours)

- Other professional time, including additional hearing time, pre and post hearing reading and research, and conference calls, will be billed at $500 per hour.

**ARBITRATION FEES**
**Filing Fee**
$1,200 – Two Party Matter
$2,000 – Matters involving three or more parties
- Entire filing fee must be paid in full to expedite the commencement of the proceedings
- A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the Filing Fee is non-refundable

**Case Management Fee**
- 12% of Professional Fees
- Professional Fees include time spent for hearings, pre- and post-hearing reading and research, and award preparation.
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support. Weekends and holidays are subject to additional charges.

**FEES FOR OTHER MATTERS**
**(Discovery, Special Master, Reference, Appraisal and Neutral Analysis Matters)**
Initial non-refundable fee of $600 per party
Plus 12% of Professional Fees

**CANCELLATION/CONTINUANCE POLICY**

| Number of Days | Cancellation/Continuance Period | Fee |
|---|---|---|
| 1 to 2 days | 30 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 3 to 5 days | 45 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 5 days or more | 60 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| Hearings of any length | Inside the cancellation/continuance period | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued after the cancellation date unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the cancelling or continuing party is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration order or award.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is $400. The employer must bear the remainder of the employee's share of the filing fee and all Case Management Fees. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. The company must bear the remainder of the consumer's share of the filing fee and all Case Management Fees.
- Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $500, and $500 every six months thereafter. If a party refuses to pay the assessed fee, the other party or parties may opt to pay the entire fee on behalf of all parties, otherwise the matter will be closed.

JAMS agreement to render services is with the attorney, the party and/or other representatives of the party.

**Atlanta • Boston • Chicago • Dallas • Greenbelt • Miami • Minneapolis • New York • Philadelphia • Washington**
www.jamsadr.com • Updated 04/14/17

**EXHIBIT I**                                    **PAGE 157**

11/28/2017                                      Morgan_Cecilia_Banking_282





**T: 214-744-5267**
**F: 214-720-6010**

**Case Manager**

Judy Stephenson
JAMS
8401 N. Central
Expressway
Suite 610
Dallas, TX 75225
T: 214-891-4523
F: 214-720-6010
jstephenson@jamsadr.com

**Cecilia H. Morgan, Esq.**
Banking

Cecilia H. Morgan, with over 38 years of experience as an attorney and ADR professional, has in-depth experience in the many facets of banking matters.

**Representative Matters**

- Mediated an action in federal courts by a national home shopping network against a national bank, a clearinghouse, two insurance companies and other responsible third parties. The case involved claims in three different jurisdictions and required interpretation of the credit card Processing Service Agreement and Rules of the National Automated Clearing House Association (NACHA).
- Mediated case between bank and title company. The bank sued on its mortgagee's title policy after foreclosure on a $500,000 mini mansion when the original deed of trust was not filed in the county records. The settlement also required the homeowner's bankruptcy trustee's approval. The bank's causes of action were breach of fiduciary duty, breach of contract, and negligence.
- Mediated case between international trucking concern and bank; trucker company claimed DTPA, breach of contract, conversion, negligent misrepresentation, fraud, and promissory estoppel. The bank defended based on the language of Tex. Bus. & Comm. Code Section 4.406.
- Mediated a case between a bank and the co-guarantor of a line of credit pursuant to a mortgage servicing agreement over "junk mortgages" on sub-standard housing in the Midwest. The co-guarantor was in Chapter 7 and the defendant co-guarantor defended based on fraud in the inducement.
- Mediated case between bank trust department and 27 beneficiaries of a trust when the corpus consisted of oil, gas, and lumber interests on 15,000 acres in Colorado.
- Mediated numerous cases from state, federal, and bankruptcy courts involving the Resolution Trust Corporation, lender liability after the major Texas banks failed.
- Mediated numerous cases between financial institutions and their employees over Title 7 and FLSA matters.
- Arbitrated numerous collection cases between financial institutions and debtors over millions of dollars
- Arbitrated multi-million dollar foreclosure dispute between bank and real estate developer of country club properties
- Litigated for over 17 years, including the following two significant cases:
  - 1988-1989, *Tripp Village Joint Venture v. MBank Lincoln Center, N.A.* - Action to enforce loan agreement in face of parole evidence. Reported Opinion 774 S.W.2d 746 (Tex.App.-Dallas, 1989) writ denied. (Co-Counsel and primary author of briefs for Bank)
  - 1979-1983, Bank of Texas, et al. vs. John Childs, et al. - Action to restrain collection of bank stock ad valorem taxes for 52 banks in Dallas County. Reported opinions: (1) 615 S.W.2d 810 (Tex.Civ.App.-Dallas, 1981) writ ref'd. n.r.e. (Co-Counsel and primary author of briefs for Banks); (2) 634 S.W.2d (Tex.Civ.App.-Dallas, 1982) (primary author of all briefs) *American Bank and Trust Co. vs. Dallas County*, 463 U.S. 855 (1983). Trials, briefs, and appearances in district courts, state court of appeals, Texas Supreme Court, and United States Supreme Court (Co-Counsel for Banks).

**Honors, Memberships, and Professional Activities**

- Credentialed Distinguished Mediator, Texas Mediator Credentialing Assoc. (2004-2015); Texas Mediator Credentialing Assoc. Board (2010-2012)
- Life Fellow, Texas Bar Foundation (1992 - present); Life Patron Fellow, Dallas Bar Assoc. Foundation (member, 1991-present)
- Fellow (2012-present), 5th Circuit Credentials Committee member (2016), College of Labor & Employment Lawyers
- Member, American Bar Assoc., State Bar of Texas, Dallas Bar Assoc., and Plano Bar Assoc.
- Member (1991-present), Immediate Past Chair (2008-2009), Chair (2007-2008), Chair Elect (2006-2007), Treasurer (2004-2006) and Council Member (2003-2009), State Bar of Texas ADR Section

**EXHIBIT I**                                                         **PAGE 158**

11/28/2017                                          Morgan_Cecilia_Banking_282

Texas Bar Card
#10199300

*"As an ADR professional, I seek the challenge of assisting adversarial parties in facilitating their negotiations to create innovative solutions, as well as evaluating their cases when necessary."*

*Justice Frank G. Evans Award for Outstanding Contribution to Texas ADR, State Bar of Texas ADR Section, 2010*

*Best Lawyer in Dallas, Alternative Dispute Resolution, D Magazine, 2013-2016*

*Super Lawyer, Texas Super Lawyers by Thompson Reuters, 2012-2015*

*Best Lawyer, Alternative Dispute Resolution Category, Best Lawyers in America, 2008-2017*

*Best Lawyer in Dallas/Fort Worth, Arbitration Category, Texas' Best Lawyers, 2017*

- State Bar of Texas ADR Section Representative to Texas Mediator Credentialing Assoc. (2009-2012)
- Council Member (2005-2012), Vice Chair (2010), Chairman (2011), Immediate Past Chair (2012), Dallas Bar Assoc. Labor and Employment Law Section
- Member, State Bar of Texas Oil, Gas & Energy Resources Section (2014-2016)
- Member, Dallas Bar Association Energy Law Section (2014-2016)
- Adjunct Professor, Texas Tech University School of Law (Spring, 2013; Spring, 2014; Spring 2015; Spring 2016)
- Martindale-Hubbell AV rated since 1988

### Background and Education

- A former commercial litigator, Ms. Morgan has tried and argued cases from the trial courts to the Texas Supreme Court, the 5th Circuit, and the U.S. Supreme Court
- Negotiation, mediation, and advanced mediation courses, Straus Institute for Dispute Resolution at Pepperdine University School of Law, 1991-2010
- Mediation and negotiation courses, Harvard Law School, 1992
- Chartered Institute of Arbitrators, Introduction to International Arbitration, 2012
- College of the State Bar of Texas
- J.D., Texas Tech University School of Law
  - Phi Delta Phi
  - National Order of Barristers
- B.A., (Mass Communications), Abilene Christian University
- Extensive travel with two trips around the world including one in 2013 covering ten countries in 73 days; has traveled five continents and is culturally sensitive to many different customs and religions

### Disclaimer

This page is for general information purposes.  JAMS makes no representations or warranties regarding its accuracy or completeness.  Interested persons should conduct their own research regarding information on this website before deciding to use JAMS, including investigation and research of JAMS neutrals. See More

**EXHIBIT I**                                          **PAGE 159**



# General Fee Schedule
*Cecilia H. Morgan, Esq.*

**PROFESSIONAL FEES**

**$500 per hour**

**$600 per hour outside of Texas**

**ARBITRATION FEES**
**Filing Fee**
$1,200 – Two Party Matter
$2,000 – Matters involving three or more parties
- Entire filing fee must be paid in full to expedite the commencement of the proceedings
- A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the Filing Fee is non-refundable

**Case Management Fee**
- 12% of Professional Fees
- Professional Fees include time spent for hearings, pre- and post-hearing reading and research, and award preparation.
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support. Weekends and holidays are subject to additional charges.

**FEES FOR OTHER MATTERS**
**(Discovery, Special Master, Reference, Appraisal and Neutral Analysis Matters)**
Initial non-refundable fee of $600 per party
Plus 12% of Professional Fees

**CANCELLATION/CONTINUANCE POLICY**

| | Cancellation/Continuance Period | Fee |
|---|---|---|
| 1 to 2 days | 30 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 3 to 4 days | 45 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 5 days or more | 60 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| Hearings of any length | Inside the cancellation/continuance period | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued after the cancellation date unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the cancelling or continuing party is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration order or award.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is $400. The employer must bear the remainder of the employee's share of the filing fee and all Case Management Fees. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. The company must bear the remainder of the consumer's share of the filing fee and all Case Management Fees.
- Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $500, and $500 every six months thereafter. If a party refuses to pay the assessed fee, the other party or parties may opt to pay the entire fee on behalf of all parties, otherwise the matter will be closed.

JAMS agreement to render services is with the attorney, the party, and/or other representatives of the party.

**Atlanta • Boston • Chicago • Dallas • Greenbelt • Miami • Minneapolis • New York • Philadelphia • Washington**
www.jamsadr.com • Updated 10/01/16

**EXHIBIT I**                                    **PAGE 160**

11/28/2017                                        Thomas_Linda_Business_Commercial_1069





**T:** 214-744-5267
**F:** 214-720-6010

**Case Manager**
Beth Langs
JAMS
8401 N. Central
Expressway
Suite 610
Dallas, TX 75225
**T:** 214-891-4520
**F:** 214-720-6010
blangs@jamsadr.com

*"Thanks for doing an excellent job. My client and I were so thrilled with your dedication, insight and hard work— to say nothing of your intelligence and knowledge of the law."*

"Thank you for a fantastic effort in getting this matter settled. You were calm, measured, and directed. You worked both rooms and kept us all from getting really worked up. My client could not stop singing your praises. I'll recommend you to my [colleagues]."

--Attorneys who have worked with Chief Justice Thomas

### Hon. Linda B. Thomas (Ret.)
Business/Commercial

Chief Justice Thomas has extensive experience arbitrating, mediating, and serving as a neutral evaluator for commercial disputes, and works closely with parties to craft creative resolutions to even the most complex matters. She is lauded for her definitive legal knowledge and business acumen, and is able to make fair and reasoned decisions and recommendations.

Chief Justice Thomas has particular expertise resolving complex corporate and partnership dissolutions, which are often tied to strained personal relationships that present additional challenges and conflicts for litigants. With her ability to anticipate and work through these issues, Chief Justice Thomas is well suited to helping parties resolve their disputes and move on with their lives and livelihoods.

**Representative Matters**

- Arbitrated consumer dispute involving allegations against finance company of harassing and abusive debt collection practices
- Breach of contract claims involving commercial leases and leasing agent fees
- Breach of contract matters involving breach of warranty
- Breach of contract mediation involving appellate dispute over attorney fees
- Breach of contract mediation involving land development issues
- Breach of contract mediation over airport concession agreements
- Claims based on business torts, fraud, negligence, and interference with contractual relationships
- Contract dispute mediation between oil and gas drilling companies
- Contract dispute mediation involving precious metals companies
- Development and distribution of wind energy
- Insurance coverage mediation that included claim of breach of covenant of good faith and fair dealing
- International medical business dissolution mediation
- Mediated appellate case involving contract dispute between two online game companies
- Mediated breach of implied contract, fraud, and breach of covenant of good faith and fair dealing matter
- Mediated contract dispute between electricity provider and apartment management company
- Mediated contract dispute between sports event organizer and photography company
- Mediation involving breach of contract, fraud, and business dissolution issues
- Mediator for interstate insurance coverage dispute between multiple parties
- Mediator for medical professional partnership dissolution
- Mediator on business dissolution involving international parties
- Neutral evaluation for contract dispute between electrical power provider and public transit system
- Pre-litigation mediation involving business dissolution of religious organizations
- Served as neutral evaluator for contract dispute between major airline and large travel booking technology company

**Honors, Memberships, and Professional Activities**

- Best Lawyer in ADR/Mediation, *D Magazine* reader survey, 2014
- Credentialed Advanced Mediator, Texas Mediator Credentialing Association, 2013-2014
- Lifetime Achievement Award, Judicial Section of State Bar of Texas, 2013
- Women in Law Distinguished Alumni Appreciation Award, SMU Dedman School of Law, 2010
- Distinguished Alumni Award for Judicial Service, SMU Dedman School of Law, 2008
- Award of Excellence for outstanding service to the judiciary, 2005
- Dallas Bar Foundation Fellows Award in honor of a distinguished legal career and civic contributions, 2005
- Outstanding Profile Award for dedication, mentoring, and support of individuals in pursuit of public service, Texas Women's Initiative, 2005
- SMU Award for significant contributions to improving the lives of women and children, 2004

https://www.jamsadr.com/linda-thomas/business_commercial                                          1/2

**EXHIBIT I**                                                      **PAGE 161**

11/28/2017                                    Thomas_Linda_Business_Commercial_1069

- Judge-of-the-Year Award for outstanding service and dedication to preserving the right of civil trial by jury, ABOTA, 1998
- Distinguished Visiting Professor of Law, teaching trial and appellate procedure as well as family law, SMU Dedman School of Law, 2003-present
- Faculty, National Judicial College, 1992-present
- Commissioner, Texas Access to Justice Commission, 2007-2010
- Member, Texas Judicial Council, 2005-2010
- Chair, Texas Council of Chief Justices, 2003
- Member, Texas Commission on Judicial Efficiency, 1995-1997
- Chair, Judicial Section of State Bar of Texas, 1991-1992
- Chair, Board of Directors, Texas Center for the Judiciary, Inc., 1991-1992 (Secretary-Treasurer, 1993-1996)
- Faculty member, Texas College for New Judges, 1981-1996, 2005-2006 (Dean, 1988-1993)
- Dean, Texas Regional Judicial Conferences, 1987-1990
- A nationally recognized leader in continuing legal and judicial education, she is a frequent speaker and author for continuing education programs, teaching attorneys, judges, court personnel, and judicial educators throughout the United States

**Background and Education**
- Straus Institute for Dispute Resolution, Pepperdine University, 2011
- Advanced Family Mediation Training, 20-hour course, American Bar Association, 2011
- Family Mediation Training, 40-hour course, American Bar Association, 2009
- Basic Mediator Training, 21-hour course, American Academy of Attorney-Mediators, Inc., 1995
- Chief Justice, Fifth District Court of Appeals, Dallas, Texas, 1995-2009
- Justice, Fifth District Court of Appeals, Dallas, Texas, 1987-1994
- Judge, 256th District Court, Dallas County, Texas, 1979-1986
- Partner, Martin, Harrison and Withers, 1977-1979
- Sole Practitioner, 1975-1977
- Attorney, Bureau of Alcohol, Tobacco and Firearms, 1974-1975
- Associate Director, SMU Legal Clinic, 1973-1974
- J.D., Southern Methodist University, 1973
- B.A., University of Texas at Arlington, 1970

**Disclaimer**

This page is for general information purposes.  JAMS makes no representations or warranties regarding its accuracy or completeness.  Interested persons should conduct their own research regarding information on this website before deciding to use JAMS, including investigation and research of JAMS neutrals. See More

**EXHIBIT I**                                    **PAGE 162**



# General Fee Schedule

*Hon. Linda Thomas (Ret.)*

## PROFESSIONAL FEES

**Daily Rate** ................................................ **$5,000**
Each day not to exceed 10 hours of hearing time on the scheduled day.

- Other professional time, including additional hearing time, pre and post hearing reading and research, and conference calls, will be billed at $500 per hour.

## ARBITRATION FEES
**Filing Fee**
$1,200 – Two Party Matter
$2,000 – Matters involving three or more parties
- Entire filing fee must be paid in full to expedite the commencement of the proceedings
- A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the Filing Fee is non-refundable

**Case Management Fee**
- 12% of Professional Fees
- Professional Fees include time spent for hearings, pre- and post-hearing reading and research, and award preparation.
- The Case Management Fee includes access to an exclusive neutral panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support. Weekends and holidays are subject to additional charges.

## FEES FOR OTHER MATTERS
**(Discovery, Special Master, Reference, Appraisal and Neutral Analysis Matters)**
Initial non-refundable fee of $600 per party
Plus 12% of Professional Fees

## CANCELLATION/CONTINUANCE POLICY

| Number of Days | Cancellation/Continuance Period | Fee |
| --- | --- | --- |
| 1 day or less | 30 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 2 to 4 days | 45 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 5 days or more | 60 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| Hearings of any length | Inside the cancellation/continuance period | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued after the cancellation date unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the cancelling or continuing party is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration order or award.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is $400. The employer must bear the remainder of the employee's share of the filing fee and all Case Management Fees. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. The company must bear the remainder of the consumer's share of the filing fee and all Case Management Fees.
- Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $500, and $500 every six months thereafter. If a party refuses to pay the assessed fee, the other party or parties may opt to pay the entire fee on behalf of all parties, otherwise the matter will be closed.

JAMS agreement to render services is with the attorney, the party and/or other representatives of the party.

**Atlanta • Boston • Chicago • Dallas • Greenbelt • Miami • Minneapolis • New York • Philadelphia • Washington**
www.jamsadr.com • Updated 04/14/17

**EXHIBIT I**                    **PAGE 163**

11/28/2017                          Whittington_Mark_Business_Commercial_1041





**T:** 214-744-5267
**F:** 214-720-6010

**Case Manager**

Carolina El'Azar
JAMS
8401 N. Central
Expressway
Suite 610
Dallas, TX 75225
**T:** 214-891-4525
**F:** 214-720-6010
celazar@jamsadr.com

**Hon. Mark Whittington (Ret.)**
Business/Commercial

Hon. Mark Whittington (Ret.) spent 25 years on the bench at the trial and appellate levels handling complex business and commercial matters, while also helping to institute ADR programs for the courts. Paired with his expertise as an arbitrator, mediator, and special master, Justice Whittington's background and experience make him well suited to resolve a wide range of complex business-related cases. These include matters involving breach of contract, breach of fiduciary duty, fraud, unjust enrichment, and deceptive trade practice issues.

**Representative Matters**
- Appeal of multi-million-dollar judgment for breach of contract involving sale of ongoing retail furniture business
- Breach of contract, breach of fiduciary duty, and fraud claims by limited partner against managing partner for transfer of limited partnership assets in violation of partnership agreement
- Multi-million-dollar claims for breach of fiduciary duty and fraud by limited partners in pharmaceutical manufacturing and marketing enterprise against general partner and other limited partners
- Breach of contract and unjust enrichment claims brought by trade show services provider against aerospace trade show promoter and exhibitors
- Appeal of multi-million-dollar default judgment against lender by borrower involving claims for breach of contract and breach of fiduciary duty with respect to escrow funds and conversion
- Breach of contract, fraud, and deceptive trade practices claims brought by purchaser of multi-million-dollar yacht against manufacturer and seller for defective design and construction of craft
- Purchaser's breach of contract, fraud, and injunctive relief claims against seller of retail shopping center
- Multi-million-dollar claims for fraud, negligence, and breach of contract brought by corporation against developer of information technology systems for design and inventory management

**Honors, Memberships, and Professional Activities**
- Best Lawyers in Dallas, Alternative Dispute Resolution, *D Magazine*
- Outstanding Civil Jurist Award, American Board of Trial Advocates
- Judicial Pro Bono Award, North Texas Legal Services
- Sustaining Life Fellow, Texas Bar Foundation
- Sustaining Life Fellow, Dallas Bar Foundation
- Master, William "Mac" Taylor Inn of Court

**Background and Education**
- Justice, Fifth District Court of Appeals, Dallas, TX, 1993-2008
- Judge, 160th State District Court, Dallas, TX, 1987-1992
- Judge, County Court at Law, Dallas, TX, 1983-1986
- J.D., University of Houston

**Disclaimer**

This page is for general information purposes. JAMS makes no representations or warranties regarding its accuracy or completeness. Interested persons should conduct their own research regarding information on this website before deciding to use JAMS, including investigation and research of JAMS neutrals. See More

**EXHIBIT I**                                          **PAGE 164**



# General Fee Schedule

*Hon. Mark Whittington Ret.*

## PROFESSIONAL FEES

Daily Rate .............................................................. **$5,000**          Outside of Texas ..................................................... **$6,000**

Includes up to 8 hours of hearing time on the scheduled day, and
Up to 2 hours reading and research.

Other professional time, including additional session time,
Pre and post session reading and research, and conference calls,
Will be billed at $500 per hour.

## ARBITRATION FEES
**Filing Fee**
$1,200 – Two Party Matter
$2,000 – Matters involving three or more parties
- Entire filing fee must be paid in full to expedite the commencement of the proceedings
- A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the Filing Fee is non-refundable

**Case Management Fee**
- 12% of Professional Fees
- Professional Fees include time spent for hearings, pre- and post-hearing reading and research, and award preparation.
- The Case Management Fee includes access to an exclusive nationwide panel of judges, attorneys, and other ADR experts, dedicated services including all administration through the duration of the case, document handling, and use of JAMS conference facilities including after hours and on-site business support. Weekends and holidays are subject to additional charges.

## FEES FOR OTHER MATTERS
**(Discovery, Special Master, Reference, Appraisal and Neutral Analysis Matters)**
Initial non-refundable fee of $600 per party
Plus 12% of Professional Fees

## CANCELLATION/CONTINUANCE POLICY

| Number of Days | Cancellation/Continuance Period | Fee |
|---|---|---|
| 1 day or less | 30 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 2 to 4 days | 45 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| 5 days or more | 60 days or more prior to hearing | 100% REFUNDABLE, except for time incurred |
| Hearings of any length | Inside the cancellation/continuance period | NON-REFUNDABLE |

- Unused hearing time is non-refundable.
- Hearing fees are non-refundable if time scheduled (or a portion thereof) is cancelled or continued after the cancellation date unless the Arbitrator's time can be rescheduled with another matter. The cancellation policy exists because time reserved and later cancelled generally cannot be replaced. In all cases involving non-refundable time, the cancelling or continuing party is responsible for the fees of all parties.
- A retainer for anticipated preparation and follow-up time will be billed to the parties. Any unused portion will be refunded.
- All fees are due and payable upon receipt of invoice and payment must be received in advance of hearing. JAMS reserves the right to cancel your hearing if fees are not paid by all parties by the applicable cancellation date and JAMS confirms the cancellation in writing.
- Receipt of payment for all fees is required prior to service of an arbitration order or award.
- For arbitrations arising out of employer-promulgated plans, the only fee that an employee may be required to pay is $400. The employer must bear the remainder of the employee's share of the filing fee and all Case Management Fees. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually negotiated agreement or contract will be determined by JAMS, whose determination shall be final.
- For arbitrations arising out of pre-dispute arbitration clauses between companies and individual consumers, JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses, Minimum Standards of Procedural Fairness applies. In those cases, when a consumer (as defined by those Minimum Standards) initiates arbitration against the company, the only fee required to be paid by the consumer is $250. The company must bear the remainder of the consumer's share of the filing fee and all Case Management Fees.
- Parties that, through mutual agreement, have held their case in abeyance for one year will be assessed an annual abeyance fee of $500, and $500 every six months thereafter. If a party refuses to pay the assessed fee, the other party or parties may opt to pay the entire fee on behalf of all parties, otherwise the matter will be closed.

JAMS agreement to render services is with the attorney, the party and/or other representatives of the party.

**Atlanta • Boston • Chicago • Dallas • Greenbelt • Miami • Minneapolis • New York • Philadelphia • Washington**
www.jamsadr.com • Updated 04/14/17

**EXHIBIT I**                                                                                              **PAGE 165**

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc.
Reference No. 1310023417

    I, Carolina ElAzar, not a party to the within action, hereby declare that on  November 28, 2017, I served the attached COMMENCEMENT OF ARBITRATION on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Dallas, TEXAS, addressed as follows:

Brian J. O'Toole Esq.
Bridget K. O'Shaughnessy Esq.
O'Toole Atwell, PC
504 Lavaca St.
Suite 1010
Austin, TX   78701
Phone: 512-476-4537
botoole@otoole-atwell.com
boshaughnessy@otoole-atwell.com
    Parties Represented:
    Faith Business Management Co., Inc dba Natio

Brad Amir Mokri Esq.
Mokri & Associates
1851 E. First Street
Suite 900
Santa Ana, CA   92705
Phone: 714-619-9395
mokri@sbcglobal.net
    Parties Represented:
    Buy Insta Slim, Inc.

    I declare under penalty of perjury the foregoing to be true and correct. Executed at Dallas, TEXAS on  November 28, 2017.

Carolina ElAzar
celazar@jamsadr.com

**EXHIBIT I**                                           **PAGE 166**

| From: | Brad Mokri |
|---|---|
| To: | Carolina ElAzar; Bridget OShaughnessy; Brian OToole |
| Subject: | [SPAM]Re: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417 |
| Date: | Tuesday, December 5, 2017 3:46:22 PM |

Dear Ms. El'Azar
To be clear, I have been retained to represent Buy Insta Slim in an action against Wall Mart and Faith Business Management Company, not the arbitration. Buy Insta Slim disputes the enforceability of the arbitration agreement.
Thanks,
Brad

*Brad A. Mokri*

LAW OFFICES OF
_____
**MOKRI & ASSOCIATES**
**1851 E. First Street, Suite 900**
**Santa Ana, California 92705**
**Tel: (714) 619-9395**
**Fax: (888) 342-1406**

***************************************************
*The information contained in this email is CONFIDENTIAL and/or privileged, including attachments. This EMAIL and ATTACHMENT is intended to be reviewed by only the individual named in the body of the above email. Any improper use or disclosure of the information contained herein is strictly prohibited.*

---

**From:** Carolina ElAzar <celazar@jamsadr.com>
**To:** "boshaughnessy@otoole-atwell.com" <boshaughnessy@otoole-atwell.com>; "botoole@otoole-atwell.com" <botoole@otoole-atwell.com>
**Cc:** Brad Mokri <mokri@sbcglobal.net>
**Sent:** Tuesday, December 5, 2017 9:06 AM
**Subject:** RE: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417

Dear Counsel,

JAMS has received below correspondence from Mr. Mokri, advising that he has not been retained as counsel for the arbitration. I will need Claimant's counsel to reserve the demand of arbitration on the Respondent and provide JAMS with a proof a service.

If you have any questions, please feel free to contact me directly at 214-891-4525.

Best regards,
Carolina El'Azar

**Exhibit H**

**EXHIBIT I**                    **PAGE 167**



**Carolina El'Azar**
Sr. Case Manager

8401 N. Central Expressway, Suite 610
Dallas, TX 75225
**P:** 214.891.4525
**F:** 214.720-6010

JAMS was named <u>Mediation Firm of the Year</u> in *Who's Who Legal* 2017.

<u>U.S.</u> | <u>International</u> | <u>LinkedIn</u> | <u>Twitter</u>

**From:** Brad Mokri [mailto:mokri@sbcglobal.net]
**Sent:** Wednesday, November 29, 2017 1:29 PM
**To:** Carolina ElAzar <celazar@jamsadr.com>
**Subject:** Re: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417

Dear Ms. El'Azar
I have not been retained to represent Buy Insta Slim in the arbitration claim by Faith Business Management. I will inquire from Buy Insta Slim whether it intends to retain my services to represent Buy Insta Slim in the arbitration and will let you know within the next couple days.
Thanks,
Brad

*Brad A. Mokri*

LAW OFFICES OF

**MOKRI & ASSOCIATES**
**1851 E. First Street, Suite 900**
**Santa Ana, California 92705**
**Tel: (714) 619-9395**
**Fax: (888) 342-1406**

****************************************************
*The information contained in this email is CONFIDENTIAL and/or privileged, including attachments. This EMAIL and ATTACHMENT is intended to be reviewed by only the individual named in the body of the above email. Any improper use or disclosure of the information contained herein is strictly prohibited.*

**From:** Carolina ElAzar <celazar@jamsadr.com>
**To:** "botoole@otoole-atwell.com" <botoole@otoole-atwell.com>; "mokri@sbcglobal.net"

**EXHIBIT I**                                                    **PAGE 168**

<mokri@sbcglobal.net>; "boshaughnessy@otoole-atwell.com" <boshaughnessy@otoole-atwell.com>
**Cc:** "gmokrilaw@yahoo.com" <gmokrilaw@yahoo.com>
**Sent:** Tuesday, November 28, 2017 5:28 AM
**Subject:** Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417

Dear Counsel,

Please find attached the Commencement of Arbitration in the above matter. If you have any questions, please feel free to contact me directly at 214-891-4525.

Best regards,
Carolina El'Azar



**Carolina El'Azar**
Sr. Case Manager

8401 N. Central Expressway, Suite 610
Dallas, TX 75225
**P:** 214.891.4525
**F:** 214.720-6010

JAMS was named Mediation Firm of the Year in *Who's Who Legal* 2017.

U.S. | International | LinkedIn | Twitter

**EXHIBIT I**                    **PAGE 169**

| From: | Brian OToole |
|---|---|
| To: | Brad Mokri; Bridget OShaughnessy |
| Subject: | RE: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417 |
| Date: | Tuesday, December 5, 2017 4:18:44 PM |

So this is how it's going to be.

What's the basis for disputing the agreement to arbitrate?  Looks pretty clear to me.

**From:** Brad Mokri [mailto:mokri@sbcglobal.net]
**Sent:** Tuesday, December 5, 2017 3:39 PM
**To:** Carolina ElAzar <celazar@jamsadr.com>; Bridget OShaughnessy <boshaughnessy@otoole-atwell.com>; Brian OToole <botoole@otoole-atwell.com>
**Subject:** Re: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417

Dear Ms. El'Azar
To be clear, I have been retained to represent Buy Insta Slim in an action against Wall Mart and Faith Business Management Company, not the arbitration. Buy Insta Slim disputes the enforceability of the arbitration agreement.
Thanks,
Brad

*Brad A. Mokri*

**LAW OFFICES OF**

**MOKRI & ASSOCIATES**

**1851 E. First Street, Suite 900**
**Santa Ana, California 92705**
**Tel:  (714) 619-9395**
**Fax: (888) 342-1406**

**************************************************
*The information contained in this email is CONFIDENTIAL and/or privileged, including attachments. This EMAIL and ATTACHMENT is intended to be reviewed by only the individual named in the body of the above email. Any improper use or disclosure of the information contained herein is strictly prohibited.*

---

**From:** Carolina ElAzar <celazar@jamsadr.com>
**To:** "boshaughnessy@otoole-atwell.com" <boshaughnessy@otoole-atwell.com>; "botoole@otoole-atwell.com" <botoole@otoole-atwell.com>
**Cc:** Brad Mokri <mokri@sbcglobal.net>
**Sent:** Tuesday, December 5, 2017 9:06 AM
**Subject:** RE: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417

**Exhibit I**

**EXHIBIT I**                                                    **PAGE 170**

Dear Counsel,

JAMS has received below correspondence from Mr. Mokri, advising that he has not been retained as counsel for the arbitration.  I will need Claimant's counsel to reserve the demand of arbitration on the Respondent and provide JAMS with a proof a service.

If you have any questions, please feel free to contact me directly at 214-891-4525.

Best regards,
Carolina El'Azar



**Carolina El'Azar**
Sr. Case Manager

8401 N. Central Expressway, Suite 610
Dallas, TX 75225
**P:** 214.891.4525
**F:** 214.720-6010

JAMS was named Mediation Firm of the Year in *Who's Who Legal* 2017.

U.S. | International | LinkedIn | Twitter

**From:** Brad Mokri [mailto:mokri@sbcglobal.net]
**Sent:** Wednesday, November 29, 2017 1:29 PM
**To:** Carolina ElAzar <celazar@jamsadr.com>
**Subject:** Re: Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417

Dear Ms. El'Azar
I have not been retained to represent Buy Insta Slim in the arbitration claim by Faith Business Management. I will inquire from Buy Insta Slim whether it intends to retain my services to represent Buy Insta Slim in the arbitration and will let you know within the next couple days.
Thanks,
Brad

*Brad A. Mokri*

LAW OFFICES OF
_____
**MOKRI & ASSOCIATES**
1851 E. First Street, Suite 900
Santa Ana, California 92705

**EXHIBIT I**                                     **PAGE 171**

**Tel:  (714) 619-9395**
**Fax: (888) 342-1406**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*The information contained in this email is CONFIDENTIAL and/or privileged, including attachments. This EMAIL and ATTACHMENT is intended to be reviewed by only the individual named in the body of the above email. Any improper use or disclosure of the information contained herein is strictly prohibited.*

---

**From:** Carolina ElAzar <celazar@jamsadr.com>
**To:** "botoole@otoole-atwell.com" <botoole@otoole-atwell.com>; "mokri@sbcglobal.net" <mokri@sbcglobal.net>; "boshaughnessy@otoole-atwell.com" <boshaughnessy@otoole-atwell.com>
**Cc:** "gmokrilaw@yahoo.com" <gmokrilaw@yahoo.com>
**Sent:** Tuesday, November 28, 2017 5:28 AM
**Subject:** Faith Business Management Co., Inc dba National Direct Sales & Marketing vs. Buy Insta Slim, Inc. - REF# 1310023417

Dear Counsel,

Please find attached the Commencement of Arbitration in the above matter. If you have any questions, please feel free to contact  me directly at 214-891-4525.

Best regards,
Carolina El'Azar



**Carolina El'Azar**
Sr. Case Manager

8401 N. Central Expressway, Suite 610
Dallas, TX 75225
**P:** 214.891.4525
**F:** 214.720-6010

JAMS was named Mediation Firm of the Year in *Who's Who Legal* 2017.

U.S. | International | LinkedIn | Twitter

**EXHIBIT I**                                          **PAGE 172**

**Archived:** Friday, February 2, 2018 9:01:43 AM
**From:** cacd_ecfmail@cacd.uscourts.gov
**Sent:** Thursday, February 1, 2018 6:30:42 PM
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 8:18-cv-00011-AG-KES Buy Insta Slim, Inc. v. Faith Business Management Company, Inc. et al Motion to Compel Arbitration
**Sensitivity:** Normal

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Notice of Electronic Filing**

The following transaction was entered by Adams, Kevin on 2/1/2018 at 6:29 PM PST and filed on 2/1/2018

| | |
|---|---|
| **Case Name:** | Buy Insta Slim, Inc. v. Faith Business Management Company, Inc. et al |
| **Case Number:** | 8:18-cv-00011-AG-KES |
| **Filer:** | Faith Business Management Company, Inc. |
| **Document Number:** | 9 |

**Docket Text:**
NOTICE OF MOTION AND MOTION to Compel Arbitration filed by Defendant Faith Business Management Company, Inc.. Motion set for hearing on 3/5/2018 at 10:00 AM before Judge Andrew J. Guilford. (Attachments: # (1) Memorandum, # (2) Declaration of Brian O'Toole, # (3) Exhibit A to Declaration of Brian O'Toole, # (4) Exhibit B to Declaration of Brian O'Toole, # (5) Exhibit C to Declaration of Brian O'Toole, # (6) Exhibit D to Declaration of Brian O'Toole, # (7) Exhibit E to Declaration of Brian O'Toole, # (8) Exhibit F to Declaration of Brian O'Toole, # (9) Exhibit G to Declaration of Brian O'Toole, # (10) Exhibit H to Declaration of Brian O'Toole, # (11) Exhibit I to Declaration of Brian O'Toole) (Adams, Kevin)

**8:18-cv-00011-AG-KES Notice has been electronically mailed to:**

Brad A Mokri     amirmokri1@yahoo.com, gissou1@yahoo.com, gmokrilaw@yahoo.com

Kevin A Adams     kadams@mulcahyllp.com

Robert J Herrington     herringtonr@gtlaw.com, beattyc@gtlaw.com, freundr@gtlaw.com, LALitDock@gtlaw.com

Robert Sean Freund     freundr@gtlaw.com, kolbers@gtlaw.com

**8:18-cv-00011-AG-KES Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** C:\fakepath\Notice of Motion and Motion.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-0]
[202e4559754cbc67ea41b1a6c15f2491a76955f55d9530bfb2e1b5f78d260ded4dd
483f603d54c10d6e9f611357893deff625986430492f8e294298d8a390c]]
**Document description:** Memorandum
**Original filename:** C:\fakepath\P&A ISO Motion to Compel Arbitration (final).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-1]

**EXHIBIT I**          **PAGE 173**

[a04ff344502b199d003055aa3e2ba240d295ace4ea1c63982b8292f505fc0c05eee3 ad4b247e86417bfbcdd96ea93697b8cfbf8fccec9dd6c2724ad9305e8310]]

**Document description:**Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Decl OToole (final).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-2] [85fbca19cc78afe689bdf79b46f489ec7293af87f6fa6e2f3dbdbcbe4fcf0f3a80a10 6a4454084772f2e4f8de1466585f69fefcf10768a4a00b6e443ec9fd0efe]]

**Document description:**Exhibit A to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Mtn to Compel Ex A.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-3] [269772f1e3e9e902255571ccc0ff90d52ae785d57a5eae4eab501085dbae7872ff59 2b8df58404ddd1b8e22c4fdc7f13bb91d0119b0cb672e021a03efb7c47b1]]

**Document description:**Exhibit B to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Mtn to Compel Ex B.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-4] [75aa8045efb548e312d5923870e8439e72551d12fa832e7715981ffb0f63638e59d0 a1a2cede38a9adf070945bb1f80489ae39274931aa804ba1db829ce66efe]]

**Document description:**Exhibit C to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Exhibit C.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-5] [0f7a3e69981b31978ce1f9a11b7874dc4001e238087ea9ec408fb732fe29aca72edc b76d732357178942cbe67a4ff033cc34a4d9b99fc6bea9926d11c821757c4]]

**Document description:**Exhibit D to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Exhibit D.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-6] [89c94ce77273ed6800a32709bd8879d22ba9997f5f4bb2c0cb32a31bdba7875925b2 f99aa329f41a026a924e63f5f97ddb543a98633da6d6edfa3bc40000c020]]

**Document description:**Exhibit E to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Exhibit E.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-7] [0080dc1a36151a475a540f7b013a40ef2b0b1a9dab74946a2fae590446660b35b2b6 287bd60c801b02c0b3d32cfe34010a03e7a9924aa7cac451f8d2003a5e28]]

**Document description:**Exhibit F to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Exhibit F.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-8] [374009eb5accb4a57ce6650d35786d646443b5561d57f63b2d8139a2c209cf970fc2 79159498a74ab299dd59d1680c4e3052b433100bee4f12b71ee8c0606993]]

**Document description:**Exhibit G to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Exhibit G.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-9] [4396cf2f2b922ff0780b0b861872efd6eba6419c672c301dab285f968f0d6fb8c6ab 22cec7920f9103458c58a2bda39a42f8a7752f20fd7f70e401424771332c]]

**Document description:**Exhibit H to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Exhibit H.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-10 ] [031af1bcec71c8171ca7b7bbe0833b59e96b8f16316a70e5b447e91f195c3705e94 8d0fdc63fc7d6d954aa091104713969d0cb6612337c46e1c68b600f8fbb81]]

**Document description:**Exhibit I to Declaration of Brian O'Toole
**Original filename:**C:\fakepath\Exhibit I.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/1/2018] [FileNumber=24950760-11

**EXHIBIT I**                                     **PAGE 174**

] [12a404f6103abace4753d86bf42b02968963b42d9e05e7fac2eb8cf72653df6d77a
6b013e8e9b147fc64febb159472aa15ddd410a38b26a1edc4b218ecacdf11]]

**EXHIBIT I**                                          **PAGE 175**